**From:** Phillip Coulombe <phillip.coulombe@onlinedeliverytechnologies.com>
**Date:** September 20, 2021 at 12:08:52 PM EDT
**To:** Fabian Bello <fbello@journeyflight.com>
**Subject: Re: Pause until next week**


Hi Fabian,

Really, thanks for hanging in there -- I was *really* sick, and soon my whole family was as well, but thank God we are over it and finally I am back in the office this week. One of the short-term challenges I have at ODT will be onboarding support staff to cover things, as we're short handed without FL3XX directly involved.

I do need to state that this arrangement for Journey Aviation is absolutely unique, and I have been extremely careful to do this correctly. ODT has been providing server hosting for FL3XX, as every other US operator has direct services and support with them. However, for Journey, we have a privately hosted solution which, while maintained and supported independently, no party besides myself has access to the infrastructure or customer data.

To your last requirements,

1. Online Delivery Technologies, Inc. is a Delaware corporation 100% owned by me, **attached**. Originally I founded it as FL3XX, Inc., as my primary business is exclusively hosting the FL3XX platform at arm's length for the developer in the United States. For several reasons, I initiated a corporate amendment to name change to Online Delivery Technologies, Inc., and have established all of my business contracts in this name.
   o You can confirm my fl3xx.us domain ownership here: https://whois.domaintools.com/fl3xx.us
   o **Attached** you may review our license and data services agreement with FL3XX. This was executed May 28, and provides for ODT to:
      ▪ Host the platform in the United States
      ▪ Pay licensing fees to FL3XX
      ▪ Deliver the software for US Customers
      ▪ Receive feature updates to the codebase, review the updates and raw code, deploy to ODT servers
      ▪ Contract annually renewing for 30 years and difficult to terminate, to mitigate influence
2. Beyond a boiler-plate data protection addendum doc, I think you need a more comprehensive security outline which covers exactly how the software is architecturally

Exh. 4 - Declaration of Fabian Bello ISO Ex Parte Motion for TRO

isolated. If anything, this has to be an affidavit because it governs future, not just present, guidelines for Journey's data security. I'll need to draft this with my documentation counsel this week. However, I can initially brief here that,

- o I exclusively use domestic AWS-US East-West cloud servers for the app, redundancy, load balancing, and the databases
- o User data is stored in multiple databases for redundancy, plus backups to AWS glacial storage
- o This entire infrastructure is only accessible through my Amazon cloud root account.
- o When FL3XX deploys feature updates or hotfixes, I manually deploy them to fl3xx.us
- o In cases of specific user support, FL3XX simply *cannot* access your account
- o The iOS and Android mobile apps published by FL3XX GmbH have a connector option, whereby you can choose to connect to ODT's server. Journey logins are directed appropriately.

3. **Attached** you can review our $1m general liability and $100k data breach liability coverage with Hartford, attached. If you require additional coverage, I'm happy to check into something further or more specific.

We should have a call at some point, given that I have very little knowledge of Journey's internal requirements, customization needs, or the specific training/onboarding tasks that would need to be undertaken, and want to be able to build a roadmap to success here if we can manage the data protection end of things.

PC

Phillip Coulombe
CEO
Online Delivery Technologies, Inc.

CONFIDENTIALITY NOTICE: The contents of this email message and any attachments are intended solely for the addressee(s) and may contain confidential and/or privileged information and may be legally protected from disclosure.

On Thu, Sep 16, 2021 at 12:23 AM Fabian Bello <fbello@journeyflight.com> wrote:

Hey Phillip,


Hope you are OK.  Better now?


Any update?


Thanks.


Best regards,

Exh. 4 - Declaration of Fabian Bello ISO Ex Parte Motion for TRO

Fabian Bello

CEO

Journey Aviation

**From:** Phillip Coulombe <phillip.coulombe@onlinedeliverytechnologies.com>
**Date:** Thursday, August 19, 2021 at 10:56 AM
**To:** Fabian Bello <fbello@journeyflight.com>
**Subject:** Pause until next week

Dear Fabian,

I've been flat on my back with Covid this week and entirely out of the office, hence the slow replies, but I didn't want to drop your last request without a note. I'll return to your documentation requirements next week.

PC

--

**Phillip Coulombe** | **Online Delivery Technologies**

**a:** 1 Aviation Lane, Greenville, SC 29607
**e:** phillip.coulombe@onlinedeliverytechnologies.com
**m:** +1 (818) 665-9971

Exh. 4 - Declaration of Fabian Bello ISO Ex Parte Motion for TRO

**ACTION BY WRITTEN CONSENT**
**OF THE SOLE INCORPORATOR**
**OF**

**Online Delivery Technologies Inc.,**
a Delaware Corporation,
April 2, 2021

The undersigned, acting as the sole incorporator of Online Delivery Technologies Inc., a Delaware corporation (the "Corporation"), hereby approves and adopts the following resolutions by this written consent without a meeting (this "Written Consent") pursuant to Section 108 of the Delaware General Corporation Law, which shall be effective upon the commencement of the corporation's existence:

RESOLVED, that the bylaws regulating the conduct of the Corporation's business and affairs, in the form attached to this Written Consent, are hereby adopted as the bylaws of the Corporation ("Bylaws").

RESOLVED FURTHER, that the Secretary of the Corporation is hereby authorized and directed to execute a certificate of the adoption of the Bylaws, to insert the Bylaws as so certified and as may be amended from time to time, in the minute book of the Corporation and to see that a copy of the Bylaws, similarly certified, is kept at the principal executive office for the transaction of business of the Corporation, as required by law.

RESOLVED FURTHER, that each person named below is hereby elected to serve as a director of the Corporation until such time as his or her successor is duly elected and qualified:

Phillip Coulombe

RESOLVED FURTHER, that the officers of the Corporation, as elected by the Corporation's Board of Directors, are authorized and directed to insert a copy of this Written Consent in the minute book of the Corporation.

RESOLVED FURTHER, that the undersigned, the sole incorporator of the Corporation, hereby resigns as the incorporator of the Corporation, effective upon the commencement of the corporation's existence.

IN WITNESS WHEREOF, the undersigned executes this Written Consent as of the date set forth above.

By: Phillip Coulombe
Sole Incorporator

**BYLAWS**

**OF**

**Online Delivery Technologies Inc.,**
**a Delaware Corporation**

ARTICLE I

**Stockholders**

Section 1.1. **Annual Meetings**. An annual meeting of stockholders of Online Delivery Technologies Inc. shall be held for the election of directors on a date and at a time and place either within or without the state of Delaware fixed by resolution of the Board of Directors. Any other proper business may be transacted at the annual meeting.

Section 1.2. **Special Meetings**. Special meetings of the stockholders may be called at any time by the Board of Directors, the Chairman of the Board of Directors or the holders of shares entitled to cast not less than ten percent of the votes at the meeting, such meeting to be held on a date and at a time and place either within or without the state of Delaware as may be stated in the notice of the meeting. Business transacted at any special meeting of the stockholders shall be limited to the purposes stated in the notice.

Section 1.3. **Notice of Meetings**. Whenever stockholders are required or permitted to take any action at a meeting, a written notice of the meeting shall be given not less than ten nor more than sixty days before the date of the meeting to each stockholder entitled to vote thereat. If mailed, such notice shall be deemed to be given when deposited in the United States mail, postage prepaid, directed to the stockholder at such stockholder's address as it appears on the records of the Corporation. Such notice shall state the place, date and hour of the meeting, and in the case of a special meeting, the general purpose for which the meeting is called.

Section 1.4. **Adjournments**. Any meeting of stockholders may be adjourned from time to time, to reconvene at the same or some other place. Notice need not be given of any such adjourned meeting if the date, time and place thereof are announced at the meeting at which the adjournment is taken. At the adjourned meeting the Corporation may transact any business which might have been transacted at the original meeting. If the adjournment is for more than 30 days or if after the adjournment a new record date is fixed for the adjourned meeting, a notice of the adjourned meeting shall be given to each stockholder of record entitled to vote at the meeting.

Section 1.5. **Quorum**. At each meeting of stockholders, except where otherwise provided by law or the certificate of incorporation or these bylaws, the holders of a majority of the outstanding shares of stock entitled to vote, represented in person or by proxy, shall constitute a quorum at a meeting of the stockholders. In the absence of a quorum, any meeting of stockholders may be adjourned from time to time by the vote of a majority of the shares represented either in person or by proxy until a quorum is present or represented. Shares of its own capital stock belonging to the Corporation or to another Corporation where the majority of the voting power is held by the Corporation shall nether be entitled to vote nor counted for quorum purposes; provided, however, that the foregoing shall not limit the right of the Corporation to vote stock, including but not limited to its own stock, held by it in a fiduciary capacity.

Section 1.6. **Organization**. Meetings of stockholders shall be presided over by the Chairman of the Board of Directors, if any, or in the absence of the Chairman of the Board of Directors by the Vice Chairman of the Board of Directors, if any, or in the absence of the Vice Chairman of the Board of Directors by the President, or in the absence of the foregoing persons by a chairman designated by the Board of Directors, or in the absence of such designation by a chairman chosen at the meeting. The Secretary, or in the absence of the Secretary, an Assistant Secretary, shall act as secretary of the meeting, or in their absence the chairman of the meeting may appoint any person to act as secretary of the meeting.

Section 1.7. **Voting**. Unless otherwise provided in the certificate of incorporation, each stockholder entitled to vote at any meeting of stockholders shall be entitled to one vote for each share held by such stockholder which has voting power upon the matter in questions. Directors shall be elected by a plurality of the votes of the shares present in person or represented by proxy at the meeting and entitled to vote on the election of directors. In all other matters, unless otherwise provided by law or by the certificate of incorporation or these bylaws, the affirmative vote of the holders of a majority of the shares present in person or represented by proxy and entitled to vote on the subject matter at a meeting in which a quorum is present shall be the act of the stockholders. Where a separate vote by class or classes is required, the affirmative vote of the holders of a majority of the shares of such class or classes present in person or represented by proxy shall be the act of such class or classes, except as otherwise provided by law or by the certificate of incorporation or these bylaws.

Section 1.8. **Stockholder's Proxies**. Every person entitled to vote or to express consent or dissent to corporate action in writing without a meeting may authorize another person or persons to act by proxy with respect to such shares. No proxy shall be voted or acted on after three years from its date, unless the proxy provides for a longer period. Every proxy continues in full force and effect until revoked by the person executing it. Such revocation may be effected by a writing delivered to the Corporation stating that the proxy is revoked or by a subsequent proxy executed by the person executing the prior proxy and presented to the meeting, or as to any meeting by attendance at such meeting and voting in person by the person executing the proxy.

Section 1.9. **Fixing Date for Determination of Stockholders of Record**. In order that the Corporation may determine the stockholders entitled to notice of any meeting, the Board of Directors may fix a record date, which shall not be more than sixty nor less than ten days prior to the date of such meeting, nor shall the record date precede the date upon which the resolution fixing the record date is adopted by the Board of Directors. In order that the Corporation may determine the stockholders entitled to consent to corporate action without a meeting, the Board of Directors may fix a record date, which shall not precede, or be more than 10 days after, the date upon which the resolution fixing the record date is adopted by the Board of Directors. In order that the Corporation may determine the stockholders entitled to receive payment of any dividend or other distribution or allotment of any rights or of any other lawful action, the Board of Directors may fix a record date, which shall not be more than sixty days prior to such action.

If no record date is fixed: (1) the record date for determining stockholders entitled to notice of or to vote at a meeting of stockholders shall be at the close of business on the business day next preceding the day on which notice is given or, if notice is waived, at the close of business on the business day next preceding the day on which the meeting is held; (2) the record date for determining stockholders entitled to give consent to corporate action in writing without a meeting, when no prior action by the Board of Directors has been taken, shall be the day on which the first written consent is given; if prior action by the Board of Directors is required, then the record date shall be the close of business on the date the Board of Directors adopts the resolution taking such prior action, and (3) the record date for determining stockholders for any other purpose shall be at the close of business on the day on which the Board of Directors adopts the resolution relating thereto, unless the Board of Directors sets a new record date.

Section 1.10. **Consent of Stockholders in Lieu of Meeting**. Except as otherwise provided in the certificate of incorporation, any action which may be taken at any annual or special meeting of the stockholders may be taken without a meeting and without prior notice, if a consent in writing, setting forth the action so taken, shall be signed by the holders of outstanding shares having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all shares entitled to vote thereon were present and voted, and shall be delivered to the Corporation. Every written consent shall bear the date of signature of each stockholder who signs the consent, and no written consent shall be effective unless, within 60 days of the earliest consent, written consents signed by a sufficient number of holders have been delivered to the Corporation.

Unless all stockholders entitled to vote consent in writing, prompt notice of any stockholder approval without a meeting shall be given to those stockholders who have not consented in writing and who, if the action had been taken at a meeting, would have been entitled to notice of the meeting if the record date for such meeting had been the date that sufficient consents were delivered to the Corporation.

ARTICLE II

**Board of Directors**

Section 2.1. **Powers; Number; Qualifications**. The business and affairs of the Corporation shall be managed by, and all corporate powers shall be exercised by or under, the direction of the Board of Directors, except as otherwise provided by laws or in the certificate of incorporation. The Board of Directors shall consist of one or more members, the number thereof to be determined from time to time by the Board of Directors.

Section 2.2. **Election; Term of Office; Resignation; Removal; Vacancies**. Each director shall hold office until a successor has been elected and qualified or until his or her earlier resignation or removal. Any director may resign effective upon giving written notice to the Chairman of the Board of Directors, the President or the Secretary of the Corporation. Such resignation shall take effect at the time specified therein, and unless otherwise specified therein no acceptance of such resignation shall be necessary to make it effective. Any or all of the directors may be removed, with or without cause if such removal is approved by a majority of the outstanding voting shares then entitled to vote on the election of directors. Unless otherwise provided in the certificate of incorporation or in these bylaws, vacancies and newly-created directorships resulting from any increase in the authorized number of directors may be filled by a majority of the directors then in office, although less than a quorum, or by the sole remaining director.

Section 2.3. **Regular Meetings**. Regular meetings of the Board of Directors may be held without notice at such places within or without the state of Delaware and at such times as the Board of Directors may from time to time determine, and if so determined notice thereof need not be given.

Section 2.4. **Special Meetings; Notice of Meetings; Waiver of Notice**. Special meetings of the Board of Directors may be held at any time or place within or without the state of Delaware whenever called by the Chairman of the Board of Directors, by the Vice Chairman of the Board of Directors, if any, or by any two directors. Reasonable notice shall be given by the person or persons calling the meeting unless a director signs a waiver of notice or a consent to holding the meeting or an approval of the minutes thereof, whether before or after the meeting, or who attends the meeting without protesting the lack of notice prior to the meeting or at its commencement.

Section 2.5. **Participation in Meetings by Conference Telephone Permitted**. Members of the Board of Directors, or any committee designated by the Board of Directors, may participate in a meeting of the Board of Directors or of such committee, as the case may be, through the use of conference telephone or similar communications equipment by means of which all members participating in such meeting can hear one another, and participation in a meeting pursuant to this Section shall constitute presence in person at such meeting.

Section 2.6. **Quorum; Adjournment; Vote Required for Action**. At all meetings of the Board of Directors a majority of the authorized number of directors shall constitute a quorum for the transaction of business. The vote of a majority of the directors present at a meeting at which a quorum is present shall be the act of the Board of Directors unless the certificate of incorporation or these bylaws shall require a vote of a greater number.

Section 2.7. **Organization**. Meetings of the Board of Directors shall be presided over by the Chairman of the Board of Directors, or in the absence of the Chairman of the Board of Directors by the Vice Chairman of the Board of Directors, if any, or in their absence by a chairman chosen at the meeting. The Secretary, or in the absence of the Secretary an Assistant Secretary, shall act as secretary of the meeting, but in the absence of the Secretary and any Assistant Secretary the chairman of the meeting may appoint any person to act as secretary of the meeting.

Section 2.8. **Action by Directors Without a Meeting**. Any action required or permitted to be taken by the Board of Directors, or any committee thereof, may be taken without a meeting if all members of the Board of Directors or of such committee, as the case may be, consent in writing to such action and such consent is filed with the minutes of the proceedings of the Board of Directors.

Section 2.9. **Compensation of Directors**. The Board of Directors shall have the authority to fix the compensation of directors for services in any capacity.

ARTICLE III

**Committees**

Section 3.1. **Committees of Directors**. The Board of Directors may designate one or more committees, each consisting of one or more directors. Any committee, to the extent provided in the resolution of the Board of Directors, shall have and may exercise all the powers and authority of the Board of Directors, except that no such committee shall have power or authority with respect to the following matters:

a) Approving or adopting, or recommending to the stockholders, any action or matter expressly required by Delaware Corporation Law to be submitted to the stockholders for approval; or

Exh. 4 - Declaration of Fabian Bello ISO Ex Parte Motion for TRO

b) The amendment or repeal of the bylaws, or the adoption of new bylaws.

Section 3.2. **Committee Rules.** Unless the Board of Directors otherwise provides, each committee designated by the Board of Directors may adopt, amend and repeal rules for the conduct of its business. In the absence of a provision by the Board of Directors or a provision in the rules of such committee to the contrary, each committee shall conduct its business in the same manner as the Board of Directors conducts its business pursuant to Article II of these bylaws.

ARTICLE IV

**Officers**

Section 4.1. **Officers; Election**. As soon as practicable after the annual meeting of stockholders in each year, the Board of Directors shall elect a President and a Secretary, and if it so determines, elect from among its members a Chairman of the Board of Directors and a Vice Chairman of the Board of Directors. The Board of Directors may also elect one or more Vice Presidents, one or more Assistant Secretaries, and such other officers as the Board of Directors may deem desirable or appropriate and may give any of them such further designations or alternate titles, as it considers desirable.

Section 4.2. **Term of Office; Resignation; Removal; Vacancies**. Except as otherwise provided in the resolution of the Board of Directors electing any officer, each officer shall hold office until his or her successor is elected and qualified or until his or her earlier resignation or removal. Any officer may resign at any time upon written notice to the Board of Directors or to the Chairman of the Board of Directors or the Secretary of the Corporation. Such resignation shall take effect at the time specified therein, and unless otherwise specified therein no acceptance of such resignation shall be necessary to make it effective. The Board of Directors may remove any officer with or without cause at any time. Any such removal shall be without prejudice to the contractual rights of such officer, if any, with the Corporation, but the election of an officer shall not of itself create contractual rights. Any vacancy occurring in any office of the Corporation by death, resignation, removal or otherwise may be filled by the Board of Directors at any regular or special meeting.

Section 4.3. **Powers and Duties**. The officers of the Corporation shall have such powers and duties in the management of the Corporation as shall be stated in these bylaws or in a resolution of the Board of Directors which is not inconsistent with these bylaws and, to the extent not so stated, as generally pertain to their respective offices, subject to the control of the Board of Directors. The Secretary shall have the duty to record the proceedings of the meetings of the stockholders, the Board of Directors and any committees in a book to be kept for that purpose. The Board of Directors may require any officer, agent or employee to give security for the faithful performance of his or her duties.

ARTICLE V

**Forms of Certificates; Loss and Transfer of Shares**

Section 5.1. **Forms of Certificates**. Every holder of shares in the Corporation shall be entitled to have a certificate signed in the name of the Corporation by (1) the President, any Vice President, Chairman of the Board of Directors or Vice Chairman, and (2) by the Chief Financial Officer, Treasurer, Assistant Treasurer, Secretary or Assistant Secretary. Each certificate shall state the number of shares and the class or series of shares owned by such stockholder. If such certificate is manually signed by one officer or manually countersigned by a transfer agent or by a registrar, any other signature on the certificate may be a facsimile. In case any officer, transfer agent or registrar who has signed or whose facsimile signature has been placed upon a certificate shall have ceased to be such officer, transfer agent or registrar before such certificate is issued, it may be issued by the Corporation with the same effect as if such person were such officer, transfer agent or registrar at the date of issue.

If the Corporation is authorized to issue more than one class of stock or more than one series of any class, the powers, designations, preferences, relative or other special rights, qualifications, restrictions and limitations of each class or series shall be set forth in full or summarized on the face or back of the certificate representing such class or series of stock, provided that in lieu of the foregoing, there may be set forth on the back or face of the certificate a statement that the Corporation will furnish without charge to each stockholder who requests the powers, designations, preferences, relative or other special rights, qualifications, restrictions and limitations of such class or series.

Section 5.2. **Lost, Stolen or Destroyed Stock Certificates; Issuance of New Certificates**. The Corporation may issue a new share certificate or a new certificate for any other security in the place of any certificate theretofore issued by it, alleged to have been lost, stolen or destroyed, and the Corporation may require the owner of the lost, stolen or destroyed certificate, or such owner's legal representative, to give the Corporation a bond sufficient to indemnify it against any claim that may be made against it (including any expense or liability) on account of the alleged loss, theft or destruction of any such certificate or the issuance of such new certificate.

## ARTICLE VI

### Records

Section 6.1. **Records**. The Corporation shall keep a stock ledger, a list of stockholders and other books and records as may be required to run the Corporation. The Secretary shall have the duty to record the proceedings of the meetings of the stockholders, the Board of Directors and any committees in a book to be kept for that purpose.

Section 6.2. **Form of Records**. Any records maintained by the Corporation in the regular course of its business, including its stock ledger, books of account and minute books, may be kept on, or be in the form of, computer discs, magnetic tape, photographs, or any other information storage device, provided that the records so kept can be converted into clearly legible form within a reasonable time. The Corporation shall so convert any records so kept upon the request of any person entitled to inspect the same.

## ARTICLE VII

### Miscellaneous

Section 7.1. **Fiscal Year**. The fiscal year of the Corporation shall be determined by the Board of Directors.

Section 7.2. **Seal**. The Corporation may have a corporate seal which shall have the name of the Corporation inscribed thereon and shall be in such form as may be approved from time to time by the Board of Directors. The corporate seal may be used by causing it or a facsimile thereof to be impressed or affixed or in any other manner reproduced.

Exh. 4 - Declaration of Fabian Bello ISO Ex Parte Motion for TRO

Section 7.3. **Waiver of Notice of Meetings of Stockholders, Directors and Committees**. Whenever notice is required to be given by law or under any provision of the certificate of incorporation or these bylaws, a written waiver thereof, signed by the person entitled to notice, whether before or after the time stated therein, shall be deemed equivalent of notice. Attendance of a person at a meeting shall constitute a waiver of notice of such meeting, except when the person attends a meeting for the express purpose of objecting, at the beginning of the meeting, to the transaction of any business because the meeting is not lawfully called or convened. Neither the business to be transacted at, nor the purpose of, any regular or special meeting of the stockholders, directors or members of a committee of directors need be specified in any written waiver of notice unless required in the certificate of incorporation or these bylaws.

Section 7.4. **Interested Directors; Quorum**. No contract or transaction between the Corporation and one or more of its directors or between the Corporation and any other Corporation, firm or association in which one or more of its directors are directors, or have a financial interest, shall be void or voidable solely for this reason, or solely because such director or directors are present at the meeting of the Board of Directors or committee thereof which authorizes, approves or ratifies the contract or transaction, or solely because his or her or their votes are counted for such purpose, if: (1) the material facts as to his or her relationship or interest and as to the contract or transaction are fully disclosed or are known to the Board of Directors or the committee, and the Board of Directors or committee authorizes, approves or ratifies the contract or transaction in good faith authorizes the contract or transaction by the affirmative votes of a majority of the disinterested directors, even though the disinterested directors be less than a quorum; or (2) the material facts as to his or her relationship or interest and as to the contract or transaction are fully disclosed or are known to the stockholders and such contract or transaction is specifically approved by the stockholders in good faith by vote of the stockholders; or (3) the contract or transaction is fair as to the Corporation as of the time it is authorized, approved or ratified, by the Board of Directors, a committee thereof or the stockholders. Common or interested directors may be counted in determining the presence of a quorum at a meeting of the Board of Directors or of a committee which authorizes the contract or transaction.

Exh. 4 - Declaration of Fabian Bello ISO Ex Parte Motion for TRO

Section 7.5. **Indemnification**. The Corporation shall have the power to indemnify to the full extent permitted by law any person made or threatened to be made a party to any action, suit or proceeding, whether civil, criminal, administrative or investigative, by reason of the fact that such person or such person's testator or instate is or was a director, officer or employee of the Corporation serves or served at the request of the Corporation as a director, officer, employee or agent of another enterprise. Expenses, including attorneys' fees, incurred by any such person in defending against such action, suit or proceeding may be paid in advance of the final disposition of such action, suit or proceeding by the Corporation upon receipt by it of an undertaking of such person to repay such expenses if it shall be ultimately determined that such person is not entitled to be indemnified by the Corporation. For purposes of this Section, the term "Corporation" shall include any predecessor of the Corporation and any constituent Corporation absorbed by the Corporation in consolidation or merger; the term "other enterprise" shall include any corporation, partnership, joint venture, trust or employee benefit plan; service "at the request of the Corporation" shall include services as a director, officer or employee of the Corporation which imposes duties on, or involves services by, such director, officer or employee with respect to an employee benefit plan, its participants or beneficiaries; any excise taxes assessed on a person with respect to an employee benefit plan shall be deemed to be indemnifiable expenses; and action by a person with respect to an employee benefit plan which such person reasonable believes to be in the interest of the participants and beneficiaries of such plan shall be deemed to be action not opposed to the best interests of the Corporation.

Section 7.6. **Amendment of Bylaws**. These bylaws may be amended or repealed, and new bylaws adopted, by the Board of Directors. The stockholders entitled to vote, however, retain the right to adopt additional bylaws and may amend or repeal any bylaw whether or not adopted by them.

*[Remainder Intentionally Left Blank.]*

Exh. 4 - Declaration of Fabian Bello ISO Ex Parte Motion for TRO

**CERTIFICATE BY SECRETARY OF ADOPTION**
**OF BYLAWS BY SOLE INCORPORATOR**

**OF**

**Online Delivery Technologies Inc.**


The undersigned, Phillip Coulombe, as Secretary of Online Delivery Technologies Inc., a Delaware corporation (the "Corporation"), hereby certifies the attached document is a true and complete copy of the bylaws of the Corporation and that such bylaws were duly adopted by the person appointed in the Certificate of Incorporation to act as the sole incorporator of the Corporation on the date set forth below.

IN WITNESS WHEREOF, the undersigned has executed this certificate as of April 2, 2021.


Phillip Coulombe
Secretary

**ACTION BY UNANIMOUS WRITTEN CONSENT IN
LIEU OF ORGANIZATIONAL MEETING BY THE BOARD OF DIRECTORS
OF
Online Delivery Technologies Inc.,**
a Delaware Corporation

The undersigned, constituting all of the members of the board of directors (the "Board") of Online Delivery Technologies Inc., a Delaware corporation (the Corporation), in lieu of holding a meeting of the Board, hereby consent to the taking of the actions set forth herein, and the approval and adoption of the following resolutions by this unanimous written consent ("Written Consent") pursuant to Section 141 of the Delaware General Corporation Law and the Bylaws of the Corporation:

Certificate of Incorporation

RESOLVED, that the Certificate of Incorporation of the Corporation filed with the Delaware Secretary of State hereby is adopted, ratified and affirmed in all respects.

RESOLVED FURTHER, that the Secretary of the Corporation is authorized and directed to insert a certified copy of the Certificate of Incorporation in the Corporation's minute book.

Stock Issuance

RESOLVED, that the officers of the Corporation are hereby authorized to issue and sell shares of common stock of the Corporation, $0.0001 par value (the "Shares"), which the Board hereby determines to be the fair market value of the Corporation's common stock as of the date hereof, to each person named below (the "Stockholder"), in the amounts specified opposite each name in exchange for cash or contributed property as follows:

| Name of Stockholder | Number of Shares | Total Purchase Price($) |
|---|---|---|
| Phillip Coulombe | 10,000 | $1.00 |

RESOLVED FURTHER, that the Board hereby determines that the consideration to be received for the above-mentioned Shares is adequate for the Corporation's purposes, and that the sale and issuance of the Shares to each of the above-named persons shall be conditioned upon receipt by the Corporation of the purchase price of said Shares and final copies of all appropriate documentation required by Corporation.

RESOLVED FURTHER, that upon the issuance and sale in accordance with the foregoing resolutions, such Shares shall be validly issued, fully paid and non-assessable shares of common stock of the Corporation.

Exh. 4 - Declaration of Fabian Bello ISO Ex Parte Motion for TRO

RESOLVED FURTHER, that the officers of the Corporation are hereby authorized and directed, for and on behalf of the Corporation, (i) to take all actions necessary to comply with applicable laws with respect to the sale and issuance of the Shares, (ii) to thereafter execute and deliver on behalf of the Corporation, pursuant to the authorization above, share certificates representing the Shares set forth above, and (iii) to take any such other action as they may deem necessary or appropriate to carry out the issuance of the Shares and intent of these resolutions.

Election of Officers

RESOLVED, that the following individuals are hereby elected to serve in the offices of the Corporation set forth opposite their names until their successors are duly elected and qualified, or their earlier death, resignation or removal:

President: Phillip Coulombe
Treasurer: Phillip Coulombe
Secretary: Phillip Coulombe

Corporate Records and Minute Book

RESOLVED, that the officers of the Corporation are hereby authorized and directed to procure all corporate books, books of account and stock books that may be required by the laws of Delaware or of any foreign jurisdiction in which the Corporation may do business or which may be necessary or appropriate in connection with the business of the Corporation.

RESOLVED FURTHER, that the officers of the Corporation are authorized and directed to maintain a minute book containing the Certificate of Incorporation, as filed with and certified by the office of the Delaware Secretary of State and as may be amended from time to time, its Bylaws and any amendments thereto, and the minutes of any and all meetings and actions of the Board, Board committees and the Corporation's stockholders, together with such other documents, including this Written Consent, as the Corporation, the Board or the Corporation's stockholders shall from time to time direct and to ensure that an up to date copy is also kept at the principal executive office of the Corporation (as designated below).

Corporate Seal

RESOLVED, that the Corporation shall have a corporate seal in the form of two concentric circles with the name of the Corporation between the two circles and the year of incorporation and "Delaware" within the inner circle.

Stocks Certificates

RESOLVED, that the form of Stocks certificate attached hereto has been presented to the Board for review and is hereby approved and adopted as the form Stocks certificate of the Corporation and the Secretary of the Corporation is directed to insert such form Stocks certificate in the minute book of the Corporation.

Ratification of Actions by Incorporator

RESOLVED, that the Action by Written Consent of the Sole Incorporator dated April 2, 2021 and all actions taken by the Corporation's sole incorporator, LegalZoom.com, Inc. and its agents, in connection with the formation of the Corporation are hereby in all respects approved, ratified and affirmed for and on behalf of the Corporation.

Annual Accounting Period

RESOLVED, that until otherwise determined by the Board the fiscal year of the Corporation shall end on December 31.

Principal Executive Office

RESOLVED, that the principal executive office of the Corporation shall initially be located at 1 Aviation Lane, Greenville, South Carolina  29607.

Bank Accounts

RESOLVED, that the officers of the Corporation are hereby authorized and directed to establish, maintain and close one or more accounts in the name of the Corporation for the funds of the Corporation with any federally insured bank or similar depository; to cause to be deposited, from time to time, in such accounts, such funds of the Corporation as such officer deems necessary or advisable, and to designate, change or revoke the designation, from time to time, of the officer or officers or agent or agents of the Corporation authorized to make such deposits and to sign or countersign checks, drafts or other orders for the payment of money issued in the name of the Corporation against any funds deposited in any of such accounts; and to make such rules and regulations with respect to such accounts as such officers may deem necessary or advisable, and to complete, execute and deliver any documents as banks and similar financial institutions customarily require to establish any such account and to exercise the authority granted by this resolution including, but not limited to, customary signature card forms and form banking resolutions.

RESOLVED FURTHER, that all form resolutions required by any such depository, if any, are adopted in such form used by such depository by this Board, and that the Secretary is authorized to certify such resolutions as having been adopted by the Board and directed to insert a copy of any such form resolutions in the minute book of the Corporation.

RESOLVED FURTHER, that any such depository to which a certified copy of these resolutions has been delivered by the Secretary of the Corporation is entitled to rely upon such resolutions for all purposes until it shall have received written notice of the revocation or amendment of these resolutions, as adopted by the Board.

Qualification to do Business

RESOLVED, that the officers of the Corporation are hereby authorized and directed for and on behalf of the Corporation to take such action as they may deem necessary or advisable to effect the qualification of the Corporation to do business as a foreign corporation in each state that the officers may determine to be necessary or appropriate, or to withdraw from or terminate the Corporation's qualification to do business in any such state.

RESOLVED FURTHER, that any resolutions which in connection with the foregoing shall be certified by the Secretary of the Corporation as having been adopted by the Board pursuant to this Written Consent shall be deemed adopted pursuant to this Written Consent with the same force and effect as if presented to the Board and adopted thereby on the date of this Written Consent, and shall be included in the minute book of the Corporation.

Payment of Expenses

RESOLVED, that the officers of the Corporation are hereby authorized and directed to pay all expenses of the incorporation and organization of the Corporation, including reimbursing any person for such person's verifiable expenses therefor.

Agent for Service of Process in Delaware

      RESOLVED, that United States Corporation Agents, Inc. shall be appointed the Corporation's agent for service of process in Delaware.


Authorization of Further Actions

      RESOLVED, that the officers of the Corporation are, and each of them hereby is, authorized, empowered and directed, for and on behalf of the Corporation, to execute all documents and to take all further actions they may deem necessary, appropriate or advisable to effect the purposes of each of the foregoing resolutions.

      RESOLVED, that any and all actions taken by any officer of the Corporation in connection with the matters contemplated by the foregoing resolutions are hereby approved, ratified and confirmed in all respects as fully as if such actions had been presented to the Board for approval prior to such actions being taken.

      IN WITNESS WHEREOF, each of the undersigned, being all the directors of the Corporation, has executed this Written Consent as of the date set forth below.

Date: April 2, 2021           Directors:

                          Phillip Coulombe

# Software License and Data Services Agreement

This Software License and Data Services Agreement (this "**Agreement**"), effective as of May 28th, 2021 (the "**Effective Date**"), is by and between FL3XX GmbH, an Austrian corporation with offices located at Kolingasse 11, 1090 Vienna, Austria ("**Licensor**") and Online Delivery Technologies, Inc., a Delaware Corporation with offices located at 1 Aviation Lane, Greenville, South Carolina, USA ("**Licensee**"). Licensor and Licensee may be referred to herein collectively as the "**Parties**" or individually as a "**Party**."

WHEREAS, Licensor desires to license the Software described in **Exhibit A** attached hereto to Licensee; and

WHEREAS, subject to the terms and conditions of this Agreement, Licensee desires to obtain a license to use the Software for its internal business purposes and to provide, among other things, certain data services for and on behalf of Licensor and users of Licensor's software as more fully set forth herein.

WHEREAS, the Parties intend that the Licensee will (i) remain the data controller for User Information and all data relating to, or uploaded by Customers or through the licensed Software and (ii) provide Software Services to Customers related to such data only within the Territory; and (iii) secure and provision the licensed Software data within the United States.

NOW, THEREFORE, in consideration of the mutual covenants, terms, and conditions set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, The Parties agree as follows:

1.  <u>Definitions</u>.

    (a)  "**Documentation**" means Licensor's user manuals, handbooks, and installation guides relating to the Software provided in writing by Licensor to Licensee.

    (b)  "**Software**" means the product described in **Exhibit A** in object code format, including any Updates provided to Licensee pursuant to this Agreement.

    (c)  "**Software Services**" means the services provided by Licensee utilizing the Software in accordance with the restrictions contained in this Agreement.

    (d)  "**Updates**" means any updates, bug fixes, patches, or other error corrections to the Software that Licensor generally makes available free of charge to all licensees of the Software.

    (e)  "**Customers**" means any licensed end user located in the US who accesses the Software.

    (f)  "**User Information**" means any information that identifies, can identify or confirm the identity of, or is otherwise associated with, a specific individual or device, including information: (a) from which a specific individual or device can be located or contacted; or (b) that identifies a specific individual's or device's behavior on the internet, including use of the Website or other materials. User Information includes any of the

information described in the preceding sentence that is provided by, through, or on behalf of Customer or the identified or identifiable individual, and information collected by or through the use of network or other tracking technology, including personally identifiable Usage Data.

(g)     "**Data Services**" means Licensee obtaining suitable hosting arrangements for data related to the use of the Software by Customers including without limitation, User Information, and other data that may enable Customers to access the Software, in compliance with all terms and conditions of this Agreement.

(h)     "**Territory**" means the United States.

2.     <u>License</u>.

(a)     <u>Software License Grant</u>. Licensor hereby grants Licensee a non-exclusive, non-sublicensable, and non-transferable (except in compliance with Section 11(g)) license during the Term in the Territory to use the Software solely for Licensee's internal business purposes. Licensee may make copies of the Software solely for back-up, disaster recovery, and testing purposes; provided that any such copies of the Software: (x) remain Licensor's exclusive property; (y) are subject to the terms and conditions of this Agreement; and (z) must include all copyright or other proprietary rights notices contained in the original.

(b)     <u>Trademark License Grant</u>. Subject to the terms and conditions of this Agreement, Licensor hereby grants Licensee a non-exclusive, non-sublicensable, and non-transferable (except in compliance with Section 11(g)) license to use Licensor's trademarks, trade names and logos set forth in **Exhibit B** (as amended from time to time by Licensor) solely in connection with the marketing of the Software Services and the provision of Data Services through a third party in compliance with this Agreement. Licensee shall comply with any usage guidelines which may be provided to Licensee by Licensor from time to time, and upon request by Licensor, shall furnish Licensor with samples of Licensee's usage of such trademarks, trade names and logos. Licensee shall not challenge Licensor's ownership of such trademarks, trade names and logos or use or adopt any trademarks which might be confusingly similar to such marks.

(c)     <u>Use Restrictions</u>. Licensee shall not use the Software or Documentation for any purposes beyond the scope of the license granted in this Agreement. Without limiting the foregoing and except as otherwise expressly set forth in this Agreement, Licensee shall not at any time, directly or indirectly: (i) copy, modify, or create derivative works of the Software or the Documentation, in whole or in part; (ii) rent, lease, lend, sell, sublicense, assign, distribute, publish, transfer, or otherwise make available the Software or the Documentation; (iii) reverse engineer, disassemble, decompile, decode, adapt, or otherwise attempt to derive or gain access to the source code of the Software, in whole or in part; or (iv) remove any proprietary notices from the Software or the Documentation.

(d)     Licensor Restrictions.   Licensor shall not have access to the licensed Software once provisioned by Licensee, other than for Support or Updates.  At all times all User Information shall be controlled by and owned exclusively by Licensee, and shall not be shared with Licensor, or any other party, except as required under applicable law.

(e)     Delivery. Licensor shall deliver the Software electronically, on tangible media, or by other means, mutually agreed upon by the Parties in writing, to Licensee within 30 days following the Effective Date (the "**Delivery Date**"). Risk of loss of any tangible media on which the Software is delivered will pass to Licensee upon Licensee's receipt of such tangible media at Licensee's delivery location.

(f)     Acceptance. Licensee has 7 business days following the Delivery Date to complete testing of the Software (the "**Acceptance Period**"). If testing establishes that the Software does not conform to the acceptance criteria set forth in **Exhibit A** (the "**Acceptance Criteria**"), Licensee shall send written notice setting forth in reasonable detail the nature of the nonconformity (the "**Nonconformance Notice**"). Upon receipt of the Nonconformance Notice, Licensor, at no further expense to Licensee, shall promptly take all steps necessary to bring the Software in conformity with the Acceptance Criteria within 7 business days. Licensor shall resubmit the corrected Software to Licensee, and the procedures set forth in this Section 2(e) will repeat until the Software is accepted by Licensee by written notice to the Licensor. If a Nonconformity Notice is not sent to Licensor by the end of the Acceptance Period, the Software will be deemed accepted and in conformity with the acceptance criteria set forth in **Exhibit A**.

3.     Support; Updates.

(a)     Support. Licensor shall provide Licensee with the support services described on **Exhibit A**. Such support services shall terminate when this Agreement terminates.

(b)     Updates. During the Term, Licensor shall provide Licensee, at no additional charge, all Updates, including pre-releases for testing purposes, each of which constitutes Software and is subject to the terms and conditions of this Agreement.

4.     Fees and Payment.

(a)     License Fees. Licensee shall pay Licensor the license fees ("**License Fees**") set forth on **Exhibit C**. Licensor shall invoice Licensee for all License Fees in accordance with the invoicing schedule and requirements set forth in **Exhibit C**. Licensee shall pay all invoices for License Fees within 30 days after Licensee's receipt of each invoice. Licensee shall make all payments hereunder in US dollars. In the event any License Fees are not paid within ten (10) days of the date they are due, interest shall accrue on such License Fees at a rate of 12% per annum until paid in full and Licensee agrees to pay all reasonable costs of collection incurred by Licensor including, but not limited to, reasonable attorneys' fees and other professional fees.

3

(b)  Data Service Fees.  Licensor shall pay to Licensee the data service fees set forth on **Exhibit D** (the "**Data Service Fees**"). Licensee shall invoice Licensor for all License Fees in accordance with the invoicing schedule and requirements set forth in **Exhibit D** Licensor shall pay all invoices for Data Service Fees within 30 days after Licensor's receipt of each invoice. Licensor shall make all payments hereunder in US dollars. In the event any Data Service Fees are not paid within ten (10) days of the date they are due, interest shall accrue on such Fees at a rate of 12% per annum until paid in full and Licensor agrees to pay all reasonable costs of collection incurred by Licensee including, but not limited to, reasonable attorneys' fees and other professional fees.

(c)  Taxes. All License Fees and Data Service Fees under this Agreement are exclusive of taxes and similar assessments, and payment thereof shall be the sole responsibility of the party required to pay such fees, excluding any income taxes of the receiving party.

5.  Confidential Information. From time to time during the Term, either Party may disclose or make available to the other Party information about its business affairs, products, confidential intellectual property, trade secrets, third-party confidential information, and other sensitive or proprietary information, whether orally or in written, electronic, or other form or media/in written or electronic form or media, whether or not marked, designated or otherwise identified as "confidential" (collectively, "**Confidential Information**"). Confidential Information does not include information that, at the time of disclosure is: (a) in the public domain; (b) known to the receiving Party at the time of disclosure; (c) rightfully obtained by the receiving Party on a non-confidential basis from a third party; or (d) independently developed by the receiving Party. The receiving Party shall not disclose the disclosing Party's Confidential Information to any person or entity, except to the receiving Party's employees who have a need to know the Confidential Information for the receiving Party to exercise its rights or perform its obligations hereunder. Notwithstanding the foregoing, each Party may disclose Confidential Information to the limited extent required (i) in order to comply with the order of a court or other governmental body, or as otherwise necessary to comply with applicable law, provided that the Party making the disclosure pursuant to the order shall first have given written notice to the other Party and made a reasonable effort to obtain a protective order; or (ii) to establish a Party's rights under this Agreement, including to make required court filings. On the expiration or termination of the Agreement, the receiving Party shall promptly return to the disclosing Party all copies, whether in written, electronic, or other form or media, of the disclosing Party's Confidential Information, or destroy all such copies and certify in writing to the disclosing Party that such Confidential Information has been destroyed. Each Party's obligations of non-disclosure with regard to Confidential Information are effective as of the Effective Date and will expire five years from the date first disclosed to the receiving Party; provided, however, with respect to any Confidential Information that constitutes a trade secret (as determined under applicable law), such obligations of non-disclosure will survive the termination or expiration of this Agreement for as long as such Confidential Information remains subject to trade secret protection under applicable law.

4

6.    Intellectual Property Ownership. Licensee acknowledges that, as between Licensee and Licensor, Licensor owns all right, title, and interest, including all intellectual property rights, in and to the Software and Documentation.

7.    Warranties and Warranty Disclaimer.

(a)    Licensor warrants that: (i) the Software will perform materially as described in the specifications set out in **Exhibit A** following the Effective Date; and (ii) at the time of delivery the Software does not contain any virus or other malicious code that would cause the Software to become inoperable or incapable of being used in accordance with the Documentation.

(b)    If, during the period specified in Section 7(a), any Software fails to comply with the warranty in Section 7(a), Licensor shall, at Licensee's reasonable request, either: (i) repair or replace the Software; or (ii) refund the Fees paid for such Software, subject to Licensee's ceasing all use of and, if requested by Licensor, returning to Licensor all copies of the Software. The remedies set forth in this Section 7(b) are Licensee's sole remedies and Licensor's sole liability under the limited warranty set forth in Section 7(a).

(c)    EXCEPT FOR THE WARRANTIES SET FORTH IN SECTION 7(a), THE SOFTWARE AND DOCUMENTATION ARE PROVIDED "AS IS" AND LICENSOR HEREBY DISCLAIMS ALL WARRANTIES, WHETHER EXPRESS, IMPLIED, STATUTORY, OR OTHERWISE. LICENSOR SPECIFICALLY DISCLAIMS ALL IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, TITLE, AND NON-INFRINGEMENT, AND ALL WARRANTIES ARISING FROM COURSE OF DEALING, USAGE, OR TRADE PRACTICE.

8.    Indemnification.

(a)    Licensor Indemnification.

(i)    Licensor shall indemnify, defend, and hold harmless Licensee from and against any and all losses, damages, liabilities, costs including reasonable attorneys' fees ("**Losses**") incurred by Licensee resulting from any third-party claim, suit, action, or proceeding ("**Third-Party Claim**") that the Software or Documentation, or any use of the Software or Documentation in accordance with this Agreement, infringes or misappropriates such third party's intellectual property rights, provided that Licensee promptly notifies Licensor in writing of the claim, cooperates with Licensor, and allows Licensor sole authority to control the defense and settlement of such claim.

(ii)    If such a claim is made or appears possible, Licensee agrees to permit Licensor, at Licensor's sole cost and expense, to (A) modify or replace the Software or Documentation, or component or part thereof, to make it

5

Exh. 4 - Declaration of Fabian Bello ISO Ex Parte Motion for TRO

non-infringing, or (B) obtain the right for Licensee to continue use. If neither of these alternatives are possible notwithstanding Licensor's commercially reasonable efforts, Licensor may terminate this Agreement, in its entirety or with respect to the affected component or part, effective immediately on written notice to Licensee, provided that Licensor shall refund or credit to Licensee all amounts paid by Licensee in respect of the Software or Documentation that Licensee cannot reasonably use as intended under this Agreement.

9.    <u>Limitations of Liability</u>. EXCEPT AS EXPRESSLY OTHERWISE PROVIDED IN THIS SECTION 9, IN NO EVENT WILL EITHER PARTY BE LIABLE UNDER OR IN CONNECTION WITH THIS AGREEMENT UNDER ANY LEGAL OR EQUITABLE THEORY, INCLUDING BREACH OF CONTRACT, TORT (INCLUDING NEGLIGENCE), STRICT LIABILITY, AND OTHERWISE, FOR ANY CONSEQUENTIAL, INCIDENTAL, INDIRECT, EXEMPLARY, SPECIAL, ENHANCED, OR PUNITIVE DAMAGES, REGARDLESS OF WHETHER EITHER PARTY WAS ADVISED OF THE POSSIBILITY OF SUCH LOSSES OR DAMAGES OR SUCH LOSSES OR DAMAGES WERE OTHERWISE FORESEEABLE. EXCEPT AS EXPRESSLY OTHERWISE PROVIDED IN THIS SECTION 9, IN NO EVENT WILL THE AGGREGATE LIABILITY OF EITHER PARTY ARISING OUT OF OR RELATED TO THIS AGREEMENT UNDER ANY LEGAL OR EQUITABLE THEORY, INCLUDING BREACH OF CONTRACT, TORT (INCLUDING NEGLIGENCE), STRICT LIABILITY, AND OTHERWISE EXCEED [1] TIMES THE TOTAL AMOUNTS PAID [AND AMOUNTS ACCRUED BUT NOT YET PAID] TO LICENSOR UNDER THIS AGREEMENT IN THE [1] YEAR PERIOD PRECEDING THE EVENT GIVING RISE TO THE CLAIM OR $1000. WHICHEVER IS GREATER. The exclusions and limitations in this Section 9 do not apply to claims pursuant to 5 and 8 below.

10.    <u>Term and Termination</u>.

(a)    <u>Term</u>. The term of this Agreement begins on the Effective Date and, unless terminated earlier pursuant to any of the Agreement's express provisions, will continue in effect until 1 year from such date (the "**Initial Term**"). This Agreement will automatically renew for up to 30 additional successive one year terms unless earlier terminated pursuant to this Agreement's express provisions or either Party gives the other Party written notice of non-renewal at least 120 days prior to the expiration of the then-current term (each a "**Renewal Term**" and together with the Initial Term, the "**Term**").

(b)    <u>Termination</u>. In addition to any other express termination right set forth in this Agreement:

(i)    Licensee may terminate this Agreement for convenience, for any reason or no reason, upon 90 days' prior written notice to Licensor.

6

Exh. 4 - Declaration of Fabian Bello ISO Ex Parte Motion for TRO

(ii)      Either Party may terminate this Agreement, effective on written notice to the other Party, if the other Party materially breaches this Agreement, and such breach: (A) is incapable of cure; or (B) being capable of cure, remains uncured 30 days after the non-breaching Party provides the breaching Party with written notice of such breach; or

(iii)      Either Party may terminate this Agreement, effective immediately upon written notice to the other Party, if the other Party: (A) becomes insolvent or is generally unable to pay, or fails to pay, its debts as they become due; (B) files or has filed against it, a petition for voluntary or involuntary bankruptcy or otherwise becomes subject, voluntarily or involuntarily, to any proceeding under any domestic or foreign bankruptcy or insolvency law; (C) makes or seeks to make a general assignment for the benefit of its creditors; or (D) applies for or has appointed a receiver, trustee, custodian, or similar agent appointed by order of any court of competent jurisdiction to take charge of or sell any material portion of its property or business.

(c)      Effect of Expiration or Termination. Upon expiration or earlier termination of this Agreement, the license granted hereunder will also terminate, and, without limiting Licensee's obligations under Section 5, Licensee shall cease using and delete, destroy, or return all copies of the Software and Documentation.

(d)      Survival. This Section 10(d) and Sections 1, 5, 6, 7, 8, 9, and 11 survive any termination or expiration of this Agreement. No other provisions of this Agreement survive the expiration or earlier termination of this Agreement.

11.      Miscellaneous.

(a)      Entire Agreement. This Agreement, together with any other documents incorporated herein by reference and all related Exhibits, constitutes the sole and entire agreement of the Parties with respect to the subject matter of this Agreement and supersedes all prior and contemporaneous understandings, agreements, and representations and warranties, both written and oral, with respect to such subject matter. In the event of any inconsistency between the statements made in the body of this Agreement, the related Exhibits, and any other documents incorporated herein by reference, the following order of precedence governs: (a) first, this Agreement, excluding its Exhibits; (b) second, the Exhibits to this Agreement as of the Effective Date; and (c) third, any other documents incorporated herein by reference.

(b)      Notices. All notices, requests, consents, claims, demands, waivers, and other communications hereunder (each, a "**Notice**") must be in writing and addressed to the Parties at the addresses set forth on the first page of this Agreement (or to such other address that may be designated by the Party giving Notice from time to time in accordance with this Section). All Notices must be delivered by personal delivery, nationally recognized overnight courier (with all fees pre-paid), facsimile or email (with confirmation of transmission) or certified or registered mail (in each case, return receipt

7

requested, postage pre-paid). Except as otherwise provided in this Agreement, a Notice is effective only: (i) upon receipt by the receiving Party, and (ii) if the Party giving the Notice has complied with the requirements of this Section.

(c)     <u>Amendment and Modification; Waiver</u>. No amendment to or modification of this Agreement is effective unless it is in writing and signed by an authorized representative of each Party. No waiver by any Party of any of the provisions hereof will be effective unless explicitly set forth in writing and signed by the Party so waiving. Except as otherwise set forth in this Agreement, no failure to exercise, or delay in exercising, any rights, remedy, power, or privilege arising from this Agreement will operate or be construed as a waiver thereof; nor will any single or partial exercise of any right, remedy, power, or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power, or privilege.

(d)     <u>Force Majeure</u>. In no event shall either Party be liable to the other Party, or be deemed to have breached this Agreement, for any failure or delay in performing its obligations under this Agreement when and to the extent such failure or delay is caused by any circumstances beyond such Party's reasonable control, including but not limited to: (i) acts of God; (ii) flood, fire, earthquake, other potential disasters, catastrophes, such as pandemics, or explosion; (iii) war, invasion, hostilities (whether war is declared or not), terrorist threats or acts, riot or other civil unrest; (iv) government order, law, or actions; (v) embargoes or blockades in effect on or after the date of this Agreement; and (vi) national or regional emergency.

(e)     <u>Severability</u>. If any provision of this Agreement is invalid, illegal, or unenforceable in any jurisdiction, such invalidity, illegality, or unenforceability will not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction. Upon such determination that any term or other provision is invalid, illegal, or unenforceable, the Parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible.

(f)     <u>Governing Law; Submission to Jurisdiction</u>. This Agreement is governed by and construed in accordance with the internal laws of the State of Delaware without giving effect to any choice or conflict of law provision or rule that would require or permit the application of the laws of any jurisdiction other than those of the State of Delaware. Any legal suit, action, or proceeding arising out of or related to this Agreement or the licenses granted hereunder will be instituted exclusively in the federal courts of the United States or the courts of the State of Delaware, and each Party irrevocably submits to the exclusive jurisdiction of such courts in any such suit, action, or proceeding.

(g)     <u>Assignment</u>. Neither Party may assign or transfer any of its rights or delegate any of its obligations hereunder, in each case whether voluntarily, involuntarily,

by operation of law or otherwise, without the prior written consent of the other Party; provided, however, that either Party may assign its rights or delegate its obligations, in whole or in part, without such consent and upon 30 days prior written notice to the other Party, to (i) one or more of its affiliates, or (ii) an entity that acquires all or substantially all of the business or assets of such Party to which this Agreement pertains, whether by merger, reorganization, acquisition, sale, or otherwise. Any purported assignment, transfer, or delegation in violation of this Section will be null and void. No assignment, transfer, or delegation will relieve the assigning or delegating Party of any of its obligations hereunder. This Agreement is binding upon and inures to the benefit of the Parties hereto and their respective permitted successors and assigns.

(h)     Export Regulation. The Software may be subject to US export control laws, including the Export Control Reform Act and its associated regulations. Licensee shall not, directly or indirectly, export, re-export, or release the Software to, or make the Software accessible from, any jurisdiction or country to which export, re-export, or release is prohibited by law, rule, or regulation. Licensee shall comply with all applicable federal laws, regulations, and rules, and complete all required undertakings (including obtaining any necessary export license or other governmental approval), prior to exporting, re-exporting, releasing, or otherwise making the Software available outside the US.

(i)     Independent Contractors. The relationship of Licensor and Licensee is that of independent contractors, and nothing contained in this Agreement shall be construed to (i) give either party the power to direct or control the day-to-day activities of the other, (ii) constitute the parties as joint venturers, co-owners or otherwise as participants in a joint undertaking, or (iii) allow the Licensee to create or assume any obligation on behalf of Licensor for any purpose whatsoever.

(j)     Equitable Relief. Each Party acknowledges and agrees that a breach or threatened breach by such Party of any of its obligations under Section 5 would cause the other Party irreparable harm for which monetary damages would not be an adequate remedy and agrees that, in the event of such breach or threatened breach, the other Party will be entitled to equitable relief, including a restraining order, an injunction, specific performance, and any other relief that may be available from any court, without any requirement to post a bond or other security, or to prove actual damages or that monetary damages are not an adequate remedy. Such remedies are not exclusive and are in addition to all other remedies that may be available at law, in equity, or otherwise.

(k)     Headings. The headings of the Sections of this Agreement are intended for convenience or reference only and are not intended to be a part of or affect the meaning or interpretation of this Agreement.

(l)     Counterparts. This Agreement may be executed in counterparts, each of which is deemed an original, but all of which together are deemed to be one and the same agreement.

9

Exh. 4 - Declaration of Fabian Bello ISO Ex Parte Motion for TRO

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement as of the Effective Date.

FL3XX GmbH                                  Online Delivery Technology, Inc.

By: _____              By: _____

Name: Paolo Sommariva                       Name: Phillip Coulombe

Title: CEO                                  Title: CEO

10

Exh. 4 - Declaration of Fabian Bello ISO Ex Parte Motion for TRO

# ACORD® CERTIFICATE OF LIABILITY INSURANCE

**DATE (MM/DD/YYYY)** 05/20/2021

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

IMPORTANT: If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must be endorsed. If SUBROGATION IS WAIVED, subject to the terms and conditions of the policy, certain policies may require an endorsement. A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

| PRODUCER | CONTACT NAME | |
|---|---|---|
| NUTMEG INS AGENCY INC/PHS 76210797 The Hartford Business Service Center 3600 Wiseman Blvd San Antonio, TX 78251 | **PHONE (A/C, No, Ext)** (888) 925-3137 | **FAX (A/C, No)** (888) 443-6112 |
| | **E-MAIL ADDRESS:** | |

| | INSURER(S) AFFORDING COVERAGE | NAIC# |
|---|---|---|
| **INSURED** Online Delivery Technologies, Inc. 1 Aviation Lane Unit 4 Greenville SC 29607 | **INSURER A** Hartford Underwriters Insurance Company | 30104 |
| | **INSURER B** | |
| | **INSURER C** | |
| | **INSURER D :** | |
| | **INSURER E** | |
| | **INSURER F** | |

## COVERAGES    CERTIFICATE NUMBER:    REVISION NUMBER:

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | TYPE OF INSURANCE | ADDL INSR | SUBR WVD | POLICY NUMBER | POLICY EFF (MM/DD/YYYY) | POLICY EXP (MM/DD/YYYY) | LIMITS | |
|---|---|---|---|---|---|---|---|---|
| A | **COMMERCIAL GENERAL LIABILITY** [X] CLAIMS-MADE [X] OCCUR **General Liability** GEN'L AGGREGATE LIMIT APPLIES PER: [X] POLICY [ ] PRO-JECT [ ] LOC OTHER: | | | 76 SBU AN4BL1 | 05/21/2021 | 05/21/2022 | EACH OCCURRENCE | $1,000,000 |
| | | | | | | | DAMAGE TO RENTED PREMISES (Ea occurrence) | $1,000,000 |
| | | | | | | | MED EXP (Any one person) | $10,000 |
| | | | | | | | PERSONAL & ADV INJURY | $1,000,000 |
| | | | | | | | GENERAL AGGREGATE | $2,000,000 |
| | | | | | | | PRODUCTS - COMP/OP AGG | $2,000,000 |
| | **AUTOMOBILE LIABILITY** [ ] ANY AUTO [ ] ALL OWNED AUTOS [ ] SCHEDULED AUTOS [ ] HIRED AUTOS [ ] NON-OWNED AUTOS | | | | | | COMBINED SINGLE LIMIT (Ea accident) | |
| | | | | | | | BODILY INJURY (Per person) | |
| | | | | | | | BODILY INJURY (Per accident) | |
| | | | | | | | PROPERTY DAMAGE (Per accident) | |
| | **UMBRELLA LIAB** [ ] OCCUR **EXCESS LIAB** [ ] CLAIMS-MADE [ ] DED [ ] RETENTION $ | | | | | | EACH OCCURRENCE | |
| | | | | | | | AGGREGATE | |
| | **WORKERS COMPENSATION AND EMPLOYERS' LIABILITY** ANY PROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED? (Mandatory in NH) If yes, describe under DESCRIPTION OF OPERATIONS below | Y/N N/A | | | | | [ ] PER STATUTE [ ] OTHER | |
| | | | | | | | E.L. EACH ACCIDENT | |
| | | | | | | | E.L. DISEASE - EA EMPLOYEE | |
| | | | | | | | E.L. DISEASE - POLICY LIMIT | |
| A | Data Breach - Defense & Liab Covg | | | 76 SBU AN4BL1 | 09/21/2021 | 09/21/2022 | Limit | $100,000 |

DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES (ACORD 101, Additional Remarks Schedule, may be attached if more space is required)
Those usual to the Insured's Operations.

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| For Informational Purposes 1 Aviation Lane Unit 4 Greenville SC 29607 | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS. **AUTHORIZED REPRESENTATIVE** *Susan L. Castaneda* |

© 1988-2015 ACORD CORPORATION. All rights reserved.

**ACORD 25 (2016/03)**    The ACORD name and logo are registered marks of ACORD

Exh. 4 - Declaration of Fabian Bello ISO Ex Parte Motion for TRO