Peter Vestal (SBN 159440)
pvestal@nvlawllp.com
John Kelley (SBN 194073)
jkelley@nvlawllp.com
NIESAR & VESTAL LLP
90 New Montgomery St. 9th Floor
San Francisco, CA 94105
Telephone:  (415) 882-5300
Facsimile:   (415) 882-5400

Attorneys for Defendant FL3XX GmbH

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| STELLAR LABS, INC.,<br><br>                   Plaintiff,<br><br>        vs.<br><br>FL3XX GMBH, et al.,<br><br>                   Defendants. | Case No:  3:21-cv-05879-EMC<br><br>**COUNTERCLAIMS OF FL3XX GMBH**<br><br><br>Judge: Hon. Edward M. Chen<br>Courtroom 5 – 17th Floor |
| FL3XX GMBH,<br><br>                   Counterclaimant,<br>        vs.<br><br>STELLAR LABS, INC.,<br>And ROES 1 – 20, inclusive,<br><br>                   Counterdefendant. | |

Defendant and Counterclaimant FL3XX GmbH ("**FL3XX**"), through its counsel, asserts

the following counterclaims against Plaintiff Stellar Labs, Inc. ("**Stellar**") and Roes 1 – 20

(collectively "**Counterdefendant**s") as set forth below.

///

1

## I.      PARTIES

2      1.      FL3XX is an Austrian limited liability company with its principal place of

3 business in Vienna, Austria.

4      2.      Stellar is, and at all relevant times herein was, a Delaware corporation with its

5 principal place of business in Burlingame, California.

6      3.      FL3XX does not presently know the true names and capacities of the

7 Counterdefendants sued herein as ROES 1 through 20.  FL3XX will seek leave of court to amend

8 this Counterclaim to allege said Counterdefendants' true names and capacities as soon as it

9 ascertains them.  FL3XX is informed and believes and thereon alleges that each of the

10 Counterdefendants designated herein as a ROE is legally responsible in some manner for the acts,

11 occurrences, events, happenings and/or omissions alleged herein against them, and has

12 proximately caused damages and injury to FL3XX as herein alleged.

13      4.      FL3XX is informed and believes and thereon allege that the Counterdefendants,

14 and each of them, were the agents, partners, servants, employees, representatives, co-conspirators

15 and/or alter egos of each of the other Counterdefendants, and, in doing the things alleged herein,

16 were acting within the scope of their authority as such agents, partners, servants, employees

17 and/or representatives with the permission, consent or ratification of each of the other remaining

18 Counterdefendants.

19

## II.      JURISDICTION AND VENUE

20      5.      Subject matter jurisdiction is properly based upon diversity under 17 U.S.C.

21 §1332(a) because Stellar is a citizen of a different state from FL3XX and the amount of damages

22 exceeds $75,000.

23      6.      The Court has personal jurisdiction over Stellar because, *inter alia*, Stellar has

24 availed itself of the jurisdiction of this Court by filing a lawsuit against FL3XX in this Court.

25      7.      Venue is proper in this Court pursuant to 28 U.S.C. § 139l (b)(3) because

26 Stellar's principal place of business is located in Burlingame, California.

27

28

### III.   FACTUAL BACKGROUND

8.      FL3XX has an aviation management system for business aviation (the "**FL3XX Software**").  At all relevant times, FL3XX has owned and retained all right, title and interest to the FL3XX Software.

9.      Stellar provides applications for business aviation to customers in the United States and other markets, including the Stellar Pricing Engine and the Stellar Data Studio (the "**Stellar Products"**).  Some users of the FL3XX Software use the Stellar Products in conjunction with the FL3XX Software.

10.     Prior to March 2020, FL3XX directly marketed and sold services relating to the FL3XX Software in the Americas and the Caribbean region (the "**Territory**") and had ongoing relationships with existing and prospective customers in the Territory.

#### The Reciprocal Reseller Agreement & Service Schedule #1

11.     On March 10, 2020, Stellar and FL3XX signed a Master Strategic Alliance Agreement (the "**MSAA**").  (A true and correct copy of the MSAA is attached as Exhibit A.)

12.     On March 12, 2020, Stellar and FL3XX signed a Reciprocal Reseller Agreement (the "**RRA**") and Service Schedule #1 ("**SS1**").  (True and correct copies of the RRA and SS1 are attached as Exhibit B and Exhibit C respectively.)  Although FL3XX and Stellar described the RRA as an ancillary agreement to the MSAA, all terms specified in the RRA control with respect to any conflict with the MSAA.  SS1 is subject to the terms and conditions of the RRA.

13.     The RRA and SS1 together set forth the general terms and conditions for Stellar to sell services relating to the FL3XX Software (the "**Services**").  The Services consisted of products and services described in SS1, including but not limited to software subscriptions, platform setup services and software support services.

14.     Paragraphs 15 through 27 herein summarize certain pertinent obligations and responsibilities Stellar agreed to undertake by and through the RRA and/or SS1.

15.     <u>Reseller Services</u>:  Stellar agreed to market, promote and resell the Services to customers in a territory defined as the Americas and Caribbean region (the "**Territory**").

16.     <u>Service Standards</u>:  Steller agreed to maintain marketing and customer service standards that were appropriate in order to: (1) maintain high-quality Services to the individuals or entities to whom it resold the FL3XX Software ("**Customers**"), and (2) reflect favorably on the reputations of Stellar and FL3XX.  Stellar agreed to provide Customers with prompt, courteous, and efficient service.  It also agreed to deal with Customers honestly and fairly.

17.     <u>Pricing</u>:  Stellar agreed to charge Customers for Services based upon FL3XX's list prices and adjusted in consultation with FL3XX.  SS1 provided Stellar with a URL to FL3XX's then-current list prices.  At all relevant times, FL3XX continued to provide Stellar with current list price information.

18.     <u>Setup Services</u>:  Stellar agreed to assume responsibility for providing setup services to Customers to enable them to use the Services.

19.     <u>Support Services</u>:  Stellar agreed to assume responsibility for providing customer services (collectively labeled "**First Line Support**") to Customers and also to any individuals or companies who used the Services on Customers' behalf or through Customers' accounts or passwords ("**Users**").  The RRA defined Stellar's First Line Support obligations.  Stellar further agreed that FL3XX would not be obliged to deal directly with a Customer or User under any circumstances.

20.     <u>Limited License</u>:  Stellar understood and agreed that the RRA granted to it a limited, non-exclusive license, non-transferable license to access and use the FL3XX Software solely for the purposes of demonstrating, marketing, selling, and providing support.  Stellar also understood and agreed that termination of the RRA would necessarily extinguish the limited license.

21.     <u>Customer Data</u>:  Stellar never acquired any right, title, interest or other form of intellectual property rights from FL3XX or any Customers in or to electronic data or information submitted to the FL3XX Software by Customers ("**Customer Data**").  Stellar understood and agreed that the RRA conferred a limited right for it to access and use Customer Data to provide the Services only for so long as it was an authorized reseller of the Services.

22.     <u>Unauthorized Access & Use</u>:  Stellar agreed to use commercially reasonable efforts to prevent unauthorized access to or use of the Services.  Stellar also agreed that it would not interfere with or disrupt the integrity or performance of the Services or third-party data contained therein.  Stellar further agreed that it would not attempt to gain unauthorized access to the Services or their related systems or networks.

23.     <u>Audit Rights</u>:  The RRA gave FL3XX the right to audit Stellar's records relating to the sale of FL3XX Software on ten (10) days' written notice.  Stellar agreed to provide access to any books, computers, records, or other information that might relate to the sale of FL3XX Software.

24.     <u>Payment Terms</u>:  Stellar agreed to pay FL3XX fees for the resale of Services to Customers ("**Fees**").  Stellar also agreed that the Fees would be computed as the higher of payments received from Customers or FL3XX's list prices, net of taxes payable by Stellar and of commissions due Stellar.  Stellar further agreed to pay all amounts due to FL3XX under the RRA and SS1 within thirty (30) days following receipt of the applicable invoice.  Stellar assumed sole responsibility for payment to FL3XX for all Fees for the Services provided to Customers.

25.     <u>Acceleration</u>:  In the event any amount owed by Stellar under the RRA or any other agreement for Services became thirty (30) or more days overdue, Stellar agreed that FL3XX could accelerate Stellar's unpaid fee obligations under such agreements so that all such obligations became immediately due and payable.

26.     <u>Termination</u>:  Stellar agreed that FL3XX could terminate the RRA by written notice to Stellar at any time if Stellar failed to make any payment due under the terms of the RRA within thirty (30) days following its receipt of written notice from FL3XX that such payment was delinquent.

27.     <u>Effect of Termination</u>:  Stellar agreed that, upon termination of the RRA, it would have to cease all use and reselling of the Services.  Stellar also agreed that, upon termination of the RRA, it would have to return all user guides, online help, release notes, training materials, and

**Niesar & Vestal LLP**
90 New Montgomery St.
9ᵗʰ Floor
San Francisco, CA 94105

FL3XX GmbH's Counterclaims                                    Case No. 3:21-cv-05879-EMC

other documentation provided or made available by FL3XX to Stellar regarding the use or operation of the Services (collectively the "**Documentation**").

**The Contract Period**

28.     Between March 2020 and June 2021, FL3XX expended significant resources to assist and support Stellar's reselling activities in accordance with the terms of the agreements between the two parties.

29.     During the course of the contractual relationship, FL3XX became aware that Stellar was setting its own prices and discounts for the Services in disregard of FL3XX's list prices and without consulting FL3XX or obtaining FL3XX's authorization.  For example, Stellar gave one Customer a ten percent (10%) discount for a one-year contract, together with six months of free service, all without FL3XX's authorization.  Stellar's unilateral and unauthorized pricing decisions materially reduced the Fees FL3XX would have otherwise received from each Customer transaction.

30.     Between March 2020 and June 2021, Stellar regularly imposed upon FL3XX to perform Customer setup services because it could neither accurately gather Customer information nor competently add the information to the FL3XX Software.  Nevertheless, Stellar retained one-hundred percent (100%) of the fees it realized from Customer setup services.  FL3XX eventually discovered that Stellar charged unusually high setup fees to Customers at the same time it was selling the Services at discounted rates and pushing the setup work to FL3XX.

31.     Between March 2020 and June 2021, Stellar did not provide Customers the requisite level of First Line Support required by the RRA.  Stellar did not maintain marketing and customer service standards consistent with the agreed-upon objective of maintaining high-quality Services to Customers.  Stellar did not provide prompt and efficient service to Customers.

32.     Stellar habitually forwarded trouble tickets regarding customer service issues to FL3XX without making any recognizable effort to resolve those issues.  Stellar regularly obliged FL3XX to deal directly Customers and Users, including—in some cases—participating in weekly meetings and handling regular support requests.  FL3XX received an excessive number of

Niesar & Vestal LLP
90 New Montgomery St.
9ᵗʰ Floor
San Francisco, CA 94105

FL3XX GmbH's Counterclaims                                        Case No. 3:21-cv-05879-EMC

support requests from Stellar compared to other FL3XX Software users.  Stellar also did not provide adequate training support to Customers as required under the RRA and SS1.

33.     Stellar's chronically inadequate customer service caused dissatisfaction and frustration among Customers, and it reflected poorly on FL3XX and the FL3XX Software. FL3XX complained to Stellar on multiple occasions about its unsatisfactory customer service performance.

34.     Stellar did not timely pay numerous outstanding FL3XX invoices, including IN2021/0088, IN2021/0089, IN2021/0090, IN2021/0091 and IN2021/0092, all dated March 16, 2021 (the "**Invoices**").  FL3XX issued several notices of non-payment to Stellar, including one on April 18, 2021.  Stellar had still not paid the Invoices as of June 9, 2021.

35.     FL3XX is informed and believes and thereon alleges that Stellar charged Customers for Services without disclosing the charges, or resulting payments by Customers, to FL3XX.

### Termination and Post Termination

36.     On June 9, 2021, FL3XX sent Stellar a written notice terminating the RRA (the "**Termination Notice**").  The Termination Notice referenced some of the numerous problems plaguing Stellar's performance as a reseller of the Services, including but not limited to Stellar's failure to provide adequate First Line Support and failure to comply with the payment terms set forth in the RRA.  The Termination Notice informed Stellar of FL3XX's decisions to terminate the RRA with immediate effect and to accelerate payment of all outstanding invoices in accordance with the RRA's terms.

37.     Stellar partially paid the Invoices following receipt of the Termination Notice.

38.     FL3XX began advising Customers and prospective customers after June 9, 2021, that Stellar was no longer a reseller of FL3XX Software in the Territory.

39.     On July 8, 2021, FL3XX sent Stellar a written notice exercising its audit rights under the RRA (the "**Audit Notice**").  FL3XX specifically requested access to any books,

computers, records, or other information that related or might relate to Stellar's sale of Services under the RRA.  Stellar acknowledged receipt of the Audit Notice but never complied with it.

40.      At all relevant times since it received the Termination Notice, Stellar has continued to: (1) Insist and claim to FL3XX that Stellar remains the exclusive reseller of Services in the Territory; (2) Hold itself out to Customers, prospective customers and the aviation management system marketplace as the exclusive reseller of Services in the Territory; and (3) Act as though it still enjoys all the rights conferred to it under the RRA and SS1 to access the FL3XX Software and Customer Data.

41.      Stellar continued to offer FL3XX Software support services to Customers after June 9, 2021.  It did so without FL3XX's authorization and against FL3XX's express admonitions.

42.      FL3XX detected activity on multiple occasions after June 9, 2021, in which users logged onto and accessed FL3XX Software Customer accounts using login credentials associated with Stellar.

43.      FL3XX eventually became aware, after June 9. 2021, that Stellar was gaining access to FL3XX Software Customer accounts at the request of Customers, but without FL3XX's necessary authorization.  FL3XX detected activity on multiple occasions, after June 9, 2021, in which Stellar personnel used Customer-created login credentials to access and use the FL3XX Software, as well as to browse Customer Data.  On some occasions, Stellar personnel have altered Customer and system data.  For example, on September 8, 2021, FL3XX personnel observed a Stellar employee change a specific Customer's aircraft take-off weight and approach settings.

44.      Stellar's post-termination activities with respect to the FL3XX Software and Customer Data have occurred without FL3XX's authorization and contrary to FL3XX's express admonitions.

///

# IV.     CAUSES OF ACTION

## First Cause Of Action

## Breach Of Written Contract

## (Against Stellar)

45.     FL3XX realleges and incorporates by reference the allegations set forth in paragraphs 1 through 44 into this cause of action.

46.     FL3XX performed all, or substantially all, of the significant things that the RRA and SS1 required it to do, or was excused from such performance.

47.     Stellar breached the RRA and SS1 by: (1) Charging Customers for the FL3XX Software according to Stellar's own pricing decisions, without regard to FL3XX's list prices and without consulting FL3XX or obtaining FL3XX's authorization; (2) Charging Customers for Services without disclosing the charges, or Customers' resulting payments, to FL3XXl; (3) Failing to provide prompt or efficient customer service, and by providing significantly inadequate First Line Support, to Customers; (4) Obliging FL3XX to deal directly with Customers and Users; (5) Charging excessive setup fees to Customers; (6) Failing to timely or fully pay the Invoices; and (7) Ignoring FL3XX's Audit Notice.

48.     FL3XX was harmed as a result of Stellar's conduct, and Stellar's breach of contract was a substantial factor in causing FL3XX's harm in an amount to be proven at trial and within the jurisdiction of this Court.

## Second Cause Of Action

## Breach Of Implied Covenant Of Good Faith And Fair Dealing

## (Against Stellar)

49.     FL3XX realleges and incorporates by reference the allegations set forth in paragraphs 1 through 44 into this cause of action.

50.     FL3XX performed all, or substantially all, of the significant things that the RRA and SS1 required it to do, or was excused from such performance.

Niesar & Vestal LLP
90 New Montgomery St.
9th Floor
San Francisco, CA 94105

51.     Stellar unfairly interfered with FL3XX's right to receive the benefits of the RRA and SS1.

52.     FL3XX was harmed by Stellar's conduct in an amount to be proven at trial and within the jurisdiction of this Court.

**Third Cause Of Action**

**Intentional Interference With Prospective Economic Relations**

**(Against Stellar and Roes 1 – 20)**

53.     FL3XX realleges and incorporates by reference the allegations set forth in paragraphs 1 through 44 into this cause of action.

54.     FL3XX was in an economic relationship with its customers and prospective customers that probably would have resulted in an economic benefit to FL3XX.

55.     Counterdefendants knew of the relationship.

56.     Counterdefendants engaged in wrongful conduct by: (1) Misrepresenting, after June 9, 2021, that Stellar was the exclusive reseller of the Services in the Territory; (2) Providing FL3XX Software support services to Customers after June 9, 2021; (3) Accessing and using the FL3XX Software without authorization after June 9, 2021; and (4) Browsing and altering Customer Data after June 9, 2021.

57.     Counterdefendants intended to disrupt the relationship, or knew that disruption of the relationship was certain or substantially certain to occur.

58.     The relationship was disrupted, and FL3XX was harmed.

59.     Counterdefendants' conduct was a substantial factor in causing FL3XX's harm in an amount to be proven at trial and within the jurisdiction of this Court.

60.     Counterdefendants acted with malice, oppression, or fraud, within the meaning of California Civil Code Section 3294, entitling FL3XX to punitive and exemplary damages in a sum to be determined at trial.

///

**Fourth Cause Of Action**

**Negligent Interference With Prospective Economic Relations**

**(Against Stellar and Roes 1 – 20)**

61.     FL3XX realleges and incorporates by reference the allegations set forth in paragraphs 1 through 44 into this cause of action.

62.     FL3XX was in an economic relationship with its customers and prospective customers that probably would have resulted in a future economic benefit to FL3XX.

63.     Counterdefendants knew or should have known of this relationship.

64.     Counterdefendants knew or should have known that this relationship would be disrupted if they failed to act with reasonable care.

65.     Counterdefendants engaged in wrongful conduct by:  (1) Misrepresenting, after June 9, 2021, that Stellar was the exclusive reseller of the Services in the Territory; (2) Continuing to provide FL3XX Software support services to Customers after June 9, 2021; (3) accessing and using the FL3XX Software without authorization after June 9, 2021; and (4) Browsing and altering Customer Data after June 9, 2021.

66.     The relationship was disrupted, and FL3XX was harmed.

67.     Counterdefendants' conduct was a substantial factor in causing FL3XX's harm in an amount to be proven at trial and within the jurisdiction of this Court.

**Fifth Cause Of Action**

**Unjust Enrichment**

**(Against Stellar and Roes 1 – 20)**

68.     FL3XX realleges and incorporates by reference the allegations set forth in paragraphs 1 through 44 into this cause of action.

69.     Counterdefendants, and each of them jointly and severally, through their wrongful conduct as described herein, have reaped substantial profits from the monies and intellectual property belonging to FL3XX.  In so doing, they have unjustly retained the benefits of said monies and property at FL3XX's expense, and they have caused FL3XX to suffer substantial

Niesar & Vestal LLP
90 New Montgomery St.
9th Floor
San Francisco, CA 94105

monetary losses, all of which damages and costs were not only foreseeable but were the intended consequences of Counterdefendants' collective actions.

70.     Based on the facts as alleged herein and as proven at trial, in equity and good conscience, it would be unconscionable and otherwise unjust for Counterdefendants to enrich themselves at FL3XX's expense.

**Sixth Cause Of Action**

**Trespass To Chattel**

**(Against Stellar and Roes 1 – 20)**

71.     FL3XX realleges and incorporates by reference the allegations set forth in paragraphs 1 through 44 into this cause of action.

72.     At all relevant times FL3XX owned the FL3XX Software, and it possessed and was custodian of the Customer Data.

73.     After June 9, 2021, Counterdefendants acted intentionally and without authorization to access and use the FL3XX Software and Customer Data.

74.     After June 9, 2021, Counterdefendants took, copied and/or made use of FL3XX Software-related data, including Customer Data.

75.     After June 9, 2021, Counterdefendants added, altered, damaged, deleted and/or destroyed FL3XX Software-related data, including Customer Data.

76.     Counterdefendants' wrongful conduct: (1) Interfered with FL3XX's ownership and use of the FL3XX Software and its possessory interest in the Customer Data; (2) Impaired or disrupted the proper functioning and performance of the FL3XX Software; and (3) Compromised the accuracy and integrity of the Customer Data.

77.     FL3XX did not consent to Counterdefendants' access, use and interference.

78.     FL3XX was harmed, and Counterdefendants' conduct was a substantial factor in causing FL3XX's harm, in an amount to be proven at trial and within the jurisdiction of this Court.

79.     Counterdefendants acted with malice, oppression, or fraud, within the meaning of California Civil Code Section 3294, entitling FL3XX to punitive and exemplary damages in a sum to be determined at trial.

### Seventh Cause Of Action

### Violation Of The California Data Access And Fraud Act

### (Cal. Penal Code § 502)

### (Against Stellar and Roes 1 – 20)

80.     FL3XX realleges and incorporates by reference the allegations set forth in paragraphs 1 through 44 into this cause of action.

81.     At all relevant times FL3XX owned the FL3XX Software, and it possessed and was custodian of the Customer Data.

82.     After June 9, 2021, Counterdefendants acted intentionally and without authorization to access and use the FL3XX Software and Customer Data.

83.     After June 9, 2021, Counterdefendants took, copied and/or made use of the FL3XX Software-related data, including Customer Data.

84.     After June 9, 2021, Counterdefendants added, altered, damaged, deleted and/or destroyed FL3XX Software-related data, including Customer Data.

85.     Counterdefendants' wrongful conduct: (1) Interfered with FL3XX's ownership and use of the FL3XX Software and its possessory interest in the Customer Data; (2) Impaired or disrupted the proper functioning and performance of the FL3XX Software; and (3) Compromised the accuracy and integrity of the Customer Data.

86.     FL3XX did not consent to Counterdefendants' access, use and interference.

87.     FL3XX was harmed, and Counterdefendants' conduct was a substantial factor in causing FL3XX's harm, in an amount to be proven at trial and within the jurisdiction of this Court.

///

88.    Counterdefendants acted with malice, oppression, or fraud within the meaning of California Civil Code Section 3294, entitling FL3XX to punitive and exemplary damages in a sum to be determined at trial.

## V.    PRAYER FOR RELIEF

WHEREFORE, FL3XX prays for relief as set forth below:

On the First Cause of Action (Breach of Written Contract):

1.    For compensatory and consequential damages in an amount to be proven at trial;

2.    For specific performance of Stellar's contractual obligations to: (1) Comply with FL3XX's Audit Notice; and (2) Return all Documentation;

3.    For prejudgment interest;

4.    For costs of suit incurred herein; and

5.    For such other and further relief as the Court deems just and proper.

On the Second Cause of Action (Breach of Implied Covenant of Good Faith and Fair Dealing):

1.    For compensatory damages in an amount to be proven at trial;

2.    For costs of suit incurred herein; and

3.    For such other and further relief as the Court deems just and proper.

On the Third Cause of Action (Intentional Interference with Prospective Economic Relations):

1.    For compensatory damages in an amount to be proven at trial;

2.    For punitive and exemplary damages;

3.    For injunctive relief requiring Counterdefendants to return any wrongfully obtained data in their possession, and prohibiting Counterdefendants from:

(1) Representing that Stellar is a reseller of the Services in the Territory; (2) Providing FL3XX Software support services; (3) Accessing and using the FL3XX Software; and (4) Browsing and altering Customer Data;

4.      For costs of suit incurred herein; and

5.      For such other and further relief as the Court deems just and proper.

On the Fourth Cause of Action (Negligent Interference with Prospective Economic Relations):

1.      For compensatory damages in an amount to be proven at trial;

2.      For injunctive relief requiring Counterdefendants to return any wrongfully obtained data in their possession, and prohibiting Counterdefendants from: (1) Representing that Stellar is the exclusive reseller of the Services in the Territory; (2) Providing FL3XX Software support services; (3) Accessing and using the FL3XX Software; and (4) Browsing and altering Customer Data;

3.      For costs of suit incurred herein; and

4.      For such other and further relief as the Court deems just and proper.

On the Fifth Cause of Action (Unjust Enrichment):

1.      For imposition of a constructive trust;

2.      For restitution in an amount to be proven at trial;

3.      For costs of suit incurred herein; and

4.      For such other and further relief as the Court deems just and proper.

On the Sixth Cause of Action (Trespass to Chattel):

1.      For compensatory damages in an amount to be proven at trial;

2.      For punitive and exemplary damages;

Niesar & Vestal LLP
90 New Montgomery St.
9th Floor
San Francisco, CA 94105

3.     For injunctive relief requiring Counterdefendants to return any wrongfully
obtained data in their possession, and prohibiting Counterdefendants from:  (1)
Representing that Stellar is a reseller of the Services in the Territory; (2)
Providing FL3XX Software support services; (3) Accessing and using the FL3XX
Software; and (4) Browsing and altering Customer Data;

4.     For costs of suit incurred herein; and

5.     For such other and further relief as the Court deems just and proper.


On the Seventh Cause of Action (Violation of the California Data Access and Fraud Act
(Cal. Penal Code § 502)):

1.     For compensatory damages in an amount to be proven at trial;

2.     For punitive and exemplary damages;

3.     For injunctive relief requiring Counterdefendants to return any wrongfully
obtained data in their possession, and prohibiting Counterdefendants from: (1)
Representing that Stellar is the exclusive reseller of the Services in the Territory;
(2) Providing FL3XX Software support services; (3) Accessing and using the
FL3XX Software; (4) Browsing and altering Customer Data;

4.     For attorney's fees and costs;

5.     For costs of suit incurred herein; and

6.     For such other and further relief as the Court deems just and proper.


Dated:  November 4, 2021                    NIESAR & VESTAL LLP


By:_____*/s/   Peter Vestal*_____
Peter Vestal
Attorneys for Defendant and Counterclaimant
FL3XX GmbH

Niesar & Vestal LLP
90 New Montgomery St.
9th Floor
San Francisco, CA 94105

Exhibit A

# MASTER STRATEGIC ALLIANCE AGREEMENT
# BETWEEN STELLAR LABS, INC. AND FL3XX GMBH

This Master Strategic Alliance Agreement (the "**Agreement**") shall commence from the date of the last signature below (the "**Effective Date**") and is made by and between Stellar Labs, Inc. ("**Stellar**"), a Delaware corporation, having its principal office and place of business at 205 Park Road, Burlingame, CA 94010, and FL3XX GmbH ("**FL3XX**"), an Austrian company, having its principal office and place of business at Kolingasse 11, 1090 Vienna, Austria. Stellar and FL3XX may be referred to individually as the "**Party**" and collectively as the "**Parties**."

*WHEREAS*, Stellar has an online exchange and other software products for business aviation (the "**Stellar Software**") and FL3XX has an aviation management system for business aviation (the "**FL3XX Software**");

*WHEREAS,* the Parties wish to establish a strategic relationship that drives an evolution from individual development and marketing of separate products to a fully shared and integrated mode of building, marketing, selling, and supporting of combined products;

*WHEREAS*, the Parties anticipate such efforts to be done over a period of time and expect to expand and extend cooperative efforts by entering into one or more ancillary agreements that are or will be governed by this Agreement; and

*WHEREAS,* the Parties wish to maximize the value created by the relationship, in part by minimizing redundant spending and taxes; moving work where it is performed more efficiently; moving weight where it is best carried; and enhancing the value and performance of each Party's products and services.

*THEREFORE*, in consideration of the above premises, the representations, warranties and covenants set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and intending to be legally bound hereby, the Parties agree as follows:

## 1. GOVERNANCE

a. Steering Committee. The "**Steering Committee**" sets strategic direction and is accountable for the overall success of the relationship. The following shall guide the development and actions of the Steering Committee.

- The Steering Committee ensures programs and activities are aligned with the objectives and business goals of this Agreement and all other ancillary agreements between the Parties.

- The Steering Committee reviews program status, performance, and financial results.

- The Parties will each have an equal number of Steering Committee participants. Either Party may change its participants in the Steering Committee to reflect changes of roles internal to each Party, or to improve the effectiveness of the Steering Committee, by notifying the other Party.

- The head of the Steering Committee shall be Paolo Sommariva who will lead the committee and manage its activities.

- The Steering Committee will conduct regular activity as agreed upon by the participants through workshops held approximately every calendar quarter, a monthly conference call, and continuous communications among the committee members.

- All Steering Committee meetings and relevant communications shall be logged using shared tools, as agreed to.

b. <u>Teams</u>. The Steering Committee may establish and manage joint teams to work on specific work streams as agreed. These teams may include: (1) Technical and Product team; (2) Marketing team; (3) Sales team; (4) Customer Support team; and (5) Finance team. Teams will provide recommendations, report their progress and status, and deliver work product for approval to the Steering Committee.

## 2.   ANCILLARY AGREEMENTS

The Parties may enter into one or more ancillary agreements from time to time. Each ancillary agreement will be made a part of this Agreement. In the event of any conflict between an ancillary agreement and this Agreement, this Agreement shall prevail, unless expressly stated otherwise in the ancillary agreement. Upon mutual agreement, the Parties may expand or contract the scope of an ancillary agreement by executing an amendment to that ancillary agreement.

## 3.   TERM AND TERMINATION

10 March 2020 - 9 March 2023

a. <u>Term of Agreement</u>. This Agreement commences on the Effective Date and continues for a period of three (3) years. This Agreement may be terminated earlier upon the completion of a merger of the Parties or upon mutual written agreement by the Parties.

b. <u>Renewal</u>. This Agreement may be renewed by mutual agreement of the Parties for additional renewal terms of one (1) year each.

c. <u>Termination for Cause</u>. Either Party may terminate this Agreement for the other's material breach by written notice specifying in detail the nature of the breach, effective in thirty (30) days unless the other Party first cures such breach, or effective immediately if the breach is not subject to cure.

## 4.   DEVELOPMENTS, INTELLECTUAL PROPERTY, AND FEEDBACK

a. <u>Developments</u>. "**Developments**" collectively refers to all inventions, discoveries, designs, developments, methods, modifications, improvements, processes, algorithms, mask works, databases, computer programs, formulae, techniques, trade secrets, graphics or images, and audio or visual works, and other works of authorship that either Party makes, conceives, reduces to practice, or creates, either alone or jointly with others (including the other Party), in association with this Agreement or any ancillary agreement.

b. <u>Ownership</u>. Each Party retains all right, title, and interest to any Developments or other intellectual property ("**IP**") to which that Party has, including without limitation all software, APIs, graphics, user interfaces, logos, patents, and Marks (as defined herein). This Agreement does not grant a Party any license or rights in or to the other Party's Developments or IP, except to the limited extent that this Agreement or future ancillary agreements specifically sets forth such rights. Each Party recognizes that the other Party's Developments and IP may be protected by copyright and other laws.

c.  <u>Limited License.</u>  Notwithstanding the provisions of this Article 4, each Party grants to the other Party a limited, non-exclusive, non-transferable license to access and use its IP for the purposes of demonstrating, marketing, selling, and providing support.

d.  <u>Customer Data</u>. Each Party is and will remain the sole data controller to all of its Customer Data ("**Customer Data**" means data in electronic form managed, received, processed, or stored by a Party related to that Party's end-user customers) including any intellectual property rights therein. It is the responsibility of the Party with the end-user contract to secure required permissions from the data owner to exchange and process personal data.

e.  <u>Feedback</u>. Each Party hereby grants the other Party a perpetual, irrevocable right and license to exploit Feedback ("**Feedback**" refers to any suggestion or idea for improving or otherwise modifying any Party's products or services) in any and every way. The Parties agree that Feedback is not considered Confidential Information as defined in this Agreement. Nothing in this Agreement or in the Parties' dealings arising out of or related to this Agreement will restrict a Party's right to use, profit from, disclose, publish, keep secret, or otherwise exploit Feedback, without compensating or crediting the source of such Feedback.

## 5.  TRADEMARKS

a.  <u>Materials</u>. Each Party will provide the other Party with electronic files containing the trademarks, logos, and trade names of such Party to be used under this Agreement, as specified in Exhibit A, if any (the "**Marks**").

b.  <u>Reciprocal License</u>. Subject to the terms and conditions of this Agreement, each Party hereby grants to the other Party a worldwide, non-exclusive, non-assignable, non-sublicensable, royalty-free, paid up, license to use and display the other Party's Marks solely as necessary to perform their respective obligations under this Agreement and any ancillary agreements.

c.  <u>Guidelines</u>. In its use of the Marks of the other Party ("**Licensor**"), each using Party ("**Licensee**") will comply with any trademark usage guidelines that Licensor may communicate to Licensee from time to time. Each use of Licensor's Marks by Licensee will be accompanied by the appropriate trademark symbol (either "™" or "®") and a legend specifying that such Marks are trademarks of Licensor, and will be in accordance with Licensor's then-current trademark usage policies as provided in writing to Licensee from time to time. Licensee will provide Licensor with copies of any materials bearing any of Licensor's Marks as requested by Licensor from time to time. If Licensee's use of any of Licensor's Marks, or if any material bearing such Marks, does not comply with the then-current trademark usage policies provided in writing by Licensor, Licensee will promptly remedy such deficiencies upon receipt of written notice of such deficiencies from Licensor. Other than the express licenses granted herein with respect to each Licensor's Marks, nothing herein will grant to Licensee any other right, title or interest in Licensor's Marks. All goodwill resulting from Licensee's use of Licensor's Marks will inure solely to Licensor. Licensee will not, at any time during or after this Agreement, register, attempt to register, claim any interest in, contest the use of, or otherwise adversely affect the validity of any of Licensor's Marks (including, without limitation, any act or assistance to any act, which may infringe or lead to the infringement of any such Marks).

## 6.   PUBLICITY

The Parties shall cooperate to draft all appropriate press releases and other public announcements relating to the subject matter of this agreement and the relationship between the Parties. The Parties will not unreasonably withhold or delay their consent to press releases or public announcements.

## 7.   CONFIDENTIAL INFORMATION

a.   <u>Confidential Information</u>. "**Confidential Information**" refers to the following items one Party to this Agreement ("**Discloser**") discloses to the other ("**Recipient**"): (a) any document Discloser marks "Confidential"; (b) any information Discloser orally designates as "Confidential" at the time of disclosure, provided Discloser confirms such designation in writing within 10 business days; (c) the terms and conditions of this Agreement (including other terms set forth in all ancillary agreements hereunder), benchmark or similar test results, other technology and technical information, security information, security audit reports, business and marketing plans, customer contact information, leads and sales pipeline information, the terms of third-party partner agreements, and (d) any other nonpublic, sensitive information Recipient should reasonably consider a trade secret or otherwise confidential.

b.   <u>Exclusions</u>. Notwithstanding the foregoing, Confidential Information does not include information that: (i) is in Recipient's possession at the time of disclosure; (ii) is independently developed by Recipient without use of or reference to Confidential Information; (iii) becomes known publicly, before or after disclosure, other than as a result of Recipient's improper action or inaction; or (iv) is approved for release in writing by Discloser. Recipient is on notice that the Confidential Information may include Discloser's valuable trade secrets.

c.   <u>Nondisclosure</u>. Recipient shall not use Confidential Information for anything other than to facilitate the purpose of this Agreement. Recipient: (a) shall not disclose Confidential Information to any employee or contractor of Recipient unless such person needs access in order to facilitate obligations under this Agreement and executes a nondisclosure agreement with Recipient with terms no less restrictive than those of this Agreement; and (b) shall not disclose Confidential Information to any other third party without Discloser's prior written consent. Without limiting the generality of the foregoing, Recipient shall protect Confidential Information with the same degree of care it uses to protect its own confidential information of similar nature and importance, but with no less than reasonable care. Recipient shall promptly notify Discloser of any misuse or misappropriation of Confidential Information that comes to Recipient's attention.

d.   <u>Compelled Disclosure</u>. Notwithstanding the foregoing, Recipient may disclose Confidential Information as required by applicable law or by proper legal or governmental authority. Recipient shall give Discloser prompt notice of any such legal or governmental demand and reasonably cooperate with Discloser in any effort to seek a protective order or otherwise to contest such required disclosure, at Discloser's expense.

e.   <u>Injunction</u>. Recipient agrees that breach of this Agreement would cause Discloser irreparable injury, for which monetary damages would not provide adequate compensation, and that in addition to any other remedy, Discloser will be entitled to injunctive relief against such breach or threatened breach, without proving actual damage or posting a bond or other security.

f.  <u>Termination & Return</u>. The obligations of Section 7.c above (Nondisclosure) will terminate five (5) years after the Effective Date; provided that such obligations related to Confidential Information constituting Discloser's trade secrets will continue so long as such information remains subject to trade secret protection pursuant to applicable law. Upon termination of this Agreement, Recipient shall return all copies of Confidential Information to Discloser or certify, in writing, the destruction thereof.

g.  <u>Exception & Immunity</u>. Pursuant to the Defend Trade Secrets Act of 2016, 18 USC Section 1833(b), Recipient is on notice and acknowledges that, notwithstanding the foregoing or any other provision of this Agreement:

(i) <u>*Immunity*</u>. An individual shall not be held criminally or civilly liable under any Federal or State trade secret law for the disclosure of a trade secret that
(A) is made (i) in confidence to a Federal, State, or local government official, either directly or indirectly, or to an attorney; and (ii) solely for the purpose of reporting or investigating a suspected violation of law; or
(B) is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal.

(ii) <u>*Use of Trade Secret Information in Anti-Retaliation Lawsuit*</u>. An individual who files a lawsuit for retaliation by an employer for reporting a suspected violation of law may disclose the trade secret to the attorney of the individual and use the trade secret information in the court proceeding, if the individual
(A) files any document containing the trade secret under seal; and
(B) does not disclose the trade secret, except pursuant to court order.

8.  **REPRESENTATIONS, WARRANTIES, AND DISCLAIMERS**

a.  <u>Representations and Warranties</u>. Each Party represents and warrants to the other Party that (a) it has the full power to enter into this Agreement and to perform its obligations hereunder, (b) it is the owner of all IP it claims under this Agreement or the recipient of a valid license thereto, and that it has and will maintain the full power and authority to grant the rights granted in this Agreement without the further consent of any third party, (c) this Agreement constitutes a legal, valid and binding obligation of such Party, enforceable against such Party in accordance with its terms, and (d) this Agreement does not contravene, violate or conflict with any other agreement of such Party.

b.  <u>Disclaimer</u>. EXCEPT AS SPECIFICALLY PROVIDED IN THIS AGREEMENT, NEITHER PARTY MAKES, AND EACH PARTY EXPRESSLY DISCLAIMS, ANY REPRESENTATIONS OR WARRANTIES IN CONNECTION WITH THIS AGREEMENT, WHETHER EXPRESS, IMPLIED, STATUTORY OR OTHERWISE, INCLUDING, WITHOUT LIMITATION, WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT OF THIRD PARTY RIGHTS, TITLE, ANY WARRANTIES ARISING OUT OF A COURSE OF PERFORMANCE, DEALING OR TRADE USAGE, AND THEIR EQUIVALENTS UNDER THE LAWS OF ANY JURISDICTION.

## 9.  INDEMNIFICATION

Each Party ("**Indemnitor**") shall defend, indemnify, and hold harmless the other Party ("**Indemnified Party**") and its Indemnified Associates (as defined below in this Section) against any third-party claim, suit, or proceeding arising out of, related to, or alleging any of the following (any "**Indemnified Claim**"): (i) unauthorized disclosure or exposure of personally identifiable information resulting from Indemnitor's acts or omissions or from those of its contractors; (ii) injury to or death of any individual, or any loss of or damage to real or tangible personal property, resulting from Indemnitor's acts or omissions or from those of its contractors; or (iii) intellectual property infringement by software or content Indemnitor contributed. Indemnitor's obligations in the preceding sentence include retention and payment of attorneys and payment of court costs, as well as settlement at Indemnitor's expense and payment of judgments.  The "**Indemnified Associates**" are the Indemnified Party's officers, directors, shareholders, parents, subsidiaries, agents, successors, and assigns.

## 10.  LIMITATION OF LIABILITY

a.  Dollar Cap. IN NO EVENT WILL THE AGGREGATE LIABILITY OF EITHER PARTY UNDER THIS AGREEMENT EXCEED U.S. $1,000,000 (OR EQUIVALENT IN LOCAL CURRENCY).

b.  Exclusion of Consequential and Related Damages. IN NO EVENT WILL EITHER PARTY BE LIABLE TO THE OTHER PARTY FOR ANY CONSEQUENTIAL, INDIRECT, SPECIAL, INCIDENTAL, OR PUNITIVE DAMAGES ARISING OUT OF OR RELATED TO THIS AGREEMENT.

c.  Clarifications and Disclaimers. THE LIABILITIES LIMITED BY THIS ARTICLE APPLY: (i) TO LIABILITY FOR NEGLIGENCE; (ii) REGARDLESS OF THE FORM OF ACTION, WHETHER IN CONTRACT, TORT, STRICT PRODUCT LIABILITY, OR OTHERWISE; (iii) EVEN IF THE DAMAGED PARTY IS ADVISED IN ADVANCE OF THE POSSIBILITY OF THE DAMAGES IN QUESTION AND EVEN IF SUCH DAMAGES WERE FORESEEABLE; and (iv) EVEN IF PARTY'S REMEDIES FAIL OF THEIR ESSENTIAL PURPOSE.  If applicable law limits the application of the provisions of this Article, a Party's liability will be limited to the maximum extent permissible.  For the avoidance of doubt, a Party's liability limits, and other rights set forth in this Article, apply likewise to its affiliates, authorized contractors, licensors, suppliers, advertisers, agents, sponsors, directors, officers, employees, consultants, and other representatives.

d.  Exceptions.  Section 10.a (Liability Cap) does not apply to: (a) claims for liquidated damages pursuant to any provision of this Agreement or any ancillary agreement; or (b) claims pursuant to Article 9 (Indemnification).

## 11.  RESERVATION OF RIGHTS

The Parties acknowledge and agree that, except for the rights and licenses expressly granted by each Party to the other Party under this Agreement, each Party will retain all right, title and interest in and to its products, services, Developments, IP, Marks, Confidential Information, and all content, information and other materials on its website(s), and nothing contained in this Agreement will be construed as conferring upon such party, by implication, operation of law or otherwise, any other license or other right.

## 12.   INSURANCE

Within 90 days of the Effective Date and for the duration of the term of this Agreement, each Party shall maintain in full force and effect: (a) commercial general liability insurance covering personal injury and property damage, including without limitation contractual liability, with limits of at least $1,000,000 per occurrence and $2,000,000 in the aggregate; (b) business automobile liability insurance for all vehicles, including those owned or rented by each Party or its employees, covering personal injury and property damage, with a limit of at least $1,000,000 per occurrence; (c) worker's compensation and employer's liability insurance, with limits of at least $1,000,000; and (d) cyber liability insurance, with a limit of at least $2,000,000 per occurrence.

## 13.   DISPUTE RESOLUTION

The Parties will negotiate in good faith to resolve any disputes arising from programs and activities under this Agreement. The Parties may amend this Agreement by mutual agreement.

Each Party agrees to notify the other in writing within sixty (60) days of becoming aware of a dispute.  The Parties agree to cooperate to try to reasonably resolve all disputes.  If requested by either Party, a senior representative of each Party will meet and engage in good faith negotiations; such representatives will convene within thirty (30) days of the written dispute notice, unless otherwise agreed.  All meetings and discussions between senior representatives will be deemed confidential settlement discussions not subject to disclosure under Federal Rule of Evidence 408 or any similar applicable state rule.  If the Parties fail to resolve the dispute, the Parties will proceed to non-binding mediation before a single mediator who is jointly selected by the Parties.  Nothing in this Section shall prevent either Party from seeking necessary injunctive relief from a court of competent jurisdiction at any time.

## 14.   GENERAL PROVISIONS

    a.   No Agency. Notwithstanding anything in this Agreement, neither Party will make any claims, representations, or warranties on behalf of the other Party or bind the other Party, and neither Party is authorized to do so by this Agreement. The relationship between the Parties will be that of independent contractors.  Nothing contained herein will be construed to imply a joint venture, principal or agent relationship, or other joint relationship, and neither Party will have the right, power or authority to bind or create any obligation, express or implied, on behalf of the other Party.

    b.   No Disparagement. During the term of this Agreement, each Party shall not make any public statements disparaging the other Party's Marks, products or services.

    c.   Severability. To the extent permitted by applicable law, the Parties hereby waive any provision of law that would render any clause of this Agreement invalid or otherwise unenforceable in any respect. In the event that a provision of this Agreement is held to be invalid or otherwise unenforceable, such provision will be interpreted to fulfill its intended purpose to the maximum extent permitted by applicable law, and the remaining provisions of this Agreement will continue in full force and effect.

    d.   Assignment and Successors. Neither Party may assign this Agreement or any of its rights or obligations hereunder without the other Party's express written consent. Except to the extent

forbidden in this Section 14.d, this Agreement will be binding upon and inure to the benefit of the Parties' respective successors and assigns.

e.  <u>Force Majeure</u>.  No delay, failure, or default, other than a failure to pay fees when due, will constitute a breach of this Agreement to the extent caused by acts of war, terrorism, hurricanes, earthquakes, other acts of God or of nature, strikes or other labor disputes, riots or other acts of civil disorder, embargoes, or other causes beyond the performing Party's reasonable control.

f.  <u>Choice of Law and Jurisdiction</u>. This Agreement will be governed solely by the internal laws of the State of California including, without limitation, applicable federal law, without reference to: (i) any conflicts of law principle that would apply the substantive laws of another jurisdiction to the Parties' rights or duties; (ii) the 1980 United Nations Convention on Contracts for the International Sale of Goods; or (iii) other international laws. The Parties consent to the personal and exclusive jurisdiction of the federal and state courts of San Mateo County, California.  This Section XX governs all claims arising out of or related to this Agreement, including without limitation tort claims.

g.  <u>Technology Export</u>. The Parties agree that no Developments or IP will be shipped, transferred or exported into any country or used in any manner prohibited by the United States Export Administration Act or any other export laws, restrictions or regulations.

h.  <u>Execution in Counterparts</u>. This Agreement may be executed in one or more counterparts.  Each counterpart will be an original, but all such counterparts will constitute a single instrument.

i.  <u>Invoices</u>.  The terms, provisions or conditions of any purchase order or other business form or written authorization used by either Party will have no effect on the rights, duties or obligations of the Parties under, or otherwise modify, this Agreement, regardless of any failure of the receiving Party to object to those terms, provisions or conditions.

j.  <u>Waiver and Amendment</u>.  No modification, amendment or waiver of any provision of this Agreement shall be effective unless in writing and signed by the party to be charged.  No failure or delay by either Party in exercising any right, power, or remedy under this Agreement, except as specifically provided herein, shall operate as a waiver of any such right, power or remedy.

k.  <u>Compliance with Laws</u>.  Each party shall comply with all applicable laws and regulations regarding the general conduct of business including without limitation all relevant anti-corruption and anti-bribery laws, including the United States Foreign Corrupt Practices Act, and all data protection regulations including the EU General Data Protection Regulation.

IN WITNESS WHEREOF, the Parties have executed this Agreement on the date below.

For Stellar:

DocuSigned by:

*Vicki Nakata*

—AEA285F609A640E...

Vicki Nakata
Chief Executive Officer

Date: 3/10/2020

For FL3XX:

DocuSigned by:

—584D4A21E7A24DF...

Paolo Sommariva
Chief Executive Officer

Date: 3/10/2020

DocuSign Envelope ID: 587990C8-EF61-496A-8F21-A3293C741E3

**EXHIBIT A**

The Parties' Marks (with the meaning given in Section 5.a above) are as follows.

1. For Stellar Labs,

| | |
|---|---|
| The name Stellar | |
| The styled STELLAR mark | STELLAR |
| The name Stellar Cloud | |
| | |

2. For FL3XX,

| | |
|---|---|
| The styled FL3XX mark | FL3XX |
| The name FL3XX | |

Exhibit B

DocuSign Envelope ID: 2215FC8B-222B-450A-95D2-347E3FD2E605

# RECIPROCAL RESELLER AGREEMENT

This Reciprocal Reseller Agreement (the "**Agreement**") shall commence from the date of the last signature below (the "**Effective Date**") and is made by and between Stellar Labs, Inc. ("**Stellar**"), a Delaware corporation, having its principal office and place of business at 205 Park Road, Burlingame, CA  94010, and FL3XX GmbH ("**FL3XX**"), an Austrian company, having its principal office and place of business at Kolingasse 11, 1090 Vienna, Austria (collectively, the "**Parties**").  Stellar and FL3XX may be referred to individually as the "**Party**" and collectively as the "**Parties**."  As used in this Agreement and as the case may be, the term "**Provider**" means the Party that is making available Services (as defined below) that the other Party, the "**Reseller**," will resell.

This Agreement is an ancillary agreement to that certain Master Strategic Alliance Agreement (the "**Master Agreement**"), signed by the Parties concurrent with this Agreement.  All terms specified in this Agreement control with respect to any conflict with the Master Agreement.

1.    **DEFINITIONS**

For the purposes of this Agreement, in addition to the capitalized terms defined elsewhere in this Agreement, the following terms shall have the meanings ascribed to them as follows:

"**Affiliate**" means any entity that directly or indirectly controls, is controlled by, or is under common control with the subject entity.  Control, for purposes hereof, means direct or indirect ownership or control of more than fifty percent (50%) of the voting interests of the subject entity.

"**Customer(s)**" means individuals or entities to which Reseller has resold Services.

"**Customer Data**" means all electronic data or information submitted by Customers to the Services.

"**Fees**" means the fees (as specified in each Service Schedule) payable by Reseller to Provider for the resale of the Services to Customers

"**Deliverables**" means any work product, software, programs, interfaces, modifications, configurations, reports, or documentation developed or delivered in the performance of Professional Services.

"**Documentation**" means the user guides, online help, release notes, training materials, and other documentation provided or made available by Provider to Reseller regarding the use or operation of the Services.

"**Malicious Code**" means viruses, worms, time bombs, Trojan horses and other harmful or malicious code, files, scripts, agents or programs.

"**Professional Services**" means the services to be provided by the Provider to the Reseller or Customer, which may include, without limitation, engineering, maintenance, installation, design consulting, business planning, network planning and analysis.

"**Reseller Data**" means all electronic data or information submitted by Reseller to the Services.

"**Service Schedule**" means the documents for placing orders pursuant to this Agreement that are entered into between the Parties from time to time, including addenda and supplements thereto.  Service Schedules shall be deemed incorporated into this Agreement by reference.

"**Services**" means the products and services that are ordered by Reseller pursuant to a Service Schedule and made available by the Provider.

"**Statement of Work**" or "**SOW**" means a statement of work entered into and executed by the Parties describing Professional Services to be provided.  SOW's shall be deemed incorporated into this Agreement by reference.

"**Term**" has the meaning ascribed to that term in Section 8.1.

DocuSign Envelope ID: 2215FC8B-222B-450A-95D2-347E3FD2E605

"**Territory**" means the geographic area specified under the heading "Territory" for any particular Service Schedule as it relates to that Service Schedule.

"**Third-Party Applications**" means online applications and offline software products provided by entities or individuals other than the Provider and are clearly identified as such, and that interoperate with the Services.

"**User(s)**" means any individual or company who uses the Services on Customer's behalf or through Customer's account or passwords, whether authorized or not, including, without limitation, Customer's employees, consultants, contractors, agents, or other third parties with which Customer transacts business.

## 2.   SERVICES

**2.1.    Provision of Services.**  Conditioned on the provisions in this Section 2.1 and the other terms and conditions of this Agreement and payment of the applicable Fees, Provider hereby appoints Reseller, and Reseller hereby accepts a revocable, non-transferable, authorization to sell Services in the Territory as outlined in each Service Schedule.  Reseller shall market, promote and resell the Services to Customers and potential Customers, at its own expense and using its own efforts with its own sales force.  Reseller shall pay the Provider the Fees set forth in each Service Schedule.  The Provider shall make the Services available to Reseller for resale to Customers pursuant to this Agreement and in accordance with the terms specified in the individual Service Schedules entered into by Provider and Reseller.

**2.2.    Provider Responsibilities for the Services.**  Provider shall provide Reseller with the Services within the Territory for the purpose of the resale to Customers.  The Services shall be made available by Provider subject to any unavailability caused by circumstances beyond Provider's reasonable control, including any force majeure events and any computer, communications, Internet service or hosting facility failures or delays involving hardware, software, power or other systems not within Provider's possession or reasonable control, and denial of service attacks.  The Services may be temporarily limited, interrupted or curtailed due to maintenance, repair, modifications, upgrades or relocation.  Provider shall attempt to notify Reseller of scheduled and unscheduled network outages that are expected to last more than four (4) hours and that may affect the Services.

**2.3.    Reseller Responsibilities.**  Reseller shall maintain marketing and customer service standards that are appropriate in order to maintain high-quality Services and to reflect favorably on Reseller's and Provider's reputation. Reseller shall provide Customers with prompt, courteous, and efficient service, shall take every reasonable precaution not to disclose any Customer information, other than as permitted by any applicable privacy, and shall deal with Customers honestly and fairly.  Reseller shall be responsible for all activities of its Customers and Reseller shall (i) use commercially reasonable efforts to prevent unauthorized access to or use of the Services and shall notify Provider promptly of any such unauthorized access or use; and (ii) comply with all applicable local, state, provincial, federal and foreign laws in respect to the promotion and resale of the Services.

**2.4.    Non-Disparagement Obligations.**  Neither Party nor its Affiliates shall by way of statement, act or omission, discredit or reflect adversely upon the reputation of or the quality of the other Party or the products or Services provided by the other Party.

**2.5.    Customer Subscriptions.**  Unless otherwise specified in the applicable Service Schedule, access to SaaS-based Services is generally purchased as a subscription (each a "**Customer Subscription**") and limits to the number of Users may be applicable.  Subscriptions are for designated Customers only and cannot be shared or used by more than one Customer.

**2.6.    Customer Contracts.**  The Services shall be provided to Customers upon execution of an end-user agreement on terms and conditions that are determined by Reseller, in accordance with any applicable regulations and in accordance with provisions set out in the applicable Service Schedule (each a "**Customer Contract**").  A Customer Contract shall:  (a) forbid access or exploitation of the Services outside of that authorized by the Customer Contract; (b) restrict the use of Services to the same extent, or more, than those in Section 2.7 ("Restrictions"); (c) provide for audit rights in order to fulfill obligations set forth in Section 2.11 ("Audit Rights"); (d) require that the Customer cease using all Services and return all Documentation upon termination of the Customer Contract; (e) provide a warranty disclaimer to the effect that the Services are provided "as is" and that there are no representations or warranties that the Services will perform without interruption or error; and (f) provide that the Provider may enforce the Customer Contract as an intended third-party beneficiary of the provisions therein.

DocuSign Envelope ID: 2215FC8B-222B-450A-95D2-347E3FD2E605

Provider shall have no obligation to determine any regulatory requirements or restrictions regarding the resale of Services in the Territory.  Except as agreed upon in a Service Schedule, Provider shall have no obligation to deal directly with Customers or for any customer service activities for or in respect of Customers.  Reseller shall not make any representations or warranties on behalf of Provider or in any way bind or attempt to bind Provider contractually or otherwise with any Customer(s).

**2.7.   Restrictions.**  Reseller shall not (and shall not authorize any third party to):  (a) modify, translate, reverse engineer, decompile, disassemble, or create derivative works based on the Services except to the extent that enforcement of the foregoing restriction is prohibited by applicable law; (b) circumvent any User limits or other timing, use or functionality restrictions built into the Services; (c) remove any proprietary notices, labels, or marks from the Services (except to the extent Reseller is so permitted to for the purposes of re-branding the Services); (d) frame or mirror any content forming part of the Services; or (e) access the Services in order to (i) build a competitive product or service, or (ii) copy any ideas, features, functions or graphics of the Services.

**2.8.   Ownership and Proprietary Rights.**  The Parties acknowledge that Article 4 of the Master Agreement ("Development, Intellectual Property, and Feedback") prescribes each Party's respective ownership and proprietary rights.

**2.9.   Professional Services.**  Upon execution of a Service Schedule or SOW requesting Professional Services and subject to the terms and conditions set forth in Exhibit A, Reseller may retain Provider to provide Professional Services (including the development of Deliverables) for Reseller, all as described in such Service Schedule or SOW. If Reseller submits a request for Professional Services, such request shall not be binding upon Provider until accepted by Provider.  Provider shall respond to each request submitted by Reseller within five (5) business days following receipt thereof.  Once a request has been accepted, it shall be subject to the terms and conditions of this Agreement (such terms superseding any and all pre-printed terms and/or conditions within such requesting document).

**2.10.   Customer and Reseller Data.**  Provider shall have the limited right to use the Customer Data and Reseller Data to provide the Services in accordance with this Agreement and Reseller shall obtain such rights from its Customers for Provider.  Subject to the limited rights granted to Provider pursuant to this Agreement or the applicable Service Schedule, Provider acquires no right, title or interest from Reseller or any Customers under this Agreement in or to Customer Data and Reseller Data, including any intellectual property rights therein.

**2.11.   Audit Rights.**  During the Term of this Agreement and at any time during the sixty (60) days thereafter, Provider may audit Reseller's records relating to the sale of Services, on ten (10) days' advance written notice. Reseller shall cooperate with the audit, including by providing access to any books, computers, records, or other information that relate or may relate to the sale of Services.  Such audit shall not unreasonably interfere with Reseller's business activities.  If Provider discovers unauthorized exploitation, Reseller shall reimburse Provider for the reasonable cost of the audit, or of the next audit in case of discovery without an audit, in addition to such other rights and remedies as Provider may have.  Provider may not conduct an audit more than once per year.

**3.   SERVICES SETUP AND OPERATION**

**3.1.   Launch of the Services with Reseller.**  Upon execution of this Agreement and for each Service Schedule, the Parties will cooperate and use commercially reasonable efforts to integrate the ordered Services with any Reseller software or infrastructure within which the Services need to interact in order to allow the Services to be marketed by Reseller to Customers in the Territory.  Once the Services have been integrated with Reseller's software or infrastructure and the Parties agree that the integrated Services are of a reasonable quality (having regard to similar commercial offerings), the Reseller shall be entitled to begin reselling the Services to Customers in the Territory.

**3.2.   Support.**  Provider shall provide basic support for the Services to Reseller at no additional charge and/or upgraded support if purchased separately by Reseller.  Reseller shall be responsible for providing First Line Support to Customers and Users of the Services.  For the purposes of this Agreement, "**First Line Support**" means (i) fielding each initial call on a Services problem or other inquiry from a Customer or User; (ii) generating and issuing a trouble ticket containing a reference/tracking number to the Customer or User (i.e., provision of a Reseller support number to the Customer or User); (iii) to the extent reasonably possible, identifying the problem or performance deficiency in the Services; (iv) by reference to only a troubleshooting guide that may be provided by Provider, attempting to resolve the problem; (v) where such problem has not been resolved, preparing an error notification in relation to the problem or performance deficiency; (vi) managing communications and expectations with the Customer and/or User until the

DocuSign Envelope ID: 2215FC8B-222B-450A-95D2-347E3FD2E605

problem is referred to Provider; and (vii) escalating the error notification to Provider.  Under no circumstances will Provider be obliged to deal directly with a Customer or User.

**3.3.** **Acquisition of Third-Party Products and Services.**  Third parties may from time to time make available to Reseller third-party products or services, including but not limited to Third-Party Applications and implementation, customization and other consulting services.  Any acquisition by Reseller of such third-party products or services, and any exchange of data between Reseller or its Customers and any third-party vendor, is solely between Reseller or the applicable Customer, as the case may be, and the applicable third-party vendor.  Provider does not warrant or support third-party products or services, whether or not they are designated by Provider as "certified" or otherwise, except as specified in a Service Schedule.  Subject to Section 3.5, no purchase of third-party products or services is required to use the Services except a supported computing device, operating system, web browser and Internet connection.

**3.4.** **Third-Party Applications and Customer and Reseller Data.**  If Reseller or any of its Customers installs or enables Third-Party Applications for use with the Services, Reseller acknowledges that Provider may allow vendors of those Third-Party Applications to access Customer Data and Reseller Data required for the interoperation of such Third-Party Applications with the Services.  Provider shall not be responsible for any disclosure, modification or deletion of any Customer Data and Reseller Data resulting from any such access by Third-Party Application vendors. The Services shall allow Customers to restrict such access by restricting Users from installing or enabling such Third-Party Applications for use with the Services.

**3.5.** **Integration with Third-Party Services.**  The Services may contain features designed to interoperate with Third-Party Applications.  To use such features, Reseller and Customers may be required to obtain access to such Third-Party Applications from their respective vendors.  If a vendor ceases to make a Third-Party Application available for interoperation with the corresponding Service features on reasonable terms, Provider may cease providing such Service features without entitling Reseller or any Customers to any refund, credit, or other compensation.

**3.6.** **Provider Protection of Customer Data.**  Provider shall maintain commercially reasonable administrative, physical, and technical safeguards for protection of the security, confidentiality and integrity of Customer Data. Provider shall not (a) modify Customer Data except to the extent required to provide the Services, (b) disclose Customer Data except as compelled by law or as expressly permitted in writing by Reseller or the applicable Customer, or (c) access Customer Data except to provide the Services and prevent or address service or technical problems, or at Reseller's request in connection with Customer support matters.

**3.7.** **Reseller Responsibilities.**  Reseller shall be responsible for Customers' and Users' compliance with Provider's policies and procedures applicable to the Services.  Reseller shall not: (a) make the Services available to anyone other than Customer and Users; (b) sell, resell, rent or lease the Services outside the applicable Territory; (c) use the Services to store or transmit infringing, libelous, or otherwise unlawful or tortious material, or to store or transmit material in violation of third-party privacy rights; (d) use the Services to store or transmit Malicious Code; (e) interfere with or disrupt the integrity or performance of the Services or third-party data contained therein; or (f) attempt to gain unauthorized access to the Services or their related systems or networks.  Reseller shall, solely at its own cost, employ at least one (1) experienced salesperson who is knowledgeable concerning the functions, specifications, and advantages of the Services.

**3.8.** **Usage Limitations.**  If Provider opts to impose Services limitations on all customers, such as but not limited to disk storage space, application programming interface calls, then Provider will use commercially reasonable efforts to provide at least three (3) months written notice of such limitations to Reseller.

**4.** **PAYMENT TERMS AND TAXES**

**4.1.** **Customer Pricing and Responsibility.**  Reseller is responsible for establishing Customer pricing for the Services.  Provider shall have no responsibility for billing or collecting such fees or any other amounts from Customers.  Reseller is solely responsible for payment to Provider for all Fees for the Services provided to Customers. In connection with such activities, Reseller will act in all respects for its own account and will be responsible for such matters as credit verification, deposits, billing, collection, bad debts, and any unauthorized use of the Services by or on behalf of Customers.  Provider is obligated only to Reseller, with which it is in privity of contract, and not to Customers, with whom Provider is not in privity of contract.  Customers are not to be deemed third-party beneficiaries of this Agreement.

DocuSign Envelope ID: 2215FC8B-222B-450A-95D2-347E3FD2E605

**4.2.**     **Fees.**  Reseller shall pay all Fees specified in all Service Schedules or SOW's pursuant to this Agreement. Except as otherwise specified in this Agreement or in a Service Schedule, (i) for subscription-based Services, Fees are based on Customer Subscriptions and the actual usage therein, and (ii) payment obligations are non-cancelable and Fees paid are non-refundable.

**4.3.**     **Payment Terms.**  All payments under this Agreement shall be made within thirty (30) days after the receipt of the applicable invoice.  All amounts are payable in currency as specified on the Service Schedule or SOW.  Any amounts not paid when due shall accrue interest at the lesser of one and one-half percent (1.5%) per month compounded or the maximum rate allowed by law.  If Reseller has been delinquent in its payments, Provider may condition future subscription renewals and Service Schedules on prepayment or payment terms shorter than those specified in this Section.

**4.4.**     **Suspension of Services and Acceleration.**  If any amount owing by Reseller under this or any other agreement for the Services is thirty (30) or more days overdue, Provider may, without limiting Provider's other rights and remedies, accelerate Reseller's unpaid Fee obligations under such agreements so that all such obligations become immediately due and payable, and suspend provision of the Services to Reseller and the Customers until such amounts are paid in full.  Provider will give Reseller at least seven (7) days prior notice that its account is overdue, before suspending the Services.

**4.5.**     **Taxes.**  Amounts due under this Agreement are payable to Provider and are net of any taxes, levies, duties or similar governmental assessments of any nature, including but not limited to value-added, goods and services, harmonized, sales, use or withholding taxes, assessable by any local, state, provincial, federal or foreign jurisdiction (collectively, "**Taxes**").  Reseller is responsible for paying all Taxes associated with its sale of Services pursuant to this Agreement.  If Provider has the legal obligation to pay or collect Taxes for which Reseller is responsible under this paragraph, the appropriate amount shall be invoiced to and paid by Reseller, unless Reseller provides Provider with a valid tax exemption certificate authorized by the appropriate taxing authority.  For clarity, Provider is solely responsible for taxes assessable against Provider based on its income, property, and employees.

## 5.     CONFIDENTIALITY

The Parties acknowledge that Article 7 of the Master Agreement ("Confidential Information") prescribes each Party's respective confidentiality requirements.

## 6.     REPRESENTATIONS, WARRANTIES, AND DISCLAIMERS

**6.1.**     **Acknowledgment.**  The Parties acknowledge that Article 8 of the Master Agreement ("Representations, Warranties, and Disclaimers") outlines each Party's respective representations, warranties, and disclaimers, as amended herein for purposes of this Agreement.

**6.2.**     **Additional Warranties.**  In addition to Section 6.1 above, Provider warrants that (i) the Services shall perform materially in accordance with the Documentation, (ii) subject to Sections 3.3 and 3.5, the functionality of the Services will not be materially decreased during a subscription term, and (iii) Provider will not transmit Malicious Code to Reseller or any Customers provided that if Reseller, a Customer, or a User uploads a file containing Malicious Code into the Services and later downloads that file, this warranty shall not apply to such file.  For any breach of a warranty in this Article 6, Reseller's exclusive remedy shall be as provided in Sections 8.2 and 8.5 below.

## 7.     INDEMNITY

**7.1.**     **Acknowledgment.**  The Parties acknowledge that Article 9 of the Master Agreement ("Indemnification") prescribes each Party's respective indemnification obligations, as amended herein for purposes of this Agreement.

**7.2.**     **Additional Reseller Indemnification.**  In addition to Section 7.1 above, Reseller shall defend, indemnify, and hold harmless Provider against any third-party claim, suit, or proceeding arising out of, related to, or alleging (a) the provision, use or failure of any non-Provider product or service provided by Reseller; (b) any representations or warranties made by Reseller in respect to the Services or any portions thereof beyond those authorized in this Agreement; or (c) any violation of any law or regulation by Reseller or any of its Affiliates or any of its or their officers, directors, employees, contractors or agents.

DocuSign Envelope ID: 2215FC8B-222B-450A-95D2-347E3FD2E605

**7.3.     Additional Provider Indemnification.**  In addition to Section 7.1 above, Provider shall defend, indemnify, and hold harmless Reseller against any third-party claim, suit, or proceeding arising out of, related to, or alleging non-compliance with performance and service level standards for the Services.

**7.4.     Exception.**  Notwithstanding the indemnification obligations in this Article 7, Provider shall have no liability for a claim of infringement or misappropriation to the extent caused by (i) the combination of Services with any other service, software, data or products not provided by Provider, which claim would have been avoided if the Services had not been so combined; (ii) the use of any material provided by Reseller or any Customers; (iii) any use or resale of the Services outside the parameters set in the applicable Service Schedule; or (iv) any breach by Reseller of this Agreement or by any Customers of any Services policies and/or procedures.

**8.       TERM AND TERMINATION**   <span style="color:red">see Master Alliance Agreement / 3. Term and Termination: expires 9 March 2023</span>

**8.1.     Term.**  This Agreement shall commence as of the Effective Date and shall continue in effect for an initial term to coincide with the initial term prescribed in the Master Agreement (such initial term referred to in this Agreement as the "**Initial Term**").  Thereafter, if the Master Agreement is renewed by the Parties, then the term of this Agreement shall be automatically renewed annually on the anniversary of the Effective Date for additional one (1) year renewal terms (any such subsequent renewal terms referred to in this Agreement as a "**Renewal Term**"), unless either party gives written notice of non-renewal to the other party at least sixty (60) days prior to the end of the Initial Term or any Renewal Term hereof.  Collectively, the Initial Term and any subsequent Renewal Terms shall constitute the "**Term**".

**8.2.     Termination.**  This Agreement may be terminated as follows: (a) if Reseller fails to make any payment due hereunder within thirty (30) days after receiving written notice from Provider that such payment is delinquent, Provider may terminate this Agreement on written notice to Reseller at any time following the end of such period; (b) if either Party breaches any material term or condition of this Agreement and fails to cure such breach within thirty (30) days after receiving written notice of the breach, the non-breaching Party may terminate this Agreement on written notice at any time following the end of such thirty (30) day period; or (c) if either Party becomes insolvent (i.e., becomes unable to pay its debts in the ordinary course of business as they come due) or makes an assignment for the benefit of creditors, then the other Party may terminate this Agreement immediately upon notice.

**8.3.     Survival.**  The following articles and sections shall survive the termination or expiration of this Agreement for any reason: 1, 2.8, 2.10 thru 2.11 (for sixty (60) days after expiration or termination of the Agreement), 5, 6, 7, 8.3 thru 8.6, 9, 10, and any payment obligations incurred prior to the expiration or termination of this Agreement.

**8.4.     Effect of Termination.**  Upon expiration or termination of this Agreement, Reseller shall cease all use and reselling of the Services and return all Documentation.

**8.5.     Rights upon Termination.**  Termination is not an exclusive remedy and is in addition to other rights or remedies that may be available.  Upon any termination for cause by Reseller, Provider shall refund Reseller any prepaid Fees covering the remainder of the term of all subscriptions after the effective date of termination.  Upon any termination for cause by Provider, Reseller shall pay any unpaid Fees covering the remainder of the term of all Service Schedules after the effective date of termination.  In no event shall any expiration or termination relieve Reseller of the obligation to pay any Fees payable to Provider for the period prior to the effective date of termination.  If the Agreement is not terminated for a breach by Reseller and if each Party is amenable to such an arrangement, then once the Reseller has sold a subscription for the Services to a Customer during the Term, ongoing revenue for the remaining term of such Customer's subscription (as of the effective date of termination of expiration of this Agreement) will continue to be shared as per the clauses in this Agreement and both Parties shall continue to provide services to such Customer in the manner prescribed in this Agreement for the remainder of such subscription term.

**8.6.     Return of Customer and Reseller Data.**  Upon request by Reseller made within thirty (30) days after the effective date of termination or expiration of a Services subscription, Provider will make available to Reseller for download a file of such individual Customer Data (for the Customer whose subscription has expired) or Reseller Data in comma separated value (.csv) format along with attachments in their native format.  After such 30-day period, Provider shall have no obligation to maintain or provide any of such Customer Data or Reseller Data and shall thereafter, unless legally prohibited, may delete all of such Customer Data or Reseller's Data in Provider's systems or otherwise in Provider's possession or under Provider's control.

DocuSign Envelope ID: 2215FC8B-222B-450A-95D2-347E3FD2E605

**9.     LIMITATION OF LIABILITY**

**9.1.    Acknowledgment.**   The Parties acknowledge that Article 10 of the Master Agreement ("Limitation of Liability") outlines each Party's liability provisions, as amended herein for purposes of this Agreement.

**9.2.    Dollar Cap.**   IN NO EVENT WILL THE AGGREGATE LIABILITY OF EITHER PARTY UNDER THIS AGREEMENT EXCEED U.S. $100,000 (OR EQUIVALENT IN LOCAL CURRENCY) OR THE CHARGES FOR THE SERVICES THAT ARE THE SUBJECT OF THE CLAIM, WHICHEVER IS LESSER.

**10.     GENERAL PROVISIONS**

**10.1.    Acknowledgment.**   The Parties acknowledge that Article 14 of the Master Agreement ("General Provisions") outlines general provisions that this Agreement is still subject to, unless specifically amended herein, along with new provisions specified herein.

IN WITNESS WHEREOF, the Parties have executed this Agreement on the date below.

**For Stellar**

DocuSigned by:

*Vicki Nakata*   _____
AEA285F609A640E...
Chief Executive Officer
Date: 3/12/2020

**For FL3XX**

DocuSigned by:

_____
584D4A21E7A24DF...
Chief Executive Officer
Date: 3/12/2020

DocuSign Envelope ID: 2215FC8B-222B-450A-95D2-347E3FD2E605

# EXHIBIT A

## PROFESSIONAL SERVICES TERMS AND CONDITIONS

The following terms and conditions are incorporated into the Agreement.  Capitalized words not defined in this Schedule shall have the meaning ascribed to such words in the Agreement.

Provider is willing to provide Professional Services (including the development of Deliverables) on a time and materials or fixed price basis according to the terms and conditions set forth in this Exhibit A or such other form as the Parties may agree in writing.  Such Professional Services may include instruction and training on the use of products and services; installation, configuration, maintenance and testing of products and services; evaluation, design and implementation of system architectures; business and network planning; and custom software development.

**1.      General**
All Professional Services to be performed and Deliverables to be developed by Provider at Reseller's request shall be described in a SOW.  Upon execution by authorized representatives of each Party, each SOW shall become a part of the Agreement.  Each SOW will incorporate the terms and conditions of this Exhibit A.  In the event of a conflict between the SOW and this Exhibit A or the Agreement, this Exhibit A or the Agreement, as the case may be, shall prevail.

**2.      Provider Obligations**
Provider shall perform Professional Services and develop Deliverables for Reseller as described in any SOW agreed to by the parties.  Provider shall perform such Professional Services and develop Deliverables in a reasonable, professional and workmanlike manner in keeping with industry standards and practices.  Provider shall be entitled, in its sole discretion, to determine the method and means for performing the Professional Services and developing the Deliverables.  Reseller acknowledges and agrees that Provider may retain the services of independent consultants ("**Subcontractors**") from time to time to perform, or to assist Provider in performing the Professional Services and developing the Deliverables under this Exhibit A or a SOW.  Provider personnel or Subcontractors shall remain under the direction and control of Provider.  Provider shall in the performance of any Professional Services and development of any Deliverables use reasonable efforts to comply with all Reseller procedures and rules which have been communicated to Provider in writing.

**3.      Reseller Obligations**
Reseller acknowledges and agrees that performance of Professional Services is heavily dependent upon information and responses to be provided by Reseller.  Accordingly, in addition to any specific responsibilities set out in the SOW, Reseller shall: (i) provide timely and accurate information and documentation, as reasonably required by Provider, to allow Provider to perform the Professional Services and develop the Deliverables; and (ii) carry out reviews and respond to requests for approval and information on a timely basis.  Provider shall not be liable for any delay to the extent caused by Reseller's failure to fulfill any of its requirements under the Agreement, this Exhibit A and/or any SOW.

**4.      Price and Payment**
Reseller shall pay Provider the fees set forth in the SOW either on a time and materials basis at Provider's then-current price, or on a fixed price per project basis to be negotiated between the Parties and set forth in the applicable SOW.  Reseller shall reimburse Provider for all reasonable out of pocket expenses (including travel, lodging and related expenses) incurred by Provider in the performance of any Professional Services or development of any Deliverables, provided that such expenses are approved in advance in writing by Reseller.  The fees for Professional Services and development of Deliverables shall exclude all applicable federal, state, provincial, value-added, goods and services, harmonized and local taxes (other than taxes on Provider's net income).

Unless otherwise specified in the SOW, Provider shall invoice Reseller for fees for Professional Services and development of Deliverables provided pursuant to this Agreement or a SOW on a monthly basis.  All such fees shall be paid within thirty (30) days of the date of the invoice.

DocuSign Envelope ID: 2215FC8B-222B-450A-95D2-347E3FD2E605

**5.      Change Orders**

Changes to Deliverables will require and shall become effective only when fully documented in a written change order (each a "**Change Order**") signed by duly authorized representatives of the Parties prior to implementation of the changes.  Such changes may include, for example, changes to the scope of work and any corresponding changes to the estimated fees and schedule.  Change Orders shall be deemed part of, and subject to, this Agreement.

**6.      Term and Termination**

This Exhibit A shall remain in effect only during the Term of the Agreement.  Unless provided otherwise in a SOW, Reseller may terminate a SOW without cause upon thirty (30) days prior written notice to Provider.  Unless provided otherwise in a SOW, if Reseller terminates a SOW for convenience, Reseller shall pay Provider the full fee for any Professional Services performed (including all other costs for which Provider has the right to reimbursement) up to the effective date of termination of such SOW.  If the fee for any Deliverables is based on identified milestones being achieved by Provider, Reseller shall pay Provider the pro-rated fee based on time to the next scheduled milestone.

Each Party shall be entitled to immediately terminate a SOW for cause in the event of: (i) the material breach by the other Party of its obligations under this Exhibit A or a SOW, provided that such material breach is notified to such party and is not cured within thirty (30) days of the date of such notice, (ii) the filing of a bankruptcy petition by or against a Party, the filing of an assignment for the benefit of creditors, the appointment of a receiver or trustee, (iii) the assignment or attempt to assign the Agreement to a third party (except as permitted in the Agreement).  In the event of termination for cause, the non-defaulting party may terminate this Exhibit A and any SOW hereunder.  The non-defaulting Party's right to terminate shall be in addition to any other rights that it may have in law or in equity.

**7.      Intellectual Property Rights**

Except as set forth in the Agreement or otherwise set forth in the relevant SOW, Provider shall own all right, title and interest and all intellectual property rights to any Deliverables created by Provider pursuant to this Exhibit A or any SOW hereunder.  Provider shall retain all right, title and interest and all intellectual property rights to any and all Provider proprietary information and Provider software (including, without limitation, any modifications to the Services and/or the User Guide).  Subject to payment of the applicable fees set forth in the SOW, Provider grants to Reseller a perpetual, worldwide, fully-paid, royalty-free, non-exclusive, non-transferable (except as provided in the Agreement) license to use the Deliverables created pursuant to this Exhibit A or any SOW for the purposes described in the accompanying SOW.

Exhibit C

DocuSign Envelope ID: 2215FC8B-222B-450A-95D2-347E3FD2E605

## Service Schedule #1

As it relates the Services specified herein, this Service Schedule is subject to the terms and conditions of the Reciprocal Reseller Agreement (the "**Agreement**") between Stellar Labs, Inc. ("**Stellar**") and FL3XX Gmbh ("**FL3XX**").  Capitalized terms not defined in this Service Schedule are defined in the Agreement.  The Parties agree that the terms of this Service Schedule #1 are subject to change by mutual agreement. Each Party agrees that a request from the other Party to reconsider these terms will be taken up with due urgency.

### 1.   SERVICES

**Provider** (named below) appoints **Reseller** (named below), and Reseller accepts authorization to sell the following **Services** in the **Territory**:

| Service(s) | FL3XX aviation management platform that provides quoting, charter sales, scheduling, flight logging, duty time calculations, invoicing, customer management, and reporting<br>a) software subscriptions<br>b) platform setup services<br>c) software support services<br>d) custom software development<br>d) related professional services |
|---|---|
| Provider | FL3XX |
| Reseller | Stellar |
| Territory | The Americas, Caribbean region |
| Reseller Exclusivity* in Territory | Yes |

* Exclusivity means that only the Reseller can market and sell the Services in that Territory – neither the Provider nor other resellers are permitted to.

### 2.   PRICING

Reseller will charge Customers for the Services based upon Provider's list prices and adjusted in consultation with Provider.  Reseller will pay to Provider the Fees computed as the higher of payments received from Customer or Provider's list prices, after which all Fees are net of taxes payable by Reseller and less the Reseller's commission indicated below.

| Provider's list prices | Found at https://www.fl3xx.com/pricing/ | |
|---|---|---|
| Currency | U.S. Dollars | |
| Reseller's commission | Type of revenue | Commission % |
| | MRR* for first fractional month & first 12 full months of Customer subscription term | 27.5% |
| | MRR for full months 13 to 24, inclusive, of Customer subscription term | To be determined |
| | MRR for full months 25 to 36, inclusive, of Customer subscription term | To be determined |
| | Set up services | 100% |
| | Customer support fees<br>(not including software development or professional services) | 50% |
| | Custom software development, if performed by Provider | 0% |
| | Professional services, if performed by Reseller<br>(may include training on the product or requirements analysis and/or project management of custom software development performed by Developer) | 100% |

* MRR here means Monthly Recurring Revenue for Customer Subscriptions.

DocuSign Envelope ID: 2215FC8B-222B-450A-95D2-347E3FD2E605

## 3.      OTHER TERMS

Reseller will contract directly with Customers in the Territory.  The Services shall be provided to Customers on terms and conditions that are determined by Reseller, in accordance with any applicable regulations and incorporating Provider's provisions, as appropriate, set out here:

| End-user terms | General:  https://www.fl3xx.com/wp-content/uploads/2019/02/GTC-v1.3-6-February-2019.pdf<br>SLA:      https://www.fl3xx.com/wp-content/uploads/2019/02/SLA-v1.3-6-February-2019-.pdf<br>Data Protection: https://www.fl3xx.com/wp-content/uploads/2019/02/DPA-26-Feb-19.pdf<br>Privacy:  https://www.fl3xx.com/wp-content/uploads/2018/12/Privacy-Statement-1.1.pdf |
|---|---|

IN WITNESS WHEREOF, the Parties have executed this Agreement on the date below.

**For Stellar**

DocuSigned by:

*Vicki Nakata* _____
AEA285F609A640E...

Chief Executive Officer
Date: 3/12/2020

**For FL3XX**

DocuSigned by:

_____
584D4A21E7A24DF...

Chief Executive Officer
Date: 3/12/2020