UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| STELLAR LABS, INC.,<br><br>             Plaintiff,<br><br>      v.<br><br>FL3XX GMBH,<br><br>             Defendant. | Case No. 21-cv-05879-EMC<br><br>**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**<br><br>Docket No. 54 |

Plaintiff Stellar Labs, Inc. has filed suit against Defendant FL3XX GmbH for, *inter alia*, breach of contract, breach of the implied covenant of good faith and fair dealing, interference with contractual relations and prospective economic relations, trade libel, and defamation.[1]  FL3XX has counterclaimed.

Currently pending before the Court is FL3XX's motion for partial summary judgment, which is related to Stellar's claim for damages.  According to FL3XX, the two contracts that the parties entered into – namely, the Master Strategic Alliance Agreement ("MSAA") and Reciprocal Reseller Agreement ("RRA") – have limitation-of-liability provisions that should be enforced with respect to Stellar's claim for damages.  Having considered the parties' briefs and accompanying submissions, as well as the oral argument of counsel, the Court hereby **GRANTS** in part and **DENIES** in part FL3XX's motion.

---

[1] Initially, Stellar also sued Online Delivery Technologies ("ODT").  However, Stellar agreed to dismiss ODT, *see* Docket No. 28 (order on TRO), and therefore, it is no longer a defendant in the case.

# I. FACTUAL & PROCEDURAL BACKGROUND

## A. Parties

Stellar is a U.S. company that sells a "suite of advanced applications for business aviation." Compl. ¶ 12. FL3XX is an Austrian company that "develops, markets, and sells software that assists business aviation companies in managing their operations." Sommariva Decl. ¶ 2.

## B. Complaint

In its complaint, Stellar alleges as follows.

On March 10, 2020, the parties entered into a Master Strategic Alliance Agreement ("MSAA"), which had a three-year term. The purpose of the contract was for the parties to work together to build, market, and sell "combined products." Compl. ¶ 13.

Two days later, on March 12, 2020, the parties entered into a Reciprocal Reseller Agreement ("RRA"), which gave each company the right to sell the other's products. *See* Compl. ¶ 15. At the same time, the parties "signed Service Schedule #1, which gave Stellar the exclusive right to sell the FL3XX Software in the Americas and Caribbean regions." Compl. ¶ 18.

Between March 2020 and June 2021, Stellar marketed and sold the FL3XX software.[2] *See* Compl. ¶ 20.

In May 2021, FL3XX and ODT set up a website for ODT in which ODT claimed to have exclusive delivery rights for the FL3XX software in North America. *See* Compl. ¶ 24.

On June 9, 2021, FL3XX notified Stellar that it was terminating the RRA on the basis that Stellar owed fees under the RRA (approximately $25,000) and that Stellar had failed to provide proper first-line support to customers. *See* Compl. ¶ 27. These reasons were pretextual.[3] *See, e.g.*, Compl. ¶¶ 31-32. At or about the same time, FL3XX began telling Stellar's prospective

---

[2] According to Stellar, in reliance on the agreements, it "expended significant resources . . . , including over ten full-time equivalent employees dedicated to marketing, selling, and supporting the FL3XX Software as well as helping FL3XX adapt its software for the U.S. market and Stellar Customers." Nakata Decl. ¶ 5.

[3] *See, e.g.*, Nakata Decl. ¶ 7 (asserting that "FL3XX was complaining about failure to pay certain royalties that were not in fact owed because they had not yet been earned from Stellar's customers in the U.S. market").

customers that Stellar was no longer the exclusive reseller of FL3XX software. *See* Compl. ¶ 28.

In late June and early July 2021, FL3XX took action to further sever the relationship between the parties and to disrupt Stellar's ability to service customers of the FL3XX software. *See generally* Compl. ¶¶ 33-37 (alleging, *e.g.*, that "FL3XX started to disable, dismantle, disrupt, seize, and hijack established communication channels, [both] between Stellar and FL3XX and between Stellar and its customers").

On July 8, 2021, "FL3XX sent emails to all Stellar-contracted users of the FL3XX Software stating that: (1) the 'reseller relationship with Stellar is over'; (2) the customer's 'service contract with Stellar is no longer valid'; and (3) the FL3XX Software will soon be hosted in the United States by a new hosting provider [*i.e.*, ODT]." Compl. ¶ 38.

On July 22, 2021, FL3XX and ODT transferred hosting over to ODT. *See* Compl. ¶ 44.

On July 30, 2021, Stellar filed this lawsuit.

Stellar asserts the following claims:

(1) Breach of contract (the RRA).

(2) Breach of contract (the MSAA).

(3) Breach of the implied covenant of good faith and fair dealing.

(4) Intentional interference with contractual relations.

(5) Negligent interference with prospective economic relations.

(6) Trade libel.

(7) Defamation.

According to Stellar, FL3XX's "conduct damaged Stellar resulting in more than $850,000 in lost revenue through the agreed upon contract period, the loss of customers and potential customers, and damage to Stellar's reputation in an amount to be determined at trial." Compl. ¶ 47.

C.   <u>Agreements</u>

As noted above, the two contracts entered into by the parties are the MSAA and the RRA. According to FL3XX, the parties entered into these contracts "with the expectation that [they] might eventually merge." Sommariva Decl. ¶ 6. On this limited point, Stellar essentially agrees.

3

1  *See* Nakata Decl. ¶ 3 (testifying that the parties' contracts "were drafted and tailored to fit the
2  specific services that FL3XX offered to provide and in reasonable anticipation that the two
3  companies would merge").

   1. MSAA

The parties entered into the MSAA because they "wish[ed] to establish a strategic relationship that drives an evolution from individual development and marketing of separate products to a fully shared and integrated mode of building, marketing, selling, and supporting of combined products." MSAA, Recitals.

The MSAA itself does not contain any provision related to specific projects between the parties. Rather, it provides that

> [t]he Parties may enter into one or more ancillary agreements from time to time. Each ancillary agreement will be made a part of this Agreement. In the event of any conflict between an ancillary agreement and this Agreement, this Agreement shall prevail, unless expressly stated otherwise in the ancillary agreement.

MSAA ¶ 2.

There is a limitation-of-liability provision in the MSAA. It provides in full as follows:

> a. Dollar Cap. IN NO EVENT WILL THE AGGREGATE LIABILITY OF EITHER PARTY UNDER THIS AGREEMENT EXCEED U.S. $1,000,000 (OR EQUIVALENT IN LOCAL CURRENCY).
>
> b. Exclusion of Consequential and Related Damages. IN NO EVENT WILL EITHER PARTY BE LIABLE TO THE OTHER PARTY FOR ANY CONSEQUENTIAL, INDIRECT, SPECIAL, INCIDENTAL, OR PUNITIVE DAMAGES ARISING OUT OF OR RELATED TO THIS AGREEMENT.
>
> c. Clarifications and Disclaimers. THE LIABILITIES LIMITED BY THIS ARTICLE APPLY: (i) TO LIABILITY FOR NEGLIGENCE; (ii) REGARDLESS OF THE FORM OF ACTION, WHETHER IN CONTRACT, TORT, STRICT PRODUCT LIABILITY, OR OTHERWISE; (iii) EVEN IF THE DAMAGED PARTY IS ADVISED IN ADVANCE OF THE POSSIBILITY OF THE DAMAGES IN QUESTION AND EVEN IF SUCH DAMAGES WERE FORESEEABLE; and (iv) EVEN IF PARTY'S REMEDIES FAIL OF THEIR ESSENTIAL PURPOSE. If applicable law limits the application of the provisions of this Article, a Party's liability will be limited to the maximum extent permissible. For the avoidance of doubt, a Party's liability

> limits, and other rights set forth in this Article, apply likewise to its affiliates, authorized contractors, licensors, suppliers, advertisers, agents, sponsors, directors, officers, employees, consultants, and other representatives.
>
> d. Exceptions. Section 10.a (Liability Cap) does not apply to: (a) claims for liquidated damages pursuant to any provision of this Agreement or any ancillary agreement; or (b) claims pursuant to Article 9 (Indemnification).

MSAA ¶ 10.

### 2. RRA

The RRA expressly states that it "is an ancillary agreement to [the MSAA]" and that "[a]ll terms specified in this Agreement control with respect to any conflict with the Master Agreement." RRA at 1.

Under the RRA,

> Provider hereby appoints Reseller, and Reseller hereby accepts a revocable, non-transferable, authorization to sell Services in the Territory as outlined in each Service Schedule. Reseller shall market, promote and resell the Services to Customers and potential Customers, at its own expense and using its own efforts with its own sales force. Reseller shall pay the Provider the Fees set forth in each Service Schedule. The Provider shall make the Services available to Reseller for resale to Customers pursuant to this Agreement and in accordance with the terms specified in the individual Service Schedules entered into by Provider and Reseller.

RRA ¶ 2.1; *see also* RRA at 1 (noting that "the term 'Provider' means the Party that is making available Services (as defined below) that the other Party, the 'Reseller,' will resell"). As indicated above, Service Schedule #1 specifies that FL3XX appoints Stellar as its exclusive reseller for FL3XX software in the Americas and Caribbean region. *See* Serv. Sched. #1, ¶ 1.

Like the MSAA, the RRA contains a limitation-of-liability provision. It provides in full as follows:

> 9.1. Acknowledgment. The Parties acknowledge that Article 10 of the Master Agreement ("Limitation of Liability") outlines each Party's liability provisions, as amended herein for purposes of this Agreement.
>
> 9.2. Dollar Cap. IN NO EVENT WILL THE AGGREGATE LIABILITY OF EITHER PARTY UNDER THIS AGREEMENT EXCEED U.S. $100,000 (OR EQUIVALENT IN LOCAL CURRENCY) OR THE

5

CHARGES FOR THE SERVICES THAT ARE THE SUBJECT OF THE CLAIM, WHICHEVER IS LESSER.

RRA ¶ 9.

## II.   DISCUSSION

A.   Legal Standard

Federal Rule of Civil Procedure 56 provides that a "court shall grant summary judgment [to a moving party] if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An issue of fact is genuine only if there is sufficient evidence for a reasonable jury to find for the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986). "The mere existence of a scintilla of evidence . . . will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]." *Id.* at 252. At the summary judgment stage, evidence must be viewed in the light most favorable to the nonmoving party and all justifiable inferences are to be drawn in the nonmovant's favor. *See id.* at 255.

Where a defendant moves for summary judgment based on a claim for which the plaintiff bears the burden of proof, the defendant need only point to the plaintiff's failure "to make a showing sufficient to establish the existence of an element essential to [the plaintiff's] case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

In the instant case, FL3XX is essentially seeking partial summary judgment – specifically, a ruling that (1) all of the claims asserted in the complaint (both contract and tort-based) are subject to a damages cap; (2) the damages cap in the RRA ($100,000) is controlling over that in the MSAA ($1 million); (3) the provision in the MSAA excluding consequential, indirect, special, etc. damages is applicable to all claims (both contract and tort-based); and (4) Stellar has no right to attorneys' fees under the agreements.

In evaluating the motion for summary judgment, the Court bears mind that FL3XX has invoked the rule of construction that the terms of a contract should be construed against the contract drafter. *See* Cal. Civ. Code § 1654 (providing that, "[i]n cases of uncertainty not removed by the preceding rules, the language of a contract should be interpreted most strongly against the party who caused the uncertainty to exist"); *Sandquist v. Lebo Auto., Inc.*, 1 Cal. 5th 233, 247

United States District Court
Northern District of California

(2016) (stating that "ambiguities in written agreements are to be construed against their drafters" and citing § 1654 in support; "[a]s the Restatement explains, 'Where one party chooses the terms of a contract, he is likely to provide more carefully for the protection of his own interests than for those of the other party'"); *cf. Victoria v. Superior Court*, 40 Cal. 3d 734, 739 (1985) (stating that "ambiguities in standard form contracts are to be construed against the drafter"). According to FL3XX, Stellar initially drafted the MSAA and RRA, with both drafts containing limitation-of-liability provisions, and "[t]he only input FL3XX provided with respect to the liability-limiting provisions was a request for Stellar to reduce the dollar cap amount in the RRA from $1,000,000 to $100,000." Sommariva Decl. ¶¶ 8-9.

In response, Stellar argues that the rule should not be given much, if any, weight because the contract was not a boilerplate one and because FL3XX represented it had legal counsel. *See* Nakata Decl. ¶¶ 2-3 (alleging that the contracts were "not Stellar standard boilerplate contracts" but rather "were drafted and tailored to fit the specific services that FL3XX offered to provide and in reasonable anticipation that the two companies would merge"; adding that, during negotiations, "FL3XX represented it had a legal team who could review such documents for FL3XX").

Ultimately, the Court need not definitively opine which party has the better position because, even if that rule of construction favored FL3XX, it is counterbalanced by the independent rule of construction that limitation-of-liability provisions are, as a general matter, strictly construed. *See Pierry, Inc. v. Thirty-One Gifts, LLC*, No. 17-cv-03074-MEJ, 2017 U.S. Dist. LEXIS 156681, at *28 (N.D. Cal. Sep. 25, 2017) (noting that, "[u]nder California law, 'contractual clauses seeking to limit liability will be strictly construed and any ambiguities resolved against the party seeking to limit its liability'"); *Nunes Turfgrass v. Vaughan-Jacklin Seed Co.*, 200 Cal. App. 3d 1518, 1538 (1988) (noting the same); *accord Rodman v. Safeway Inc.*, 125 F. Supp. 3d 922, 928 (N.D. Cal. 2015) (noting the same but acknowledging that limitation-of-liability provisions are enforceable unless they are unconscionable or contrary to public policy), that rule has little practical effect on the Court's decision herein.

B.  Relationship Between the MSAA and RRA

As an initial matter, the Court must address the relationship between the MSAA and RRA.

7

On its face, the MSAA contemplates that "[t]he Parties may enter into one or more ancillary agreements from time to time. Each ancillary agreement will be made a part of this Agreement." MSAA ¶ 2. The RRA expressly states that it "is an ancillary agreement to [the MSAA]," RRA at 1. Therefore, the RRA is effectively a part of the MSAA, and, as to the transactions and conduct falling within the purview of the RRA, the MSAA applies as well, unless there is a conflict. The MSSA states that, if there is a conflict between the MSAA and an ancillary agreement, the MSAA "shall prevail, *unless* expressly stated otherwise in the ancillary agreement." MSAA ¶ 2 (emphasis added). The RRA expressly states that "[a]ll terms specified in this Agreement control with respect to any conflict with the Master Agreement." RRA at 1. Therefore, where matters fall within the purview of the RRA, the terms of the RRA itself apply as do the terms of the MSAA *unless* the latter conflicts with the former, in which case the RRA prevails. Of course, conduct that is not within the purview of the RRA is governed only by the MSAA.

C.   Limitation-of-Liability Provision in the MSAA

As noted above, the limitation-of-liability provision in the MSAA has three main parts:

a. Dollar Cap. IN NO EVENT WILL THE AGGREGATE LIABILITY OF EITHER PARTY UNDER THIS AGREEMENT EXCEED U.S. $1,000,000 (OR EQUIVALENT IN LOCAL CURRENCY).

b. Exclusion of Consequential and Related Damages. IN NO EVENT WILL EITHER PARTY BE LIABLE TO THE OTHER PARTY FOR ANY CONSEQUENTIAL, INDIRECT, SPECIAL, INCIDENTAL, OR PUNITIVE DAMAGES ARISING OUT OF OR RELATED TO THIS AGREEMENT.

c. Clarifications and Disclaimers. THE LIABILITIES LIMITED BY THIS ARTICLE APPLY: (i) TO LIABILITY FOR NEGLIGENCE; (ii) REGARDLESS OF THE FORM OF ACTION, WHETHER IN CONTRACT, TORT, STRICT PRODUCT LIABILITY, OR OTHERWISE; (iii) EVEN IF THE DAMAGED PARTY IS ADVISED IN ADVANCE OF THE POSSIBILITY OF THE DAMAGES IN QUESTION AND EVEN IF SUCH DAMAGES WERE FORESEEABLE; and (iv) EVEN IF PARTY'S REMEDIES FAIL OF THEIR ESSENTIAL PURPOSE. If applicable law limits the application of the provisions of this Article, a Party's liability will be limited to the maximum extent permissible. For the avoidance of doubt, a Party's liability limits, and other rights set forth in this Article, apply likewise to its affiliates, authorized contractors, licensors,

>suppliers, advertisers, agents, sponsors, directors, officers, employees, consultants, and other representatives.

MSAA ¶ 10.

At the hearing, the Court expressed an inclination to defer interpreting the scope of and interrelationship between the three parts – even though contract interpretation generally is a legal matter for the Court to decide, *see Wolf v. Walt Disney Pics. & Tel.*, 162 Cal. App. 4th 1107, 1125 (2008) (stating that "[t]he interpretation of a contract is a judicial function") – because there was arguably some ambiguity therein which raised the possible consideration of extrinsic evidence to aid in the interpretation. *See id.* at 1126 (noting that, where a contract is ambiguous, "[e]xtrinsic evidence is admissible . . . to interpret [the] agreement"). However, having further considered the record on the motion, the Court shall move forward with interpretation of the MSAA (as well as the RRA) because, in briefing this motion for summary judgment, the parties did not offer any extrinsic evidence for the Court to consider. Indeed, neither party even submitted a declaration supporting its specific understanding of the relevant contract terms. Given the absence of any extrinsic evidence to consider, despite the parties' opportunity (indeed, obligation) to do so on summary judgment, the Court proceeds to interpret the agreement based on its language.

1. Dollar Cap

The Court addresses first ¶ 10(a) of the MSAA – *i.e.*, the dollar cap. According to FL3XX, the dollar cap applies to *all* of the causes of action pled in the complaint. Those causes of action are as follows:

- Breach of contract (both the MSAA and the RRA);
- Breach of the implied covenant of good faith and fair dealing.
- Intentional interference with contractual relations.
- Negligent interference with prospective economic relations.
- Trade libel.
- Defamation.

The first two causes of action are contract-based claims; the remaining causes are action are tort claims.

9

1  The Court rejects FL3XX's position that the dollar cap applies to all claims, both contract-based and tort. The dollar cap states that "IN NO EVENT WILL THE AGGREGATE LIABILITY OF EITHER PARTY UNDER THIS AGREEMENT EXCEED U.S. $1,000,000." MSAA ¶ 10(a). Notably, ¶ 10(a) refers only to liability "*under* this agreement," in contrast to ¶ 10(b) which refers to damages "*arising out of or related to* this Agreement" (emphasis added). Courts have in other contexts construed the latter phrase more broadly. *Cf. Cape Flattery Ltd. v. Titan Mar., LLC*, 647 F.3d 914, 924 (9th Cir. 2011) (stating that, "under an arbitration agreement covering disputes 'arising under' the agreement, only those disputes 'relating to the interpretation and performance of the contract itself' are arbitrable"); *Tracer Research Corp. v. Nat'l Envt'l Servs. Co.*, 42 F.3d 1292, 1295 (9th Cir. 1994) (holding that agreement to arbitrate "any controversy or claim arising out of this agreement" is narrower than agreement to arbitrate claims related to the agreement and does not encompass tort or statutory claims, even if the "tort claim would not have arisen 'but for' the parties' licensing agreement"); *Mediterranean Enters., Inc. v. Ssangyong Corp.*, 708 F.2d 1458, 1464 (9th Cir. 1983) (finding clause with "arising hereunder" language "is intended to cover a much narrower scope of disputes than language that includes 'relating' to a contract, *i.e.*, only those relating to the interpretation and performance of the contract itself"). Thus, the use of the term "under" limits the applicability of the dollar cap. *See, e.g.*, https://www.merriam-webster.com/dictionary/under?utm_campaign=sd&utm_medium=serp&utm_source=jsonld (last visited 2/14/2022) (defining "under" as, *inter alia*, "subject to the authority, control, guidance, or instruction of"). Liability "under" the agreement implicitly applies to breaches of the agreement itself (which would include the breach of the implied covenant) and not, *e.g.*, tort claims.

2. Damages Exclusion

The Court turns next to ¶ 10(b) of the MSAA – *i.e.*, the damages exclusion. The damages exclusion states:

> Exclusion of Consequential and Related Damages. IN NO EVENT WILL EITHER PARTY BE LIABLE TO THE OTHER PARTY FOR ANY CONSEQUENTIAL, INDIRECT, SPECIAL, INCIDENTAL, OR PUNITIVE DAMAGES ARISING OUT OF OR RELATED TO THIS AGREEMENT.

10

MSAA ¶ 10(b).

As noted above, the damages exclusion uses language different from that used in the dollar cap. Whereas the dollar cap refers to "LIABILITY . . . UNDER THIS AGREEMENT," the damages exclusion refers to "DAMAGES ARISING OUT OF OR RELATED TO THIS AGREEMENT." The latter makes the damages exclusion broader in scope. The damages exclusion applies not just to the claims for breach of contract and breach of the implied covenant but also to any tort claim so long as it is "related to" the agreement.

At the hearing, Stellar argued for the first time that the damages exclusion should not be so construed because it addresses, *e.g.*, "consequential" damages, which is a type of damage that may be awarded for contract-based claims, but not tort claims. *See, e.g.*, *Schellinger Bros. v. Cotter*, 2 Cal. App. 5th 984, 1010 (2016) (stating that "'[c]ontractual damages are of two types – general damages (sometimes called direct damages) and special damages (sometimes called consequential damages)'"). While this position is not entirely lacking in merit, the Court is not persuaded. Notably, the damages exclusion refers not just to consequential damages but also to punitive damages. Punitive damages are not awardable for a breach of contract at all. *See Harris v. Atl. Richfield Co.*, 14 Cal. App. 4th 70, 77 (1993) (stating that "punitive damages are never recoverable for breach of contract, no matter how wilful or malicious, except where the wrongful act is also a tort") (internal quotation marks omitted). Thus, implicitly, the damages exclusion applies to not just contract-based claims but also tort claims – a point that is underscored by the decision to include use of the phrase "related to" and not just "arising out of."

Stellar asserts that, even if the damages exclusion is applicable to any tort claims,[4] that is not the end of the matter because of California Civil Code § 1668. Section 1668 provides: "All contracts which have for their object, directly or indirectly, to exempt anyone from responsibility for his own fraud, or willful injury to the person or property of another, or violation of law,

---

[4] In its papers, FL3XX has suggested that the Court can decide now whether the tort claims, as pled in the complaint, are "related to" the MSAA (or RRA). This argument is not without some merit; however, Stellar has fairly argued that it is still conducting discovery into FL3XX's alleged misconduct and therefore it makes sense to have a fuller record before the Court makes the "related to" determination.

11

whether willful or negligent, are against the policy of the law." Cal. Civ. Code § 1668.

For this argument, the Court notes Stellar has two kinds of tort claims: one negligence-based tort claim (negligent interference with prospective economic relations) and the remainder based on intentional torts (intentional interference with contractual relations, trade libel, and defamation). Where a negligence claim is based on a negligent violation of statutory law, then courts have indicated that § 1668 does apply; however, if a negligence claim is based on a negligent violation of common law (as here), then § 1668 does *not* apply (*i.e.*, a limitation of liability is acceptable) unless the public interest is somehow implicated. *See Gardner v. Downtown Porsche Audi*, 180 Cal. App. 3d 713, 716 (1986) ("This section made it clear a party could not contract away liability for his fraudulent or intentional acts or for his negligent violations of statutory law. Less clear was the status of negligent violations of common law standards of care. While acknowledging some conflict in the cases, Witkin concludes California now follows the modern view of the Restatement of Contracts – 'a contract exempting from liability for ordinary negligence is valid where no public interest is involved . . . and no statute expressly prohibits it . . . .'"); *see also Health Net of Cal., Inc. v. Dep't of Health Servs.*, 113 Cal. App. 4th 224, 234 (2003). In the instant case, there is no indication that the public interest is implicated. Therefore, the Court rejects Stellar's contention that § 1668 prevents the damages exclusion from applying to the negligence claim (assuming that the negligence claim is "related to" the MSAA).

As for intentional torts, § 1668 on its face clearly applies to such torts as indicated by the language used in the statute: "All contracts which have for their object, directly or indirectly, to exempt anyone from responsibility for his own fraud, *or willful injury to the person or property of another*, or violation of law, whether willful or negligent, are against the policy of the law." Cal. Civ. Code § 1668 (emphasis added). In other words, § 1668 does not preclude liability based, *e.g.*, on willful conduct. FL3XX contends that § 1668 nonetheless has no applicability in the instant case because the statute only kicks in only where a party is "exempt[ed]" from responsibility. According to FL3XX, the damages cap in the MSAA does not give a complete *exemption*; rather, it simply *reduces* liability.

12

The problem with this argument is that § 1668 has still

> been applied to invalidate provisions that merely limit liability [as opposed to exempt].
>
> And while some contractual limitations over the scope of available remedies need not necessarily run afoul of section 1668[, . . . ] there is assuredly a point at which a limitation on the scope of remedies reaches the point of constituting an "exempt[ion] … from responsibility for [the] . . . violation of law," in the words of the statute.

*Health Net*, 113 Cal. App. 4th at 239. Ultimately, FL3XX may well be right that there is nothing akin to an exemption from liability here. However, that is a decision that the Court cannot make at this juncture of the proceedings, *i.e.*, without having a more developed record on the alleged misconduct and the alleged injury, as well as on the parties themselves. *See generally BlueGem Sec. Inc. v. Trend Micro Inc.*, No. CV09-1492 ODW (FFMx), 2010 U.S. Dist. LEXIS 154513, at *23-25 (C.D. Cal. June 8, 2010) (discussing factors that may be considered in assessing whether a limitation-of-liability provision violates § 1668 – *e.g.*, the extent to which the provision infringes on the plaintiff's ability to seek full redress for the past injury, whether the parties to the contract are large/sophisticated companies, whether negligence only is implicated, and/or whether the defendant can still be held accountable for its conduct to others).

### 3. Clarification/Disclaimer

Finally, the Court addresses ¶ 10(c) of the MSAA – *i.e.*, the clarification/disclaimer.

> THE LIABILITIES LIMITED BY THIS ARTICLE APPLY: (i) TO LIABILITY FOR NEGLIGENCE; (ii) REGARDLESS OF THE FORM OF ACTION, WHETHER IN CONTRACT, TORT, STRICT PRODUCT LIABILITY, OR OTHERWISE; (iii) EVEN IF THE DAMAGED PARTY IS ADVISED IN ADVANCE OF THE POSSIBILITY OF THE DAMAGES IN QUESTION AND EVEN IF SUCH DAMAGES WERE FORESEEABLE; and (iv) EVEN IF PARTY'S REMEDIES FAIL OF THEIR ESSENTIAL PURPOSE. If applicable law limits the application of the provisions of this Article, a Party's liability will be limited to the maximum extent permissible. For the avoidance of doubt, a Party's liability limits, and other rights set forth in this Article, apply likewise to its affiliates, authorized contractors, licensors, suppliers, advertisers, agents, sponsors, directors, officers, employees, consultants, and other representatives.

MSAA ¶ 10(c).

The Court notes first that an argument could be made that, based on ¶ 10(c), the dollar cap

in ¶ 10(a) is *not*, in fact, limited to contract-based claims. In other words, because ¶ 10(c) refers to liabilities limited by "this article" and then refers to, *e.g.*, liability for negligence, one could assert that the dollar cap – which is part of "this article" – applies to negligence claims. The Court finds this interpretation strained and untenable. The use of the "under" language in the dollar cap (¶ 10(a)) is clear. And there is no inevitable conflict with ¶ 10(c)'s use of the phrase "this article" because ¶ 10(c) can reasonably be understood to mean that ¶ 10(c) simply provides clarifications/disclaimers on limitations of liability *where they are applicable* (*i.e.*, whether to ¶ 10(a) *or* ¶ 10(b) *or* both). Thus, ultimately, ¶ 10(c) simply seems to underscore that ¶ 10(b) applies to both contract-based and tort claims – hence the reference to "negligence," "tort," and "strict liability" in ¶ 10(c).[5] Paragraph 10(c), however, does not expand the plain contract-based language of ¶ 10(a).

D.  Limitation-of-Liability Provision in the RRA

The Court now turns to the limitation-of-liability provision in the RRA.

1.  Dollar Cap

On its face, the RRA contains a dollar cap. For the same reasons as stated above, the Court finds that the RRA's dollar cap applies only to contract-based claims (*i.e.*, because of the use of the phrase "UNDER THIS AGREEMENT"). RRA ¶ 9.2. To the extent FL3XX has argued that the Court should find that the RRA dollar cap necessarily applies to the instant case, and not the MSAA dollar cap because of the nature of Stellar's substantive claims, the Court cannot make that determination now. The record is not fully developed as to what FL3XX's alleged misconduct is. The nature of the alleged misconduct will inform whether damages cap of the MSAA or RRA applies. The RRA dollar cap will be triggered only where there is liability under the RRA.

2.  Damages Exclusion

Unlike the MSAA, the RRA does not contain a damages exclusion on its face. However, it is clear that the damages exclusion of the MSAA is still applicable to the RRA. This is because

---

[5] At the hearing, Stellar suggested that ¶ 10(c) simply recognized that there could be limitations on liability where there are negligence claims but not claims for intentional torts. The Court rejects that position given the broad language in ¶ 10(c)(ii).

14

the RRA is subject to the MSAA – which includes the damages exclusion – unless there is a conflict. There is no apparent conflict between the RRA and the MSAA's damages exclusion. Simply because the RRA does not have a damages exclusion does not mean that there is a conflict with the MSAA.

E. Attorney's Fees

Finally, FL3XX contends that Stellar cannot obtain any attorney's fees for the case. The Court does not prejudge this matter, other than to note that the two contracts at issue (the MSAA and RRA) do not contain any provision that provides for the shifting of attorney's fees.[6]

### III.   CONCLUSION

For the foregoing reasons, the Court grants in part and denies in part FL3XX's motion for partial summary judgment. The motion is granted to the extent the Court's rulings above align with the arguments made in FL3XX's motion; the motion is otherwise denied (without prejudice). The Court's specific rulings are as follows:

- The terms of the MSAA are applicable to the RRA unless the former conflict with the terms of the latter, in which case only that particular term of the RRA applies.
- The dollar cap in the MSAA and the dollar cap in the RRA are applicable to contract-based claims.
- The damages exclusion in the MSAA is applicable to the RRA.
- The damages exclusion applies to both contract-based claims as well as to tort claims (so long as the tort claims arise out of or are "related to" the agreement). California Civil Code § 1668 does not apply to Stellar's negligence claim (thus the liability limitation provisions may apply); whether the statute applies (to preclude the liability limitations) to Stellar's intentional tort claims cannot be resolved based on the record before the Court.

---

[6] Though the MSAA does have an indemnification provision that mentions fees (¶ 9), that provision has no applicability to the instant case. Fees recoverable as part of an indemnification (for which there is no claim herein) is a matter separate, distinct, and unrelated to a fee-shifting provision awardable to the prevailing party.

- There is no fee-shifting provision in the MSAA or RRA.

This order disposes of Docket No. 54.

**IT IS SO ORDERED**.

Dated: March 8, 2022

_____
EDWARD M. CHEN
United States District Judge