1

2

3

4                          UNITED STATES DISTRICT COURT

5                         NORTHERN DISTRICT OF CALIFORNIA

6

7     STELLAR LABS, INC.,                      Case No.  21-cv-05879-EMC

8                    Plaintiff,
                                               **FINDINGS OF FACT &**
9            v.                                **CONCLUSIONS OF LAW**

10    FL3XX GMBH,

11                   Defendant.

12

13

14                              I.      **FINDINGS OF FACT**[1]

15    **A.      Parties**

16           1.       Stellar and FL3XX are software companies.  Specifically, they provide software

17    that is used in private commercial aviation.  Stellar is based in the United States; FL3XX in

18    Austria.[2]

19           2.       FL3XX sells scheduling software – that is, software used for scheduling flights.

20    Prior to the relevant period, FL3XX's scheduling software was used primarily in Europe, and it

21    had only one customer in the U.S. (Clay Lacy).  However, FL3XX was interested in building a

22    presence in the U.S. because of the size of the market.

23           3.       Unlike FL3XX, Stellar does not sell scheduling software.  Instead, it sells other

24    software that is used for flight management.  Its products include Pricing Engine, Data Studio, and

25    _____

26    [1] Although the Court has separated out Findings of Fact from Conclusions of Law, some Findings
      of Fact are repeated and/or amplified in the Conclusions of Law.

27    [2] Technically, Stellar is no longer in business.  *See* Tr., vol. 2, at 307 (Flynn).  However, for
28    purposes of these Findings of Fact and Conclusions of Law, the Court refers to Stellar in the
      present tense.

1   Marketplace.  Stellar's software can be used, if integrated, with scheduling software provided by

2   others.  At one point, Stellar was integrating its software products with a scheduling software

3   known as FOS.  Collins, a third-party company, owned FOS.  However, the relationship between

4   Collins and Stellar ended, and so Stellar was looking for a new company, with a scheduling

5   software product, to work with.

6        4.     In or about late 2019, Stellar and FL3XX began to have discussions to see if they

7   could enter into a business relationship beneficial to both.  Eventually, the parties contemplated an

8   agreement in which they would enter into a strategic alliance: the parties would get their software

9   products to interoperate, which would then attract financing, which would then lead to a merger.

10   *See, e.g.*, Tr., vol. 1, at 169-71 (Flynn); Ex. 62 (email from FL3XX to Stellar, dated 8/31/2020).

11   In conjunction with this arrangement, FL3XX would get a loan worth 1.5 million Euros from CEP

12   Investors, an investment company affiliated with Stellar.

**B.**    **Memorandum of Understanding**

13

14        5.     In or about January 2020, Stellar and FL3XX entered into a Memorandum of

15   Understanding ("MOU").  The MOU was "to provide the foundation and structure for [an]

16   anticipated Master Agreement," Ex. 1 (MOU ¶ 1.a), which, in turn would "provide the framework

17   outlining the rights and responsibilities of each party for future business-alignment efforts."  Ex. 1

18   (MOU at 1).

19   **C.**    **MSAA**

20        6.     On or about March 10, 2020, Stellar and FL3XX entered into the master

21   agreement, which was known as the Master Strategic Alliance Agreement ("MSAA").  *See* Ex. 2

22   (MSAA).  As stated in the MSAA, the parties "wish to establish a strategic relationship that drives

23   an evolution from individual development and marketing of separate products to a fully shared and

24   integrated mode of building, marketing, selling, and supporting of combined products."  Ex. 2

25   (MSAA at 1).  In essence, the point of the MSAA was to bring FL3XX and Stellar together so that

26   they could offer a complete suite of products for flight management.  From the perspective of the

27   customer, there would be a single integrated platform.

28        7.     The MSAA noted that the parties "anticipate such efforts to be done over a period

United States District Court
Northern District of California

2

of time and expect to expand and extend cooperative efforts by entering into one or more ancillary agreements that are or will be governed by this Agreement." Ex. 2 (MSAA at 1).  Ancillary agreements would become a part of the MSAA.  In the event of a conflict between the MSAA and an ancillary agreement, the MSAA "shall prevail, unless expressly stated otherwise in the ancillary agreement." Ex. 2 (MSAA ¶ 2).

8.      Under the MSAA, a Steering Committee was established to "set[] strategic direction and [be] accountable for the overall success of the relationship" between the parties.  Ex. 2 (MSAA ¶ 1.a).  The Steering Committee was to "conduct regular activity as agreed upon by the participants through workshops held approximately every calendar quarter, a monthly conference call, and continuous communications among the committee members." Ex. 2 (MSAA ¶ 1.a).  The head of the Steering Committee, who was responsible for leading the Committee and managing its activities, was Paola Sommariva, the CEO of FL3XX.  *See* Ex. 2 (MSAA ¶ 1.a.).

9.      The term of the MSAA was from March 10, 2020, to March 9, 2023, a total of three years.  *See* Ex. 2 (MSAA ¶ 3.a).  It could thereafter be renewed if the parties mutually agreed for one year at a time.  *See* Ex. 2 (MSAA ¶ 3.b).  However, one party could terminate the MSAA if the other party materially breached the agreement.  The terminating party was required to provide "written notice specifying in detail the nature of the breach, effective in thirty (30) days unless the other Party first cures such breach, or effective immediately if the breach is not subject to cure." Ex. 2 (MSAA ¶ 3.c).

10.      The MSAA contained a limitation-of-liability clause.  *See* Ex. 2 (MSAA ¶ 10).  That clause stated in relevant part as follows:

    a.  Dollar Cap.   IN NO EVENT WILL THE AGGREGATE
        LIABILITY OF EITHER PARTY UNDER THIS AGREEMENT
        EXCEED U.S. $1,000,000.

    b.  Exclusion of Consequential and Related Damages.   IN NO
        EVENT WILL EITHER PARTY BE LIABLE TO THE OTHER
        PARTY FOR ANY CONSEQUENTIAL, INDIRECT,
        SPECIAL, INCIDENTAL, OR PUNITIVE DAMAGES
        ARISING OUT OF OR RELATED TO THIS AGREEMENT.

Ex. 2 (MSAA ¶ 10).

11.      Finally, the MSAA included a dispute resolution clause.  That clause provided in

United States District Court
Northern District of California

1  relevant part as follows: "Each Party agrees to notify the other in writing within sixty (60) days of

2  becoming aware of a dispute. . . . If the Parties fail to resolve the dispute, the Parties will proceed

3  to non-binding mediation . . . ."  Ex. 2 (MSAA ¶ 13).

4          12.     The MSAA was governed by California law "without reference to . . . any conflicts

5  of law principle that would apply the substantive laws of another jurisdiction to the Parties' rights

6  or duties."  Ex. 2 (MSAA ¶ 14.f).

7  **D.     RRA**

8          13.     On or about March 12, 2020 (just days after the MSAA was signed), Stellar and

9  FL3XX entered into a Reciprocal Reseller Agreement ("RRA").  The RRA expressly stated that it

10  was an ancillary agreement to the MSAA.  *See* Ex. 5 (RRA at 1).  The RRA also stated that "[a]ll

11  terms specified in this Agreement control with respect to any conflict with the Master

12  Agreement."  Ex. 5 (RRA at 1).

13          14.     Under the RRA, FL3XX authorized Stellar to be a reseller of FL3XX

14  products/services as specified in a Service Schedule.  *See* Ex. 5 (RRA ¶ 2.1); *see also* Ex. 5 (RRA

15  ¶ 1) (defining "Service Schedule" as "the documents for placing orders pursuant to this

16  Agreement").

17          15.     With each Service Schedule, the parties were to "cooperate and use commercially

18  reasonable efforts to integrate the ordered [FL3XX] Services with any [Stellar] software or

19  infrastructure with which the Services need to interact in order to allow the Services to be

20  marketed by [Stellar] to Customers in the Territory."[3]  Ex. 5 (RRA ¶ 3.1).  Thus, the RRA

21  reflected that Stellar would be selling FL3XX software in conjunction with Stellar's own software.

22          16.     The RRA provided that Stellar would pay FL3XX certain fees for the FL3XX

23  products/services it sold to customers.  *See* Ex. 5 (RRA ¶ 2.1); *see also* Ex. 5 (RRA ¶ 4.1)

24  ("[Stellar] is solely responsible for payment to [FL3XX] for all Fees for the Services provided to

25  Customers.").  If Stellar was selling subscription-based product/services to customers, fees owed

26

27  _____

[3] At trial, Mr. Sommariva conceded that this created a contractual obligation for the parties to
28  cooperate with one another to integrate their products for the purposes of selling software
products/services.  *See* Tr., vol. 5, at 794 (Sommariva).

1    by Stellar to FL3XX were "based on Customer Subscriptions and the *actual usage* therein."  Ex. 5

2    (RRA ¶ 4.2) (emphasis added).

3          17.    Payments from Stellar to FL3XX were to "be made within thirty (30) days after the

4    receipt of the applicable invoice."  Ex. 5 (RRA ¶ 4.3).

5          18.    The RRA gave audit rights to FL3XX.  Specifically, FL3XX could audit Stellar's

6    "records relating to the sale of Services, on ten (10) days' advance written notice."  Ex. 5 (RRA ¶

7    2.11).

8          19.    The RRA contemplated that, essentially, Stellar alone would have interaction with

9    the customers who purchased the FL3XX products/services.  *See* Ex. 5 (RRA ¶ 2.6) ("Except as

10   agreed upon in a Service Schedule, [FL3XX] shall have no obligation to deal directly with

11   Customers or for any customer service activities for or in respect of Customers.").  Furthermore,

12   Stellar was "responsible for providing First Line Support to Customers and Users of the Services."

13   Ex. 5 (RRA ¶ 3.2).  However, FL3XX was available to "provide basic support for the Services to

14   [Stellar] at no additional charge and/or upgraded support if purchased separately by [Stellar]."  Ex.

15   5 (RRA ¶ 3.2).

16         20.    Consistent with the MSAA, the RRA had a term of three years.  *See* Ex. 5 (RRA ¶

17   8.1).  It would be renewed (one year at a time) if the parties agreed to renew the MSAA.  See Ex. 5

18   (RRA ¶ 8.1).  But the RRA could be terminated under the following circumstances:

19            (a) if [Stellar] fails to make any payment due hereunder within
                 thirty (30) days after receiving written notice from [FL3XX] that
20               such payment is delinquent, [FL3XX] may terminate this
                 Agreement on written notice at any time following the end of
21               such period; [or]

22            (b) if either Party breaches any material term or condition of this
                 Agreement and fails to cure such breach within thirty (30) days
23               after receiving written notice of the breach, the non-breaching
                 Party may terminate this Agreement on written notice at any
24               time following the end of such thirty (30) day period.

25   Ex. 5 (RRA ¶ 8.2).

26         21.    Finally, the RRA contained a limitation-of-liability clause.  The clause first

27   acknowledged the limitation-of-liability clause in the MSAA.  *See* Ex. 5 (RRA ¶ 9.1).  The clause

28   then stated: "IN NO EVENT WILL THE AGGREGATE LIABILITY OF EITHER PARTY

United States District Court
Northern District of California

5

1    UNDER THIS AGREEMENT EXCEED US $100,000 . . . OR THE CHARGES FOR THE

2    SERVICES THAT ARE THE SUBJECT OF THE CLAIM, WHICHEVER IS LESSER."  Ex. 5

3    (RRA ¶ 9.2).

4    **E.**     **Service Schedule #1**

5           22.     On the same day the parties signed the RRA, they also signed the first Service

6    Schedule.  The Service Schedule expressly stated that it was "subject to the terms and conditions

7    of the [RRA]."  Ex. 5 (Serv. Sched. at 1).

8           23.     Under the Service Schedule, FL3XX appointed Stellar the exclusive reseller for

9    the FL3XX scheduling software in the United States.  Specifically, the Service Schedule provided

10   that Stellar would be the exclusive reseller for the following FL3XX products/services:

11                  FL3XX aviation management platform that provides quoting,
                    charter sales, scheduling, flight logging, duty time calculations,
12                  invoicing, customer management, and reporting.
                    a) software subscriptions
13                  b) platform setup services
                    c) software support services
14                  d) custom software development;
                    [e]] related professional services.
15

16   Ex. 5 (Serv. Sched. ¶ 1).

17          24.     Stellar would "charge Customers for the Services based upon [FL3XX's] list prices

18   and adjusted in consultation with [Stellar]."  Ex. 5 (Serv. Sched. ¶ 2).  Stellar in turn would pay to

19   FL3XX certain fees for the products/services sold, less a commission (if applicable).  *See* Ex. 5

20   (Serv. Sched. ¶ 2).

21          25.     Stellar's commission for its resale of FL3XX products/services varied:

22                  a.      For a customer subscription to FL3XX's scheduling software, Stellar's

23                          commission was 27.5% of the monthly recuring revenue – at least for the

24                          first year of the Customer Subscription.  The commission for the second and

25                          third years was to be determined.

26                  b.      For set-up services, Stellar's commission was 100%.

27                  c.      For customer support fees (not including software development or

28                          professional services), Stellar's commission was 50%.

United States District Court
Northern District of California

1          d.      For custom software development performed by FL3XX, Stellar's

2                  commission was 0%.

3          e.      For professional services performed by Stellar (*e.g.*, training on the product

4                  or requirements analysis), Stellar's commission was 100%.

5    *See* Ex. 5 (Serv. Sched. ¶ 2).

6    **F.      Post-Contract, Pre-Termination Period**

7          26.     After the parties entered into the MSAA and RRA, they proceeded to work

8    together.  As noted above, the goal was to get the parties' products to interoperate, which would

9    then attract financing, which would then lead to a merger.[4]

10         27.     For example, Steering Committee meetings were regularly held as contemplated by

11   the MSAA.

12         28.     Stellar marketed the FL3XX software in conjunction with the Stellar software

13   which were to be integrated together.  *See, e.g.*, Tr., vol. 1, at 157 (Flynn); Tr., vol. 3, at 469-76

14   (Powell); *see also* Ex. 146 (chart listing customers for the FL3XX scheduling software and also

15   reflecting that some customers had signed on for Stellar's Data Studio and/or Marketplace

16   software products).  Ultimately, Stellar managed to sign up twenty-four customers for the FL3XX

17   software.[5]

18         29.     Stellar identified bugs and problems with the FL3XX software (especially as

19   FL3XX continued to update it), and further identified enhancements that needed to be made to the

20   FL3XX software.  This was done so that there could be full integration between the parties'

21   products, so that the software could meet the needs of U.S. customers (as noted above, FL3XX's

22   scheduling software had been used primarily in Europe), and so that an individual customer's

23   specific requirements could be met.

24         30.     On a weekly basis, Stellar and FL3XX would go over a "roadmap" document that

25

26   [4] To be sure, there was never an agreement in any of the contracts entered by the parties that the
companies would merge.  However, the record is clear that that was the goal of the parties.

27   [5] For convenience, the Court shall refer to twenty-four customers throughout these Findings of
Fact and Conclusions of Law.  However, it appears that only twenty-two customers were active –
28   *i.e.*, two canceled at some point.  *See* Tr., vol. 2, at 342 (Halstead).

United States District Court
Northern District of California

addressed, *e.g.*, the needs of signed customers and prospective customers, priorities, and so forth. *See, e.g.*, Tr., vol. 3, at 426-27 (Powell); Ex. 148 (roadmap).

31.     Both parties had employees working on software development and integration so that their products could interoperate and could meet the needs and requirements of customers. Stellar had more than fifteen employees doing such work, and FL3XX at least four or five. Although Stellar never wrote any code for the FL3XX software itself (indeed, did not have access to the code), it was still writing code so that FL3XX and Stellar's software could be integrated.

32.     Notably, the parties engaged in the work above even in the absence of a formal integration agreement – *i.e.*, an ancillary agreement to govern the integration of FL3XX's and Stellar's software.  The parties could have entered into such an agreement but chose not to, reflecting an understanding that the MSAA, though perhaps not perfect, was sufficient to govern their integration work.  *Cf.* Ex. 2 (MSAA ¶ 4.c) (providing that "each Party grants to the other Party a limited, non-exclusive, non-transferable license to access and use its IP for the purposes of demonstrating, marketing, selling, and providing support").

33.     By the fall of 2020, the ultimate goal of the parties continued to be a merger. However, at that time, the parties were also encountering difficulties.  Most notably, there were problems with customers who had signed up for the FL3XX software going "live" with software – *i.e.*, commercially using it.

34.     There were various reasons underlying these problems.  For example, there were bugs with the FL3XX software that needed to be worked out, especially as the software was evolving over time.  Also, there were certain features or functionalities that needed to be added to the FL3XX scheduling software.  These functionalities included, *e.g.*, functionalities that the customers had in their existing scheduling software; functionalities that the customers needed to conduct business in the U.S.; and/or functionalities that gave customers an impetus to move over to FL3XX's scheduling software.

35.     The problems with customers going live persisted during the relevant period. Despite Stellar having developed twenty-four customers for the FL3XX software, nearly all did

not go live, even though the parties had made headway on a number of the functionalities.[6]  *See, e.g.*, Tr., vol., 1, at 150-51 (Flynn); Tr., vol. 2, at 281-82, 285 (Flynn); Tr., vol. 3, at 479 (Powell).

36.     And because customers were not commercially using the FL3XX software, they were not paying for the software.  For the most part, customers were unwilling to start paying subscription fees until the software gave them the functionalities they needed.[7]  *See, e.g.*, Tr., vol. 1, at 181, 200-01 (Flynn); Tr., vol. 3, at 428 (Powell); Tr., vol. 3, at 534-35 (Flynn); Tr., vol. 3, at 566, 571 (Bello); *see also* Ex. 99 (email from Venture to Stellar/FL3XX, dated 6/15/2021).  Furthermore, in his deposition, Mr. Sommariva admitted that Stellar was authorized to tell customers that they would not have to start paying for the software until it was being commercially used.  *See* Tr., vol. 5, at 899-900 (Sommariva).

37.     By late 2020 and early 2021, FL3XX was becoming increasingly frustrated.  FL3XX felt that Stellar was making promises to customers (including promises related to functionalities) that FL3XX had not approved.  FL3XX also was not pleased with how Stellar was handling pricing issues with customers.  For example, to entice customers to move from their existing scheduling software to FL3XX's scheduling software, Stellar was giving discounts on the cost of FL3XX's scheduling software.  This generally took the form of matching the price of competing scheduling software or waiving subscription fees for the first few months.  FL3XX was not happy with this approach.  However, this kind of discounting was discussed within the Steering Committee and/or essentially consented to by FL3XX.  Although Mr. Sommariva complained that he never gave blanket approval to discounting by Stellar, the evidence at trial indicated that Stellar obtained consent from FL3XX – sometimes before giving the discount, and sometimes after giving the discount.

[6] According to Stellar, about half of the features were completed at the time that the parties' relationship fell apart.  *See* Tr., vol. 2, at 285 (Flynn).

[7] FL3XX argued that this was not always the case, pointing to its U.S. customer Clay Lacy.  *See* Tr., vol. 1, at 181 (Flynn); Tr., vol. 4, at 725 (Sommariva).  In addition, there was a company in Germany (FAI) that paid FL3XX while it was switching over from its old software to FL3XX's software, a process that took several years.  *See* Tr., vol. 6, at 992-93 (Oberender).  Neither of these customers, however, was developed by Stellar pursuant to the RRA and Service Schedule #1.

1

**G.**   **Dunning Letters**

2

38.     In or about February 2021, Stellar sent invoices to several customers who had

3

signed on to the FL3XX scheduling software.  Based on these Stellar invoices to customers,

4

FL3XX sent its own invoices to Stellar – in or about March 2021 – so that FL3XX would get paid

5

for the scheduling software that had been sold.  FL3XX sent five different invoices to Stellar.

6

Stellar did not pay.

7

39.     On or about March 29, 2021, FL3XX sent the first of three "dunning letters" to

8

Stellar.  The letter was autogenerated by FL3XX's accounting system and sent via email from

9

billing@FL3XX.com to bnewell@stellar.aero.  "benewell" was Bridgette Newell, an accounting

10

clerk.  Although Newell had a Stellar email address and appeared on Stellar's organizational chart,

11

she was technically not an employee;  rather, she was a consultant for Stellar.  The dunning letter

12

from FL3XX informed Newell that "payment on your [*i.e.*, Stellar's] account is overdue" and

13

"[w]e kindly ask you to settle the balance as soon as possible."  Ex. 12 (first dunning letter).  The

14

dunning letter identified the five FL3XX invoices that Stellar had failed to pay.

15

40.     On or about April 8, 2021, FL3XX sent a second dunning letter to Stellar.  As

16

above, the letter was sent via email from billing@fl3xx.com to bnewell@stellar.aero and stated

17

that "payment on your account is overdue" that "[w]e kindly ask you to settle the balance as soon

18

as possible."  Ex. 90 (second dunning letter).  The same five FL3XX invoices were identified as

19

being unpaid.

20

41.     On or about April 18, 2021, FL3XX sent a third dunning letter to Stellar.  As

21

above, the letter was sent via email from billing@fl3xx.com to bnewell@stellar.aero and stated

22

that "payment on your account is overdue" and "[w]e kindly ask you to settle the balance as soon

23

as possible."  Ex. 26 (third dunning letter).  The same five FL3XX invoices were identified as

24

being unpaid.

25

**H.**   **RRA Termination Letter and Response**

26

42.     On or about June 9, 2021, FL3XX sent a letter to Stellar stating that it was

27

terminating the RRA "WITH IMMEDIATE EFFECT."  Ex. 7 (letter).  In the letter, FL3XX

28

asserted that

United States District Court
Northern District of California

United States District Court
Northern District of California

1
2
3
4
5
6

> the spirit of collaboration under which [the RRA] was signed did – unfortunately – not materialize and this remains to be a source of frustration across all FL3XX GmbH teams for some time already: Unexpectedly low sales, low prices, new features committed, no first line support, and all that done in total independence by Stellar Labs, Inc. with little or no consultation with FL3XX GmbH.  On the other side FL3XX GmbH is expected to execute fast and for free or at far too low cost otherwise US customers will hear FL3XX GmbH underperforms.  In addition: FL3XX GmbH has not paid for its services under the RRA.

7  Ex. 7.

8      43.    FL3XX then claimed that Stellar had "failed to fulfil its contractual obligations . . .

9  by not paying on time [the five invoices described above] and is thereby in clear and material

10  breach of the RRA."  Ex. 7.  FL3XX noted that it had sent "several reminders (*dunning letters*) in

11  relation to the above-mentioned invoices.  However, to date none of these invoices have been paid

12  by Stellar Labs, Inc. . . ."  Ex. 7.

13      44.    FL3XX further claimed a material breach on the basis that Stellar had "failed to

14  provide Customers with a proper First Line Support even though it was obliged to do so under

15  Clause 3.2 of the RRA."  Ex. 7.

16      45.    Before the termination letter, FL3XX had never raised the issue of failure to pay

17  invoices in Steering Committee meetings or in, *e.g.*, Slack channels between the parties (one of the

18  typical means of communications between the parties in the course of operations).  Any testimony

19  to the contrary by FL3XX witnesses is not credible.

20      46.    On or about June 15, 2021, Stellar sent a letter in response to FL3XX's termination

21  letter.  Stellar "categorically denie[d] that any of the issues you bring up in the Termination Letter

22  rise to a level that permits your unilateral termination."  Ex. 28 (letter).  With respect to the

23  invoices, Stellar stated that "our respective accounting departments have discussed these invoices

24  and are working in good faith to resolve the issues.  There has been no formal dispute on this

25  matter until such was brought forth in the Termination Letter[;] thus FL3XX has no right

26  unilaterally to terminate under Section 8.2."  Ex. 28.  Regarding First Line Support, Stellar stated

27  that, "[w]ithout specifics, [it] has no basis to evaluate your claim.  Furthermore, this is the first

28  notice Stellar has had of this claim, so it would certainly not be cause for unilateral termination."

1   Ex. 28.  Stellar added: "For formal disputes between the companies, the MSAA (in Article 13)

2   lays out a clear dispute resolution process that we are obliged to follow."  Ex. 28.

3       47.     Several days later, on or about June 18, 2021, Stellar sent another letter in response

4   to FL3XX's termination letter.  Stellar addressed each of the five invoices that FL3XX had

5   identified as being unpaid.  In essence, Stellar explained that four out of five customers had not

6   been able to use the FL3XX scheduling software yet and therefore the customers were not paying

7   for use of the software.  *See* Ex. 6 (letter).  To wit:

- FL3XX Invoice IN2021/0088, in the amount of $1,812.50, for the customer Freight
  Runners Express.  "Software was not usable by the customer.  Blocking issues at
  the time,[8] including regulations, crew positions, and flight attendants, have since
  been resolved.  Stellar will cancel [its invoice to the customer]."

- FL3XX Invoice IN2021/0089, in the amount of $1,562.50, for the customer Spirit
  Jets.  "Software was not usable by the customer.  Blocking issues included eAPIS,
  QuickBooks, Foreflight, APG, passenger weights, and expenses in the crew app.
  Stellar will cancel [its invoice to the customer]."

- FL3XX Invoice IN2021/0090, in the amount of $931.00, for the customer Jet
  Methods.  "Jet Methods was not able to use the software.  The account is
  considered at risk.  Stellar will cancel [its invoice to the customer]."

- FL3XX Invoice IN2021/0091, in the amount of $2,994.00, for the customer
  Journey Aviation.  "Journey is not able to use the software and is awaiting the US-
  based instance.  Stellar will cancel [its invoice to the customer]."

- FL3XX Invoice IN2021/0092, in the amount of $18,041.00, for the customer
  Phoenix Air Group.  "Stellar disagrees with FL3XX's calculation of the owed
  amount.  The US Dollar Price List was being changed at the time this contract was

---

[8] "Blocking" was a term of art used by sales and engineering employees, referring to changes needed to be made to the FL3XX software in order for customers to be willing to convert from their existing scheduling software to FL3XX's scheduling software.  In other words, there were issues that "blocked" the customers from adopting FL3XX's software.  *See* Tr., vol. 2, at 228 (Flynn).

United States District Court
Northern District of California

quoted.  Stellar quoted and signed this deal at prices we believed were correct at the time.  [¶] In good faith, Stellar is wiring $18,041.00 immediately, subject to Stellar's reservation of rights outlined further in this response letter."

Ex. 6.  Stellar emphasized: "Four of your five claims are undisputedly invalid as an end-user customer is only required to pay for services actually provided."  Ex. 6.  Stellar cited in support ¶ 4.2 of the RRA.  *See* Ex. 6.  That provision stated that, if Stellar was selling subscription-based product/services to customers, fees owed by Stellar to FL3XX were "based on Customer Subscriptions and the *actual usage* therein."  Ex. 5 (RRA ¶ 4.2) (emphasis added).  Payments from these customers were not actually due and had not been made, and thus no payments were owed at that point to FL3XX.

**I.      Post-Termination – Stellar and FL3XX Interactions**

48.      Although FL3XX expressly asserted a right to terminate the RRA (an ancillary agreement to the MSAA), it did not expressly assert a right to terminate the MSAA.

49.      Nevertheless, following its termination of the RRA, FL3XX began to take steps to withdraw from or abandon its relationship with Stellar (the strategic alliance) and thereby the MSAA.

50.      For example, on or about June 21, 2021, FL3XX shut down the parties' Slack communications channel.  This was a primary means of communication between the parties in the course of their coordinated operations.  Without this communications channel, the parties could not collaborate on ensuring that their products could be integrated.

51.      On or about the same date, Stellar tried to stabilize the parties' relationship by suggesting to FL3XX a mutual termination of the RRA (*i.e.*, instead of a unilateral termination by FL3XX) and a contemporaneous signing of a mutual integration agreement which would govern their relationship going forward.  FL3XX did not accept this proposal.[9]

52.      On or about June 25, 2021, Stellar again invoked the dispute resolution process in

---

[9] Post-litigation, FL3XX somewhat backtracked and provided to Stellar partnership documents for integration with FL3XX.  *See* Ex. 216 (email).

United States District Court
Northern District of California

United States District Court
Northern District of California

1  the MSAA.  *See* Ex. 100 (email).

2  53.  On or about June 26, 2021, CEP Investors (through DiamondStream Partners

3  ("DSP")[10]) sent a notice of default to FL3XX with respect to the 1.5 million Euro loan it had given

4  to FL3XX.  CEP Investors asserted that, under the loan agreement, FL3XX promised to consult

5  and get its consent to make operating changes out of the ordinary and usual course of business.  "If

6  FL3XX has a dispute with Stellar over provisions within the reseller agreement and wants to

7  terminate the agreement, it must first obtain [CEP Investors'] acquiescence."  Ex. 102 (email from

8  Flynn to Sommariva, dated 6/26/2021).

9  54.  CEP Investors added that FL3XX would also be taking action not in the ordinary

10  and usual course of business if – as threatened – it were to turn off services to current U.S.

11  customers and/or turn off API access to Portside software.  *See* Ex. 102.  FL3XX's threat to

12  terminate U.S. customers' access to Portside was significant.  Portside is a third-party software

13  provider, also in the private commercial aviation industry.  Some of the customers who had signed

14  up for the FL3XX software considered the Portside software a critical application and therefore

15  wanted FL3XX's software to be compatible with Portside's.  The API was what connected

16  FL3XX's software to Portside's.  There was a significant risk that disconnecting Portside's

17  software would lead to customers abandoning FL3XX's software.  Although not entirely clear, it

18  appears that FL3XX did not ultimately disconnect Portside.

19  55.  Although CEP Investors claimed a default on the part of FL3XX, it indicated in its

20  notice that it wanted the parties to get back on track with one another – *i.e.*, it wanted the parties'

21  dispute to be resolved so that they could move forward.  *See* Ex. 102.

22  56.  On or about July 1, 2021, a Steering Committee meeting was to take place but Mr.

23  Sommariva (FL3XX's CEO and the head of the Committee) canceled it.  FL3XX proposed to

24  have the Steering Committee meeting later that week.  Although that meeting took place, and

25  perhaps a few more thereafter, eventually, the Steering Committee meetings ceased.  It was Mr.

26

27  [10] DSP is a legal entity that controls a number of investment funds, including CEP Investors.  CEP
   Investors is a direct investor in Stellar and is the entity that extended the 1.5 million Euro loan to
28  FL3XX.  *See* Tr., vol. 3, at 511-12 (Flynn).

Sommariva's job, as the head of the Steering Committee, to ensure that the meetings were held. Mr. Sommariva's testimony that he continued to hold Steering Committee meetings via Zoom but no one from Stellar would show up is not credible.

57.     On or about July 8, 2021, FL3XX sent a letter to Stellar, notifying Stellar that it was invoking its right to an audit under the RRA.  *See* Ex. 3 (Letter at 1) ("We . . . request Stellar to cooperate with the audit, including by providing access to any books, computers, records, or other information that relate or may relate to the sale of services under the RRA."); *see also* Ex. 32 (email).

58.     On or about the same day, Stellar sent to FL3XX a cease-and-desist letter.  Stellar noted that, under the RRA, it was to provide First-Line Support to customers.  However,

> [t]he agreed upon tools and processes established for customer support were severed, without notice, by FL3XX between July 2 and July 5, 2021.  This includes ZenDesk ticket sharing, Stellar support accounts, and Bitwarden secure sharing.  The effect of this disconnection means that Stellar can no longer troubleshoot and escalate customer issues to FL3XX.  This is a clear violation of the RRA that results in our respective end-user customers not having the support they paid for and that they require.

Ex. 107 (letter).  Stellar demanded that FL3XX "cease any further dismantling and immediately: (1) reactivate ZenDesk ticket sharing, (2) re-enable Stellar support login credentials for customer instances, and (3) reestablish Bitwarden secure sharing so that Stellar can fulfill its First Line Support obligations under the RRA."  Ex. 107.  Stellar further expressed concerns that,

> [o]n our July 7, 2021, Steering Committee call and in subsequent communications, FL3XX explicitly stated that it would start to communicate directly with Stellar's customers.  FL3XX is duly reminded that Stellar is the exclusive reseller of the FL3XX Software in the Americas and that Stellar is the party with contractual relationships with the end-user customer.

Ex. 107.  In effect, because of FL3XX's action, Stellar was unable to provide first-line servicing for U.S. customers.

59.     On July 12, 2021, Stellar sent a demand for mediation to FL3XX.  *See* Ex. 111 (letter).

60.     On or about July 15, 2021, Stellar responded to FL3XX's request for an audit,

United States District Court
Northern District of California

1  stating that it would "cooperate by gathering the necessary information and timely providing that

2  to FL3XX as our other business activities allow."  Ex. 4 (Letter at 1).

3       61.     On or about July 16, 2021, Stellar sent a second cease-and-desist letter to FL3XX.

4  Stellar referred to "several attempts by FL3XX or Online Delivery Technologies . . . to directly

5  market and sell the FL3XX product to prospective customers in the United States, within Stellar's

6  exclusive territory."  Ex. 113 (letter).  Stellar referred to emails that FL3XX had sent to customers

7  on or about July 8, 2021, asserting that Stellar's contracts with the customers for FL3XX software

8  were no longer valid.  *See infra.*  "Stellar demands that both FL3XX and ODT immediately cease

9  all direct marketing or selling of the FL3XX Software within the restricted territory."  Ex. 113.

10       62.     On or about July 19 2021, CEP Investors sent a second notice of default to FL3XX.

11  *See* Ex. 114 (letter).

12       63.     On or about July 20, 2021, FL3XX claimed that Stellar had no right to mediation

13  because that was a right under the MSAA only, and the MSAA "does not apply in [this] case."

14  Ex. 116 (email from FL3XX to Stellar, dated 7/20/2021).

15       64.     On or about July 30, 2021, Stellar filed the instant lawsuit.

16       65.     On or about August 3, 2021, CEP Investors sent a letter to FL3XX, requesting that

17  it pay the outstanding principal due under the loan.  *See* Ex. 122 (letter).  Ultimately, FL3XX

18  repaid the loan, although it disagreed that it had defaulted.  *See* Ex. 123.

19       66.     On or about August 5, 2021, and then again on September 30, 2021, FL3XX

20  reiterated its desire for an audit.  *See* Ex. 32 (emails).  No formal audit ever took place, although

21  FL3XX obtained documents from Stellar through discovery in the case at bar.

22  **J.**    **Post-Termination – Interactions with Customers**

23       67.     As indicated above, or about July 8, 2021, FL3XX began to contact customers

24  regarding its relationship with Stellar and Stellar's contracts with customers related to the FL3XX

25  software.  The same email was sent out to customers, stating in relevant part as follows:

26            The reseller relationship with Stellar is over, though we continue to

27            collaborate in partnership to provide you with the integration of the great services they provide.  We have a great relationship, though

28            over time we all realized that the formulation of a reseller agreement was difficult to run.  Please consider this information confidential

United States District Court
Northern District of California

and we are going to make public announcements in the coming days.

Your service contract with Stellar is no longer valid at this point, but rest assured the services provided will not suffer and will continue indefinitely with the same level of quality and support.  We will come to you very soon with a new version of the contract that will reflect the exact same conditions you had with Stellar, so that even from a commercial perspective nothing changes.  It's going to be business as usual.

Ex. 104 (email to Jet It); *see also* Exs. 106, 108-09 (emails to other customers).

68.    On or about the same day, Stellar sent out an email to customers.  It stated:

We regret to inform you that Stellar is temporarily unable to provide our customary first-line support for the FL3XX system, as FL3XX has disabled several of our joint customer support tools.  Stellar is committed to resolving this situation and to providing our customers with the level of support you expect.  While this issue is being resolved, FL3XX has indicated customers can contact its CECO at paolo.sommariva@fl3xx.com or its support team at support@fl3xx.com.

Ex. 105 (email).

69.    Customers were not pleased and expressed concern over how they could move forward with the FL3XX software, *e.g.*, without integration of Stellar's software and support.  *See, e.g.*, Ex. 108 (email from Journey to FL3XX, dated 7/9/2021); Ex. 109 (email from Jet Edge to FL3XX, dated 7/11/2021).  Ultimately, all or almost all of the customers that Stellar had developed for the FL3XX software discontinued their use of the software.  *See, e.g.*, Ex. 110 (letter from Chantilly, dated 7/12/2021); Ex. 119 (email from Spirit Jets, dated 7/25/2021); Exs. 126-27 (email and letter from Friedkin, dated 8/27/2021); Ex. 130 (request from IBM, dated 9/15/2021); Ex. 129 (letter from Jet Edge, dated 10/4/2021); Ex. 134 (email from Jet It, dated 8/13/2022).

## II.    CONCLUSIONS OF LAW[11]

### A.    Stellar's Claim for Breach of the RRA[12]

1.    Stellar asserts that FL3XX breached the RRA, specifically by terminating the

---

[11] The Court incorporates by reference its summary judgment order in which it, *inter alia*, interpreted the limitation-of-liability clauses in the MSAA and RRA.  *See* Docket No. 59 (order).

[12] Stellar has asserted claims for breach of the RRA and MSAA, as well as breach of the implied

United States District Court
Northern District of California

United States District Court
Northern District of California

agreement without complying with the contract's termination provision.[13]  "[T]he elements of a cause of action for breach of contract are (1) the existence of the contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) the resulting damages to the plaintiff."  *Oasis West Realty, LLC v. Goldman*, 51 Cal. 4th 811, 821 (2011); *see also Piedmont Cap. Mgmt., L.L.C. v. McElfish*, 94 Cal. App. 5th 961, 968 (2023).

2.     There is no dispute that a valid contract existed between the parties: the RRA.

3.     Stellar was performing under the contract.  To the extent FL3XX argues Stellar breached the RRA, thus allowing FL3XX to terminate the agreement, that issue is addressed below.

4.     FL3XX breached the RRA by terminating it without complying with the contract's termination provision.

5.     Under the RRA, FL3XX could terminate if (a) Stellar failed to make a payment due within thirty days after receiving written notice that the payment was delinquent or (b) if Stellar breached a material term or condition of the RRA and failed to cure the breach within thirty days after receiving written notice of the breach.  *See* Ex. 5 (RRA ¶ 8.2).

6.     To the extent FL3XX claims breach by Stellar based on, *e.g.*, discounting customer prices, failing to provide First-Line Support to customers, etc., FL3XX was not entitled to terminate because it did not comply with RRA ¶ 8.2(b).  That is, it did not give Stellar written notice of such alleged breach before sending Stellar the termination letter of June 9, 2021.

7.     To the extent FL3XX claims breach by Stellar based on the failure to pay five invoices (*i.e.*, the invoices that were the subject of the dunning letters), the analysis is different.  Here, RRA ¶ 8.2(a) governs, not ¶ 8.2(b).  FL3XX asserts that it gave written notice of payment delinquency prior to contract termination through the dunning letters it sent to Stellar.  However,

---

covenant of good faith and fair dealing with respect to both agreements.  Stellar admits that its claim for breach of the implied covenant is essentially subsumed within its claims for breach of contract and therefore the Court does not address this claim separately.

[13] At points, Stellar has also suggested a breach because FL3XX did not mediate the dispute.  The Court need not address whether the mediation provision in the MSAA extends to the RRA because, as previously noted, even if it did, it is not clear what damages would flow from a breach of the mediation provision.  That claim is, in essence, superfluous to the substantive claims herein.

this was not proper notice.

8.     First, the dunning letters were sent to Ms. Newell alone, and she was, at best, simply an accounting clerk for Stellar.[14]  Given that a delinquent payment could give FL3XX a basis to terminate the entire RRA, notice of a delinquent payment should have been given to a Stellar employee of sufficient rank who would deal with the potential contract breach or termination.  That was not Ms. Newell.  Such a requirement may fairly be inferred based on the implied covenant of good faith and fair dealing which inheres in every contract.  *See Foley v. Interactive Data Corp.*, 47 Cal. 3d 654, 683-84 (1988) (stating that "[e]very contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement" and that "[t]here is an implied covenant of good faith and fair dealing in every contract that neither party will do anything which will injure the right of the other to receive the benefits of the agreement") (internal quotation marks omitted); *see also* Rest. 2d of Contracts § 205, cmt. d (in discussing good faith performance of a contract, noting that "bad faith may be overt or may consist of inaction, and fair dealing may require more than honesty[;] [a] complete catalogue of types of bad faith is impossible, but the following types are among those which have been recognized in judicial decisions: evasion of the spirit of the bargain, lack of diligence and slacking off, willful rendering of imperfect performance, abuse of a power to specify terms, and *interference with or failure to cooperate in the other party's performance*") (emphasis added).  To give notice of an amount due simply to an accounting clerk without elevating the level of notice to one who could appreciate that extremely consequential risk (contract termination) of nonpayment of a single disputed invoice would not be an act of good faith.  Notably, Mr. Sommariva even conceded that notice to an accountant would not be sufficient notice of a default.  *See* Tr., vol. 5, at 897-98 (Sommariva).

9.     Second, the dunning letters were simply autogenerated letters from FL3XX's accounting system and gave no indication that there would be contract termination if the payment

[14] For purposes of this analysis, the Court assumes, in FL3XX's favor, that the relevant decisionmakers at FL3XX did not have reason to know that Ms. Newell was not a Stellar employee.

delinquency was not cured.  In fact, the dunning letters were misleading in simply asking Stellar to "settle the balance."  *See, e.g.*, Ex. 12 (first dunning letter) (simply stating that payment was overdue and "[w]e kindly ask you to settle the balance as soon as possible").  In this regard, the Court notes that RRA ¶ 8.2(b) gives some guidance as to how RRA ¶ 8.2(a) should be construed. RRA ¶ 8.2(b) allows a party to terminate under the following circumstance: "if either Party breaches any material term or condition of this Agreement and fails to cure such breach within thirty (30) days after receiving written notice of the breach, the non-breaching Party may terminate this agreement on written notice at any time following the end of such thirty (30) day period."  Ex. 5 (RRA ¶ 8.2(b)).  RRA ¶ 8.2(a) allows FL3XX to terminate under the following situation: "if [Stellar] fails to make any payment due hereunder within thirty (30) days after receiving written notice from [FL3XX] that such payment is delinquent, [FL3XX] may terminate this Agreement on written notice at any time following the end of such period."  Ex. 5 ((RRA ¶ 8.2(a)).  Paragraph 8.2(b) essentially requires that there be notice of a significant breach such that failure to cure would result in termination.  Given the similarity between ¶ 8.2(b) and ¶ 8.2(a), the implied covenant of good faith and fair dealing suggests  ¶ 8.2(a) should be implemented in a similar way – *i.e.*, there must be notice  that failure to cure nonpayment would result in termination of the contract.  The dunning letters did not event hint termination of the RRA would be a consequence of non- or late payment.

10.    Finally, the Court notes that the dunning letters were insufficient notice of delinquency in light of prior dealings between the parties' accounting departments, indicating that, if there was a dispute about a FL3XX invoice, Stellar should hold off on payment thereof.  *See* Ex. 77 (email exchange between Villamil (Stellar) and Cazan (FL3XX), dated 1/29/2021) (Cazan stating that, "as long as the discussion on the commission is still ongoing, I would say it's better to wait altogether with the invoice remittance").

11.    Accordingly, the first valid written notice of a delinquent payment was not any dunning letter but rather FL3XX's termination letter itself.

12.    In response to the termination letter, Stellar paid one of the invoices (in respect to Phoenix Air Group).  Thus, any alleged delinquency with respect to this invoice was addressed

United States District Court
Northern District of California

1    during the thirty-day period after notice.

2    13.    As for the four remaining invoices (to Freight Runners, Spirit Jets, Jet Methods,

3    and Journey), there was, in fact, no delinquent payment.  To be sure, Stellar had issued invoices to

4    these customers, which prompted FL3XX to issue its own invoices to Stellar, and, under the RRA,

5    Stellar was to make payments to FL3XX within thirty days after being invoiced.  *See* Ex. 5 (RRA

6    ¶ 4.3) ("All payments under this Agreement shall be made within thirty (30) days after the receipt

7    of the applicable invoice.").  However, the RRA also specified that, "for subscription-based

8    Services, Fees [due to FL3XX from Stellar] are based on Customer Subscriptions and the *actual*

9    *usage* therein."  Ex. 5 (RRA ¶ 4.2) (emphasis added).  Therefore, until a customer was "actually

10   using" its subscription, Stellar did not owe any money to FL3XX.  The plain language of the

11   contract governs.  *See* Cal. Civ. Code § 1638 ("The language of a contract is to govern its

12   interpretation, if the language is clear and explicit, and does not involve an absurdity."); *id.* § 1639

13   ("When a contract is reduced to writing, the intention of the parties is to be ascertained from the

14   writing alone, if possible . . . ."); *id.* § 1644 ("The words of a contract are to be understood in their

15   ordinary and popular sense, rather than according to their strict legal meaning; unless used by the

16   parties in a technical sense, or unless a special meaning is given to them by usage, in which case

17   the latter must be followed."); *Wind Dancer Production Group v. Walt Disney Pictures*, 10 Cal.

18   App. 5th 56, 69 (2017) ("Ordinarily, the objective intent of the contracting parties is a legal

19   question determined solely by reference to the contract's terms.").  The four customers that Stellar

20   had invoiced were not commercially using the FL3XX software.  In fact, there were significant

21   functionalities that had yet to be completed as identified in Stellar's second letter in response to

22   the termination letter.

23   14.    FL3XX contends that the term "actual usage" is vague.  "Extrinsic evidence is

24   admissible . . . to interpret an agreement when a material term is ambiguous."  *Wind Dancer*, 10

25   Cal. App. 5th at 69.  Here, the evidence extrinsic to the contract does not establish that the term

26   "actual usage" is vague.  Even Stefan Oberender (the co-founder of FL3XX) admitted that

27   successful onboarding of a customer onto FL3XX software would consist of installation of the

28   software and configuration of the software, *i.e.*, so that it was "ready to be used."  Tr., vol. 6, at

991 (Oberender).

15.     Mr. Oberender suggested that there should be limits to how the term "actual usage" should be understood.  For instance, for a large customer with hundreds of aircraft, it would not be possible to "magically switch over on a certain date" from the existing scheduling software to FL3XX's scheduling software.  Tr., vol. 6, at 1032 (Oberender).  It could take years to roll out the usage of software.  In such an instance, that customer should not be allowed to avoid payment for the software just because the rollout would take time.  *See* Tr., vol. 6, at 1032-33 (Oberender). The Court does not disagree that there may be limits in principle.  However, here, the situation contemplated by Mr. Oberender is not at issue.  Here, the issue is whether a customer is actually using software if the software did not provide critical functionalities agreed upon.  If not, the software is not ready for commercial use by the customer.  And notably, there was credible testimony that customers were unwilling to start paying subscription fees if the software was not giving them the functionalities they needed; plus there was testimony by Mr. Sommariva (in his deposition) that Stellar was authorized to tell customers that they would not have to start paying for the software until it was being commercially used.

16.     Accordingly, FL3XX breached the RRA by terminating it without complying with the contract's termination provision.

17.     The remaining issue is whether Stellar was damaged as a result of FL3XX's improper termination of the RRA.  Because FL3XX terminated the RRA, Stellar was deprived of revenue that it was making under the contract.  Stellar claims that, for the remainder of the RRA three-year term, it would have earned $989,268 from the existing twenty-four customers it had developed for the FL3XX software.  *See* Ex. 146 (Item 1.a).  This includes Stellar's 27.5% commission from the sale of subscriptions to the FL3XX software (almost $420,000), professional services fees rendered by Stellar (to Jet Edge), and Stellar's subscription sales of Data Studio.  All of these items of damages are not supported, and in this regard, the Court does not find the testimony of Stellar's witnesses (including Scott Halstead's, Stellar's CFO during the relevant time) credible.

18.     For example, Stellar seems to have calculated its 27.5% commission based on the

number of months remaining in the subscription term as of August 2021.  However, it is not clear that all twenty-four customers would have been "live" with the FL3XX software as of August 2021.  Stellar's witnesses testified that, at the time of termination in June 2021, only about half of the functionalities/features sought by customers had been addressed.  *See, e.g.*, Tr., vol. 2, at 285 (Flynn); Tr., vol. 3, at 426 (Powell).  There is no competent evidence that, within two months thereafter, the remaining half of the functionalities could or would have been addressed.  This is especially true since it took the parties more than a year after they started working together to complete the half of the functionalities that the parties did complete.

19.     As another example, Stellar seeks the professional services fees (Jet Edge) – even though the fees were based on work "independent of any relationship with FL3XX," Tr., vol. 2, at 338 (Halstead) – on the ground that Stellar's relationship with Jet Edge "was cut off when . . . FL3XX interfered with Stellar's customer contracts."  Docket No. 144 (Pl.'s Post-Trial Br. at 20).  But this means that the loss of the fees constituted consequential damages.  *See Scheillinger Bros. v. Cotter*, 2 Cal. App. 5th 984, 1010 (2016) (noting that "general damages are a natural and necessary consequence of a contract breach" whereas special, or consequential, damages "are those losses that do not arise directly and inevitably from any similar breach of any similar agreement[;] []instead, they are secondary or derivative losses arising from circumstances that are particular to the contract or to the parties").  Consequential damages are barred by the MSAA/RRA.  (The bar is found in the MSAA but extends to the RRA as well.)  Moreover, as discussed *infra*, the Court does not find credible the testimony from Stellar's witnesses that Stellar's reputation was irreparably ruined, due to the fact that FL3XX told customers, including Jet Edge, that Stellar was no longer a reseller for FL3XX and that Stellar's contracts with customers for the FL3XX software were invalid.  This assertion that FL3XX ruined Stellar's reputation in the industry is not credible in light of testimony from Stellar witnesses that they had longstanding relationships with many of the customers and that Stellar's employees (including Fred Powell) were some of the most respected in the industry.

20.     Although the entirety of the damages claimed by Stellar are not supported, this does not mean that no damages are warranted.  There is nothing to indicate that the parties could

United States District Court
Northern District of California

United States District Court
Northern District of California

1  not have worked through the remaining features/functionalities needed by customers in order for

2  Stellar to start getting its 27.5% commission for the sale of the subscription to the FL3XX

3  software.  And even if this took the parties another year after June 2021 to finish the second half of

4  the features/functionalities (as noted above, it took Stellar more than a  year to get the first half

5  addressed), it is reasonable that Stellar would have earned more than $100,000 (*i.e.*, less than a

6  quarter of the asserted $420,000) within the remainder of the RRA term.

7       21.     The RRA has a damages cap of $100,000.  *See* Ex. 5 (RRA ¶ 9.2) ("IN NO EVENT

8  WILL THE AGGREGATE LIABILITY OF EITHER PARTY UNDER THIS AGREEMENT

9  EXCEED US $100,000 . . . OR THE CHARGES FOR THE SERVICES THAT ARE THE

10 SUBJECT OF THE CLAIM, WHICHEVER IS LESSER.").  Accordingly, the Court awards

11 Stellar $100,000 for breach of the RRA.

12      22.     Because of the damages cap, the Court need not address other damages claimed by

13 Stellar for breach of the RRA.  For example, Stellar has also claimed (a) $313,893 in damages, *see*

14 Ex. 146 (Item 1.b), based on "lost revenues from existing Stellar customers who were expected to

15 renew [for one year] past the original three-year RRA term."  Docket No. 144 (Pl.'s Post-Trial Br.

16 at 20) (arguing that this is especially conservative given that "customers find it difficult and costly

17 to switch scheduling software").  Stellar has also claimed (b) $1,347,520 in damages, *see* Ex. 146

18 (Item 2), based on "lost revenues from new customers that Stellar expected to win during the

19 second half of the three-year RRA term."  Docket No. 144 (Pl.'s Post-Trial Br. at 20).  Finally,

20 Stellar has claimed (c) "invested resources" of $918,527, *see* Ex. 146 (Item 4), *i.e.*, "project costs

21 invested by Stellar in reasonable reliance on the [RRA] that [was] improperly cut off by FL3XX."

22 Docket No. 144 (Pl.'s Post-Trial Br. at 22).  The Court notes, however, that the damages claimed

23 in (a) and (b) are consequential damages, which are barred by the MSAA/RRA.  Moreover, the

24 Court finds these asserted damages based on expectation of future events were not well supported

25 and were based instead upon speculation.

26 **B.      Stellar's Claim for Breach of MSAA**

27      23.     According to Stellar, FL3XX breached not only the RRA but also the MSAA.  As

28 noted above, "the elements of a cause of action for breach of contract are (1) the existence of the

1    contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4)

2    the resulting damages to the plaintiff." *Oasis West Realty*, 51 Cal. at 821.

3        24.    There is no dispute that a valid contract existed between the parties: the MSAA.

4        25.    However, the parties dispute the scope of the contract.  The Court rejects FL3XX's

5    position that the MSAA simply provided a general framework for the parties' relationship with

6    essentially no real obligations.  The MSAA provided that "the Parties wish to establish a strategic

7    relationship that drives an evolution from individual development and marketing of separate

8    products to a fully shared and integrated mode of building, marketing, selling, and supporting of

9    combined products."  Ex. 2 (MSAA at 1).  It set forth a specific governance structure: as noted

10   above, under the agreement, a Steering Committee was established to "set[] strategic direction and

11   [be] accountable for the overall success of the relationship" between the parties, and the

12   committee was to "conduct regular activity as agreed upon by the participants through workshops

13   held approximately every calendar quarter, a monthly conference call, and continuous

14   communications among the committee members."  Ex. 2 (MSAA ¶ 1.a).  Thus, the agreement

15   clearly contemplated that the parties would engage in product integration pursuant to the MSAA;

16   it was not purely aspirational.  This is demonstrated by the fact that upon its execution, the parties

17   actualized joint and cooperative operations.  Many meetings were held, and communications made

18   between the parties in implementing the joint venture; both Stellar and FL3XX invested

19   substantial time and resources into the venture as broadly contemplated by the MSAA.

20       26.    That the MSAA did not contain additional specific language regarding product

21   integration does not mean that joint effort at product integration was not required under the

22   MSAA.  Without product integration, financing contemplated by the parties would be unlikely,

23   and therefore the merger planned by the parties could not occur.  In short, the parties had a

24   concrete objective, and mutual cooperation in developing an integrated product was an obvious

25   foundation therefor.

26       27.    That the parties could have, but did not, enter into a formal ancillary agreement on

27   product integration is not dispositive.  As indicated above, the parties' conduct in which both sides

28   pursued product integration demonstrated their understanding that efforts to integrate the products

25

United States District Court
Northern District of California

were required by the MSAA; that conduct further reflected an understanding that the MSAA, though perhaps not specific in some respects, was sufficient to govern the parties' joint efforts towards the integration work.

28.     Stellar performed under the MSAA.  For example, it had multiple employees working on software development and product integration, and devoted substantial resources to the effort.

29.     FL3XX breached the MSAA by unilaterally ceasing its performance under the contract and thereby terminating its engagement with Stellar.  *Cf. Romano v. Rockwell Int'l, Inc.*, 14 Cal. 4th 479, 489 (1996) (noting that, "if a party to a contract expressly or by implication repudiates the contract before the time for his or her performance has arrived, an anticipatory breach is said to have occurred[;] [t]he rationale for this rule is that the promisor has engaged not only to perform under the contract, but also not to repudiate his or her promise").

30.     For example, FL3XX shut down the communication channels between the parties without any provocation by Stellar.  Without these communication channels, the parties could not collaborate on integrating their products.  Notably, Mr. Sommariva admitted that FL3XX owed a duty under the MSAA to pursue the stated goals of the agreement.  *See* Tr., vol. 5, at 903 (Sommariva).

31.     The Steering Committee meetings, which Mr. Sommariva chaired and thus had responsibility for conducting, were ended without good reason by FL3XX.  Without Steering Committee meetings, there was no way to advance the parties' previously contemplated path of product integration, financing, and merger.  Notably, Mr. Sommariva admitted that the MSAA would be breached if a party did not participate in the Steering Committee.  *See* Tr., vol. 4, at 766 (Sommariva).  Mr. Sommariva's testimony that he continued to open up Zoom meetings for the Steering Committee but no one showed up is not credible.

32.     It is also noteworthy that FL3XX refused to mediate the parties' dispute over the RRA and rejected Stellar's proposal that there be a mutual termination of the RRA and the signing of a mutual integration agreement.  Although the MSAA may not have required FL3XX to do so, FL3XX's actions speak to its intent to step away from its relationship with Stellar, and thereby the

1   MSAA.  This is not to stay that Stellar did not contribute to the deteriorating relationship between

2   the parties (*e.g.*, by having CEP Investors issue a notice of default and later suing FL3XX in the

3   case at bar).  But the evidence reflects FL3XX initiated the termination whereas Stellar sought to

4   come up with a resolution of the parties' dispute that would allow the parties to move forward

5   with the MSAA and the ultimate goal of merger.[15]

6       33.     The remaining issue is what damages Stellar sustained as a result of FL3XX's

7   breach of the MSAA.  Stellar claims that it sustained $7,724,808 in damages as a result of the

8   breach.  Stellar bases this claim on "lost revenues from the sale of two principal Stellar products

9   that were planned to be marketed as part of the joint Stellar-FL3XX package system: Stellar

10  Marketplace and Data Studio."  Docket No. 144 (Pl.'s Post-Tr. Br. at 21).  Stellar claims lost

11  revenue for the years 2022-2024.  The bulk of the asserted lost revenue (about 90%) is associated

12  with Marketplace (a product that could be used to search available inventories of aircraft operators

13  and the associated pricing).  *See* Ex. 146 (chart discussing "Revenue 3 – Stellar Products").

14      34.     The testimony from Stellar witnesses in support of these expectation damages is

15  not credible.  The asserted damages are speculative.  Marketplace was not even a completed

16  product at the time FL3XX terminated the RRA in June 2021, and only thirteen of the twenty-four

17  customers had signed a contract to purchase the product.  For Stellar to claim millions in damages

18  for essentially an unproven product is entirely unsupported.  For Data Studio (a product that could

19  do analytics and generate reports based on information in the FL3XX database), only five

20  customers had signed a contract to purchase the product and it appears that Stellar obtained

21  revenues of about only $366,000 during the relevant period.  These circumstances also do not

22  support future sales of millions, especially when there was no guarantee that the MSAA would

23  have continued past March 2023 (*i.e.*, its termination date).[16]  FL3XX suggested that the product

24

25  ---
    [15] That FL3XX, post-litigation, suggested that an integration agreement be signed is not
26  dispositive.  The question is whether FL3XX had essentially repudiated the MSAA prior to
    litigation.
27
    [16] In fact, any damages for the period March 2023-December 2024 are arguably consequential
28  damages barred by the MSAA.

United States District Court
Northern District of California

was overpriced.

35.     Accordingly, at most, the breach of the MSAA resulted in $366,000 in expectation damages – revenue that Stellar had made from the sale of Data Studio to five customers.  But even this amount is speculative given that it includes lost revenue from March 2023-December 2024.  Stellar has also assumed that the customers who purchased Data Studio would have gone live in August 2021, an assumption not backed by the evidence at trial.

36.     The Court therefore does not award the expectation damages requested by Stellar.

37.     However, Stellar has made an alternative request for relief.  In lieu of expectation damages, it has sought reliance damages – *i.e.*, the cost of the resources Stellar invested into the MSAA.

38.     Reliance damages can be awarded for breach of contract.  As one California appellate court has noted, "[o]ne proper "measure of damages for breach of contract is the amount expended [by the nonbreaching party] on the faith of the contract." *Agam v. Gavra*, 236 Cal. App. 4th 91, 105 (2015).  "[W]here, without fault on his part, one party to a contract who is willing to perform it is prevented from doing so by the other party, the primary measure of damages includes his reasonable outlay or expenditure toward performance." *Id.* (internal quotation marks omitted).  "[T]he burden is on the plaintiff to establish 'the amount which he has been induced to expend.' The burden then shifts to the defendant to show the nonbreaching party's expenses were unnecessary, such that his or her recovery of reliance damages should be reduced." *Id.* at 106; *see also* CACI 361 (instructing on reliance damages as a remedy for breach of contract; reliance damages are "the reasonable amount of money . . . spent in preparing for contract performance").

39.     Reliance damages are an alternative to expectation damages (*i.e.*, Stellar could not claim both expectation damages plus reliance damages).  *See Ryan v. Crown Castle NG Networks*, Inc., 6 Cal. App. 5th 775, 778 (2016); *see also* Rest. 2d of Contracts § 344 (defining expectation interest as the "interest in having the benefit of his bargain by being put in as good a position as he would have been in had the contract been performed" and reliance interest as the "interest in being reimbursed for loss caused by reliance on the contract by being put in as good a position as he would have been in had the contract not been made"); *id.* § 349 (stating that, "[a]s an alternative to

United States District Court
Northern District of California

the measure of damages stated in § 347 [expectation damages], the injured party has a right to damages based on his reliance interest, including expenditures made in preparation for performance or in performance, less any loss that the party in breach can prove with reasonable certainty the injured party would have suffered had the contract been performed"); 1 Witkin Sum. Cal. Law Contracts § 908 (stating that "[a]nother measure of contract damages is the amount of the plaintiff's expenditures, together with the reasonable value of his or her own services, in preparation and performance in reliance on the contract[;] [t]his type of recovery is frequently sought or awarded where, because of uncertainty or difficulty of proof or other reason, the plaintiff is unable to establish a claim for lost profits").

40.     In the case at bar, Stellar claims as reliance damages the time its employees (including sales employees, engineering employees, etc.) spent doing work under the MSAA;  the time amounted to more than $1.65 million in labor costs.  *See* Ex. 146 (Item 4).  Stellar estimates that the work done by the employees amounted to the work of twelve full-time employees out of a total of forty-two full-time employees.  In other words, close to 30% of the time spent by Stellar employees was working on FL3XX matters.

41.     FL3XX argues that software companies usually absorb their own development costs.  While this may be true, the issue here is different because there was a contract contemplating product integration and Stellar would not have expended resources on the product integration but for that agreement.

42.     FL3XX has also criticized Stellar's assessment of its invested resources, *e.g.*, pointing out that two of the four sales employees allegedly spent 80-90% of their time on FL3XX matters.  Similarly, out of seven employees working on product development, two spent 80-90% of their time on FL3XX matters.  While these criticisms are not without any merit, that is counterbalanced, at least in part, by the fact that a number of employees spent 0% of their time on FL3XX matters.  Furthermore, it is not unexpected that a number of employees spent a significant part of their jobs working on FL3XX matters given that the goal of the parties was ultimately to get to a merger.  Finally, it is worth noting that, even if the Court were to reduce the time spent (across-the-board) by 30%, that would still leave labor costs of more than $1 million.  The Court

finds credible Stellar's assertion of at least $1 million in reliance damages.

43.     The MSAA has a damages cap of $1 million.  Accordingly, the Court awards $1 million for breach of the MSAA.

## C.     Stellar's Unjust Enrichment Claim

44.     In addition to its claims for breach of contract, Stellar has also asserted a claim for unjust enrichment.  "The elements of an unjust enrichment claim are the 'receipt of a benefit and [the] unjust retention of the benefit at the expense of another."  *Peterson v. Cellco P'ship*, 164 Cal. App. 4th 1583, 1593 (2008).  Stellar claims that FL3XX received a benefit from Stellar because "FL3XX has continued marketing the software that was improved with the benefit of Stellar's contributions as to requirements and customer requests in the U.S. market.  FL3XX even pirated the form of subscription agreement that Stellar had developed as an exclusive reseller for FL3XX."  Docket No. 108 (Pl.'s Tr. Br. at 12-13).

45.     Because the parties' relationship was governed by the RRA and MSAA, Stellar has no valid claim for unjust enrichment.  *See Gerstle v. Am. Honda Motor Co., Inc.*, No. 16-CV-04384-JST, 2017 U.S. Dist. LEXIS 100580, at *40 (N.D. Cal. June 28, 2017) (stating that "the case law . . . is clear: 'a quasi-contract action for unjust enrichment does not lie where [] express binding agreements exist and define the parties' rights'"); *California Med. Ass'n v. Aetna U.S. Healthcare of Cal., Inc.*, 94 Cal. App. 4th 151, 172 (2001) (stating that, "as a matter of law, a quasi-contract action for unjust enrichment does not lie where, as here, express binding agreements exist and define the parties' rights"); *Hedging Concepts, Inc. v. First Alliance Mortg. Co.*, 41 Cal.App.4th 1410, 1420 (1996) (stating that, "[w]hen parties have an actual contract covering a subject, a court cannot – not even under the guise of equity jurisprudence – substitute the court's own concepts of fairness regarding that subject in place of the parties' own contract").

## D.     Stellar's Claim for Intentional Interference with Contractual Relations[17]

46.     Stellar claims that FL3XX intentionally interfered with Stellar's contractual

---

[17] In its complaint, Stellar also asserted a claim for negligent interference with prospective economic relations.  However, it appears Stellar is no longer pursuing that claim.  The claim is not mentioned in either its pre-trial or post-trial brief.

1    relationships with the twenty-four customers who had signed on for the FL3XX software.

2        47.    The elements of a claim for intentional interference with contract are as follows:

3    "(1) a valid contract between plaintiff and a third party; (2) [the defendant's] knowledge of this

4    contract; (3) [the defendant's] intentional acts designed to induce a breach or disruption of the

5    contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5)

6    resulting damage." *Nelson v. Tucker Ellis LLP*, 48 Cal. App. 5th 827, 839 (2020).

7        48.    There were valid contracts between Stellar and the twenty-four customers as the

8    customers purchased FL3XX software from Stellar.

9        49.    FL3XX was aware of these contracts between Stellar and the customers.

10       50.    FL3XX intentionally engaged in conduct designed to disrupt the contractual

11   relationship between Stellar and the customers.  Specifically, it reached out to the customers and

12   told them that Stellar was no longer a reseller for FL3XX and that the service contracts they had

13   with Stellar were no longer valid.

14       51.    As a result of these communications by FL3XX, each of the customers ultimately

15   terminated its contract with Stellar.  Stellar was thereby damaged.

16       52.    Stellar has not clearly articulated what damages it seeks for the intentional

17   interference, but presumably it seeks: (a) lost revenues from the contracts with the twenty-four

18   customers for the remainder of the RRA term; (b) lost revenues from the same customers

19   assuming that the RRA would be renewed for a year; and (c) lost revenues from new customers

20   that it would develop through the RRA term.  These are essentially the same damages as sought

21   for the claim for breach of the RRA.  (To the extent Stellar seeks damages based on lost revenues

22   from Marketplace and Data Studio, those damages are both too speculative as addressed above.)

23       53.    The damages in (b) above are too speculative.  Even if one might be able to infer

24   that the customers would want to renew, it is too speculative that FL3XX would want to renew the

25   RRA, particularly given the parties' relationship rapidly deteriorated during the relevant

26   timeframe.  FL3XX was not obligated to renew the RRA.

27       54.    The damages in (c) are also too speculative.  Testimony by Stellar witnesses that it

28   would have developed another fifteen customers is not credible, particularly as the parties were

not even able to go live with the majority of their existing twenty-four customers after more than a year.

55.     As for the damages in (a) above, as discussed *supra*, Stellar has assumed all customers would be live as of August 2021.  However, the record does not support that claim.  As of June 2021, when FL3XX terminated the RRA, Stellar admits that only half of the functionalities sought by customers had been completed.  And this was after more than a year of Stellar and FL3XX working together.  If it took the parties more than a year to get half of the functionalities completed, it cannot reasonably be inferred that the remaining half would be completed in only two months.  Stellar has not provided the Court with any alternative date by which the functionalities could or would be completed.  Its witnesses simply testified in conclusory terms that customers were on the cusp of going live, but that is not substantiated by the evidence.  Without more concrete information, the Court cannot say whether customers would have gone live within six months after June 2021, a year after June 2021, or even later (bearing in mind that the MSAA/RRA had a three-year term that would expire in March 2023).  The Court acknowledges that, for Stellar's claim for breach of the RRA, the Court noted that it was more than likely that the parties would complete the functionalities within the MSAA/RRA term.  In other words, customers would go live within the MSAA/RRA term.  It was also more than likely that Stellar would thereby earn $100,000 (the damages cap under the RRA).  However, Stellar did not meet its burden of proving for the tort claim here how much more than $100,000 it would have earned but for FL3XX's misconduct.[18]  Stellar would have to show more than $100,000 in tort damages in order to obtain damages that would not be duplicative of the damages awarded for the claim for breach of the RRA.  It has failed to do so.

56.     To the extent Stellar seeks $366,000 for damages related to Data Studio, the customers who had purchased Data Studio were not yet live.  Again, Stellar has failed to show that

---

[18] The damages caps in the MSAA and RRA do not apply to tort claims.  Although the damages exclusion provision in the MSAA/RRA can apply to tort claims, it is irrelevant here.  During the pretrial proceedings, the parties agreed that the damages exclusion provision did not bar *compensatory* damages for a tort.  Accordingly, California Civil Code § 1668, which prohibits exemptions from liability for certain tortious conduct, is also irrelevant.

1     Data Studio would have been in commercial use by August 2021, as claimed by Stellar.  *See* Ex.

2     146 (chart).

3          57.    To the extent Stellar seeks as damages the professional services fee (Jet Edge) of

4     $340,000, there is a different problem.  Stellar admits that the professional services were for work

5     unrelated to FL3XX.  Thus, Stellar must show a causal link to the interference by FL3XX.  In

6     other words, what evidence is there that FL3XX's interference with the contract between Stellar

7     and Jet Edge as it related to the FL3XX software led Jet Edge to cancel the contract unrelated to

8     that software.  Stella did not have a witness from Jet Edge testify.  The Court also finds testimony

9     from Stellar witnesses that its reputation in the industry was ruined generally as a result of

10    FL3XX's actions not credible for the reasons stated above.[19]

11    **E.**    **Stellar's Claims for Defamation and Trade Libel**

12         58.    Stellar has asserted claims for defamation and trade libel.

13         59.    Defamation can be libel or slander.  *See* Cal. Civ. Code § 44.  "'The elements of a

14    defamation claim are (1) a publication that is (2) false, (3) defamatory, (4) unprivileged, and (5)

15    has a natural tendency to injure or causes special damage.'"  *John Doe 2 v. Superior Court*, 1 Cal.

16    App. 5th 1300, 1312 (2016).  California Civil Code § 48a distinguishes general and special

17    damages as follows: general damages are "damages for loss of reputation, shame, mortification,

18    and hurt feelings" while special damages are "all damages that plaintiff alleges and proves that he

19    or she has suffered in respect to his or her property, business, trade, profession, or occupation,

20    including the amounts of money the plaintiff alleges and proves he or she has expended as a result

21    of the alleged libel, and no other."  Cal. Civ. Code § 48a(d).

22         60.    "Trade libel is an intentional disparagement of the quality of services or product of

23    a business that results in pecuniary damage to the plaintiff.  Like defamation, trade libel requires a

24

25    ───────────────

      [19] Based on the rulings above, the Court need not address FL3XX's contention that the economic

26    loss rule is a bar to damages sought by Stellar for its tort claims.  The Court notes, however, that

      there is case law indicating that the economic loss rule does not apply where there is an intentional

27    tort independent of a breach of contract.  *See, e.g., Robinson Helicopter Co., Inc. v. Dana Corp.*,

      34 Cal. 4th 979, 989-90 (2004) (noting that tort damages have been permitted in contract cases

28    where "'the duty that gives rise to tort liability is either completely independent of the contract or

      arises from conduct which is both intentional and intended to harm'").

United States District Court
Northern District of California

false statement of fact, not an expression of an opinion." *J-M Mfg. Co., Inc. v. Phillips & Cohen LLP*, 247 Cal. App. 4th 87, 97 (2016).  Generally speaking, trade libel is considered a harder claim for a plaintiff to prove compared to defamation.  *See Muddy Waters, LLC v. Superior Court*, 62 Cal. App. 5th 905, 925 (2021) ("While a cause of action for trade libel resembles that for defamation . . . [it] differs from it materially in the greater burden of proof resting on the plaintiff, and the necessity for special damage in all cases. . . . [T]he plaintiff must prove in all cases that the publication has played a material and substantial part in inducing others not to deal with him, and that as a result he has suffered special damages.") (internal quotation marks omitted).

61.     Because trade libel is generally a harder claim to prove, the Court focuses on the claim for defamation – although as a practical matter, given the damages sought by Stellar, there may be no material difference between the two claims.

62.     Stellar asserts defamation because (a) "FL3XX misinform[ed] all U.S. customers that their contracts with Stellar were no longer valid."  Docket No. 144 (Pl.'s Post-Trial Br. at 18).  Stellar also claims that it was defamatory (b) "for FL3XX to advise Airsprint Private Aviation on 7-9-21 that FL3XX's own disabling of Stellar's access to customer support resources was somehow linked to things that Stellar was 'doing or telling'" and (c) "for Mr. Sommariva to tell Fabian Bello (8-10-21) that 'hundreds of fails' in onboarding were due to 'Stellar missing out on the communication, hindering our execution."  Docket No. 144 (Pl.'s Post-Tr. Br. at 18) (citing Ex. 124).

63.     With respect to (b) and (c) above, these defamation theories were never articulated in the complaint or in pretrial filings.  Stellar therefore cannot rely on them as a factual predicate for its defamation claim.

64.     With respect to (a) above, FL3XX's claims to customers that they contracts they had with Stellar were no longer valid was immaterial.

65.     Here, FL3XX's claim that the contracts were not valid was made in connection with the nondefamatory fact – disclosed to customers – that Stellar was no longer FL3XX's reseller.  That Stellar was not a reseller was true because FL3XX had terminated the RRA.  The reason for the termination of the RRA was immaterial.   FL3XX had terminated the agreement and

United States District Court
Northern District of California

therefore Stellar was not able to resell.  That was the critical fact affecting customers.

Furthermore, the statement that the contract was invalid is not, in itself, defamatory.  Invalidity of

an agreement could be based on a number of reasons which do not imply wrongdoing by a party to

the agreement.

66.    Furthermore, the statement that Stellar was no longer FL3XX's reseller was not

defamatory.  The full context of the statement was as follows:

> The reseller relationship with Stellar is over, though we continue to
> collaborate in partnership to provide you with the integration of the
> great services they provide.  We have a great relationship, though
> over time we all realized that the formulation of a reseller agreement
> was difficult to run.  Please consider this information confidential
> and we are going to make public announcements in the coming
> days.

Ex. 104 (email to Jet It).

67.    Even if Stellar had successfully proven its defamation claim, it was claiming

special damages as a result.  And per the damages exclusion provision in the MSAA (applicable to

tort claims), special damages cannot be awarded.  Furthermore, even if they could be awarded, the

damages sought by Stellar suffer from the same problems as discussed in the section addressing

the intentional interference claim.  *See* Conclusions of Law ¶ 48 *et* seq.  Finally, to the extent

Stellar claims that its reputation was ruined as a result of FL3XX's conduct, testimony of Stellar

witnesses to that effect was not credible.  As indicated above, there was evidence that Stellar had

longstanding relationships with customers, and that its employees such as Mr. Powell were some

of the most respected in the industry; it is not credible that Stellar's reputation was ruined as a

result of FL3XX's statement.

**F.    FL3XX's Claim for Breach of the RRA[20]**

68.    FL3XX claims that Stellar breached the RRA by, *e.g.*, failing to pay invoices,

discounting FL3XX software without FL3XX's consent, providing inadequate First-Line Support

to customers, and failing to comply with an audit.

---

[20] Like Stellar, FL3XX has also asserted a related claim for breach of the implied covenant.  As
above, the Court does not address this claim separately.

United States District Court
Northern District of California

United States District Court
Northern District of California

1

69.     FL3XX has failed to prove that it was performing under the RRA.  Even if Stellar

2   had, *e.g.*, provided inadequate First-Line Support to customers, FL3XX was required to give

3   written notice and an opportunity to cure.  It failed to do so.  *See* Ex. 5 (RRA ¶ 8.2(b)).  The same

4   is true with respect to the other conduct identified by FL3XX.

5

70.     Furthermore, FL3XX has failed to show breach by Stellar.  As discussed above,

6   Stellar did not fail to pay invoices because fees to FL3XX were not yet due since the relevant

7   customers were not yet commercially using the FL3XX software.  As for the audit, FL3XX never

8   demanded from Stellar the specific information it sought.  Moreover, FL3XX has not pointed to

9   any information that was not obtained through discovery in this case (hence, no harm).

10

71.     Although Stellar did not breach the RRA, it does admit that, after the parties were

11   in litigation, it received some revenues, some of which should be shared with FL3XX.  *See* Docket

12   No. 144 (Pl.'s Post-Tr. Br. at 25-26) (indicating that Stellar owes FL3XX "either $10,937.41 . . .

13   or $18,105.41 . . . depending on how Invoice 31535 to Phoenix Air Group is categorized").  The

14   Court orders the parties to meet and confer to resolve this dispute.

15   **G.     FL3XX's Claim for Intentional/Negligent Interference with Prospective Economic**

16   **Relations**

17

72.     The elements of a claim for intentional interference with prospective economic

18   relations are: "(1) the existence, between the plaintiff and some third party, of an economic

19   relationship that contains the probability of future economic benefit to the plaintiff; (2) the

20   defendant's knowledge of the relationship; (3) intentionally wrongful acts designed to disrupt the

21   relationship; (4) actual disruption of the relationship and (5) economic harm proximately caused

22   by the defendant's action."  *Roy Allan Slurry Seal, Inc. v. American Asphalt S., Inc.*, 2 Cal. 5th 505

23   (2017).  "[T]he alleged interference must have been wrongful by some measure beyond the fact of

24   the interference itself."  *Crown Imports, LLC v. Superior Court*, 223 Cal. App. 4th 1395, 1404

25   (2014).

26

73.     The elements of a claim for negligent interference are similar, though reflective of a

27   lesser state of mind.  *See Nelson*, 48 Cal. App. 5th at 944 n.5 (stating the elements as follows: "(1)

28   the existence of . . . [an] economic relationship between the plaintiff and a third party containing

United States District Court
Northern District of California

the probability of future economic benefit to the plaintiff; (2) the defendant's knowledge (actual or construed) of the relationship; (3) the defendant's knowledge (actual or construed) that the relationship would be disrupted if the defendant failed to act with reasonable care; (4) the defendant's failure to act with reasonable care; (5) actual disruption of the relationship; and (6) resulting economic harm.")

74.     FL3XX claims wrongful conduct by Stellar because (a) Stellar claimed it was still FL3XX's reseller after FL3XX had terminated the RRA, (b) continued to provide service to customers after FL3XX had terminated the RRA, (c) accessed and used FL3XX software without authorization, and (d) browsed and altered customer data on the FL3XX software program.  Even if Stellar did engage in the identified conduct, it was not wrongful or did not constitute interference given that FL3XX had not properly terminated the RRA.

75.     Furthermore, FL3XX has failed to demonstrate that it sustained any injury as a result of such conduct.  To the extent FL3XX suggests that it had to expend labor costs to address the asserted intrusion by Stellar, there was no competent evidence to support that claim.

## H.     **FL3XX's Unjust Enrichment Claim**

76.     Like Stellar, FL3XX has no viable unjust enrichment claim because the parties' relationship was governed by express contracts.

## I.     **FL3XX's Claims for Trespass to Chattel and Violation of the California Data Access and Fraud Act (Cal. Pen. Code § 502 *et seq.*)**

77.     FL3XX asserts claims for trespass to chattel and violation of the California Data Access and Fraud Act ("DAFA"), alleging that Stellar, *e.g.*, improperly accessed FL3XX software or customer data or added, altered, or deleted FL3XX software-related data, including customer data.

78.     The elements of a claim for trespass to chattel are: "(1) Plaintiff owned/possessed/had a right to possess the personal property; (2) Defendant[] intentionally interfered with Plaintiff's use or possession of the personal property or intentionally damaged the personal property[;] (3) Plaintiff[] did not consent; (4) Plaintiff[] [was] harmed; and (5) Defendant['s] conduct was a substantial factor in causing Plaintiffs' harm." *Kian v. Pac. W. Sign*,

1  No. 34-2019-00271062-CU-PO-GDS, 2023 Cal. Super. LEXIS 7428, at *7 (Sac. Cty. Sup. Ct.

2  Mar. 1, 2023) (citing CACI 2101).

3      79.    In general, the California DAFA "'prohibits unauthorized access to computers,

4  computer systems, and computer networks.'"  *McGowan v. Weinstein*, 505 F. Supp. 3d 1000, 1020

5  (C.D. Cal. 2000).

6      80.    As above, the allegedly wrongful conduct was not wrongful or did not constitute

7  interference given that FL3XX had not properly terminated the RRA.  Furthermore, FL3XX has

8  failed to demonstrate that it sustained any injury as a result of Stellar's conduct.  To the extent

9  FL3XX suggests that it had to expend labor costs to address the asserted intrusion by Stellar, there

10  was no competent evidence to support that claim.

**J.    Summary**

11

12     81.    Stellar has proved by a preponderance of the evidence that FL3XX breached the

13  RRA.  The damages awarded are $100,000.

14     82.    Stellar has proved by a preponderance of the evidence that FL3XX breached the

15  MSAA.  The damages awarded are $1 million.

16     83.    Stellar does not have a viable unjust enrichment claim because the parties'

17  relationship was governed by express contracts.

18     84.    Stellar has proved by a preponderance of the evidence that FL3XX intentionally

19  interfered with the contracts that Stellar had with customers.  However, Stellar has failed to prove

20  damages in excess of $100,000.  Also, an award of $100,000 would be duplicative of the award

21  for the claim for breach of the RRA (*i.e.*, the same basic harm is claimed).

22     85.    Stellar has failed to prove by a preponderance of the evidence that FL3XX defamed

23  Stellar or that Stellar was damaged as a result.  In addition, special damages cannot be awarded

24  per the terms of the MSAA/RRA.

25     86.    FL3XX has failed to prove by a preponderance of the evidence any of its claims

26  against Stellar and/or that it was damaged.  In addition, its unjust enrichment claim is not viable

27  because the parties' relationship was governed by express contracts.

28     **The Clerk of the Court is ordered to enter a final judgment awarding $1.1 million to**

1  **Stellar.**  Although the Court is ordering entry of a final judgment, it shall hold a final status

2  conference to ensure all matters have been resolved.  The status conference shall be held on April

3  16, 2024, at 2:30 p.m.  The parties shall file a joint status report one week in advance.

4

5     **IT IS SO ORDERED**.

6

7  Dated: March 25, 2024

8

9  _____

10  EDWARD M. CHEN
   United States District Judge